UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

|  |  |
|---|---|
| IN RE DXC TECHNOLOGY COMPANY SECURITIES LITIGATION | ) ) No. 1:18-cv-01599-AJT-MSN ) ) ) <u>DEMAND FOR JURY TRIAL</u> ) ) ) |

## <u>CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>

## TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ................................................................................................. 1

II. JURISDICTION AND VENUE .......................................................................... 7

III. PARTIES ............................................................................................................. 8

  A. Lead Plaintiffs ......................................................................................... 8

  B. Defendants ............................................................................................... 9

IV. SUMMARY OF THE ACTION ........................................................................... 9

  A. Lawrie and Saleh Orchestrate a Merger with HPE to Create DXC. ...... 9

  B. Throughout the Class Period, Defendants Assure The Market That The
    Reorganization Is Proceeding Well. ..................................................... 12

V. THE TRUTH IS REVEALED IN THE FALL OF 2018 .................................. 24

  A. Reports Emerge That DXC's Business Is "In Chaos," But Defendants Reaffirm
    Their Guidance. ..................................................................................... 24

  B. The Truth Fully Emerges As Defendants Reveal An Enormous Revenue Shortfall
    And Issue Revised Guidance Showing Decline, Not Growth. ............. 26

VI. DEFENDANTS MISLED INVESTORS THROUGHOUT THE CLASS PERIOD
  ABOUT DXC'S TRANSFORMATION ........................................................... 31

  A. DXC's Former Head of Global Delivery Exposes Defendants' Deception ........ 32

  B. Former Employees Corroborate that Defendants Made "Chaotic" and "Sub-
    Optimal" Firing Decisions. ................................................................... 37

  C. Defendants Personally Learned About "Negative Impacts On Customer
    Satisfaction" From Their Workforce Reductions. ................................ 41

  D. Defendants Knew That They Could Not Bring On The Resources Needed To
    Support Their Promised Growth. ........................................................... 44

  E. Defendants Had Access To, And Knowledge Of, Information Undermining Their
    Projections And Revenue Guidance. ..................................................... 48

  F. Defendants Classified "Digital" Offerings To Manipulate The Market. .............. 50

VII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ... 52

i

A.     Defendants' False and Misleading Statements and Omissions Concerning DXC's Revenue Growth ........................................................................................... 52

B.     Defendants' False and Misleading Statements and Omissions Concerning DXC's Workforce Management and "Optimization" ......................................................... 56

C.     Defendants' False and Misleading Statements and Omissions Concerning DXC's "Investment in People" ..................................................................................... 63

D.     Defendants' False and Misleading Statements and Omissions Concerning DXC's Digital Growth ...................................................................................... 69

E.     Defendants Overstated the Value of the Company's Largest Asset ..................... 69

VIII.    LOSS CAUSATION ........................................................................................... 71

IX.    ADDITIONAL SCIENTER ALLEGATIONS ................................................. 72

X.    PRESUMPTION OF RELIANCE ..................................................................... 75

XI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................. 78

XII.    CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ................... 78

XIII.    CLASS ACTION ALLEGATIONS ................................................................. 80

XIV.    PRAYER FOR RELIEF ..................................................................................... 82

XV.    JURY DEMAND ................................................................................................ 83

CERTIFICATE OF SERVICE ...................................................................................... 86

Lead Plaintiffs KBC Asset Management NV and Arbejdsmarkedets Tillaegspension (collectively, "Lead Plaintiffs"), by and through their undersigned counsel, bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder. Lead Plaintiffs bring this class action on behalf of themselves and all other persons or entities who purchased or otherwise acquired the publicly-traded securities of DXC Technology Corporation ("DXC" or the "Company") during the period from February 8, 2018 to November 6, 2018, inclusive (the "Class Period") and were damaged thereby (the "Class").[1]

## I.   INTRODUCTION

1.     This is a case where Defendants lied about the purported success of the "strategic roadmap" for their new Company. In direct contrast to their public statements, Defendants knew that their reorganization plan was cutting the Company's workforce and reducing costs so aggressively that it was dramatically damaging the company's ability to service its clients and impairing the Company's long-term sustainability.

2.     DXC is an information technology ("IT") company that was formed from the merger of two other IT companies and began trading on the New York Stock Exchange ("NYSE") on April 3, 2017. As discussed in more detail below, during the Class Period, DXC engaged in a ruthless cost-cutting and "workforce optimization" strategy that Defendants claimed was transforming the Company and positioning it for strong financial performance and growth.

3.     In reality, this strategy was doing the exact opposite. By the start of the Class Period, DXC's leaders had been repeatedly warned, including by their most senior management, that their chaotic cuts to the Company's workforce and facilities were resulting in extreme

---

[1] Unless otherwise noted, all emphasis herein is added.

customer dissatisfaction, the departure of key employees, and impeding the Company's ability to secure and generate revenue on new contracts. Because confronting these facts contradicted the growth thesis that Defendants hold sold the market, Defendants ignored these red flags and instead chose to deliberately mislead investors about the purported success of their reorganization efforts—artificially inflating DXC's stock price and reaping tens of millions of dollars in insider stock sales and unwarranted performance-based compensation awards for themselves.

4.      The primary architects of DXC's reorganization strategy were Defendant J. Michael Lawrie ("Lawrie") and Defendant Paul N. Saleh ("Saleh"), DXC's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), respectively. Defendants Lawrie and Saleh expressly acknowledged that DXC was in a service industry and its employees were "a key pillar" of the Company and that it was "critical that we have the right mix of people with the right skills to serve our clients[.]" Thus, during the Class Period, Defendants repeatedly told investors that their plan was "not just about cost reduction" from randomly slashing costs and firing employees to save money in the short term, but instead strengthened DXC's business by "simplifying the organizational structure," "optimizing the workforce," and "putting quite a bit of investment" into a long-term strategy designed to keep existing clients satisfied and allow the Company to experience significant future growth.

5.      On February 8, 2018, the first day of the Class Period, DXC held an investor conference call during which Defendants reported favorable financial results and stated that they continued to execute on this "strategic roadmap." Defendant Lawrie told investors that investments made in training employees was one of the "critical factors" that allowed DXC to generate revenue and grow the business. According to Lawrie, the Company was "attracting now some really good

talent in the cyber business," which, in turn, permitted DXC "to more cost-effectively deliver existing business while staffing the required labor for new business."

6.   On multiple occasions during the Class Period, Defendants made similarly positive statements. Defendant Lawrie, for example, repeatedly stated that DXC had "improved service levels for our clients," and that the Company's reorganization efforts were having "an enormously positive impact on our business." He particularly highlighted supposed increases in "customer satisfaction" and on multiple occasions represented that the Company was performing well on its current client contracts "while staffing the required labor for new business." Defendants also continuously emphasized that they were investing heavily in training their "critical" workforce.

7.   Along with these statements, Defendants provided positive revenue and other guidance to the market. On May 24, 2018, Defendants Lawrie and Saleh told the market to expect $21.5 billion to $22 billion in revenue for fiscal 2019—guidance indicating that Defendants' transformative plan was working and had managed to moderate and perhaps even turn around legacy IT industry trends. They reiterated this guidance on August 7, 2018, and again a week later during the Company's annual shareholder meeting. During that meeting, Defendants again stated that DXC was "providing unsurpassed value for [its] clients."

8.   In late August 2018, reports began to surface in trade publications that all was not well behind the scenes at DXC. An August 17, 2018 article in *The Register* reported that employees at DXC had stated that the Company was struggling to perform its client contracts because of the massive workforce reductions. Defendants sprang quickly into action to quash those reports, holding a series of meetings with analysts covering DXC and assuring those analysts that the Company's clients were satisfied and the Company was well positioned for sustained growth. This

effort had the desired effect, ensuring that DXC's stock price did not fall as analysts issued positive reports in early September 2018.

9.      At that same time, Defendants took advantage of DXC's inflated stock price to enrich themselves through tens of millions of dollars in insider sales. For instance, during the short eight-month Class Period, Defendant Lawrie sold 110,540 shares of DXC stock—more than 17% of his holdings—for personal proceeds of more than *$10 million* (after selling no shares whatsoever for the eight months prior to the Class Period). Defendant Saleh, in turn, sold a staggering *seventy-seven percent* of his personal holdings for more than $9 million in proceeds during the Class Period. All of these sales were made at the same time that these Defendants were making aggressively positive statements to the market regarding the supposed success of DXC's reorganization efforts.

10.      Unfortunately for investors, the reality inside DXC stood in stark contrast to Defendants' rosy public statements. As Defendants Lawrie and Saleh knew, in their efforts to reduce costs in order to report seemingly strong short-term financial performance, they had caused DXC to make such drastic workforce reductions that the Company was becoming unable to deliver on its client contracts and client dissatisfaction was running at an all-time high. Numerous former employees of DXC have stated that the so-called "workforce optimization" Defendants had enacted was, in reality, little more than earnings management in disguise—a system of arbitrary quotas that fired workers by the tens of thousands and was selectively timed to present the most favorable quarterly and yearly financial reports. As detailed below, former employees have explained that these cuts were made with no real plan other than to improve the Company's short-term results, and targeted knowledgeable, longer-tenured (and thus more expensive) senior personnel.

11.     There can be no question that Defendants knew their public assurances about the success of DXC's reorganization efforts and long-term business prospects were false. DXC's most senior executives expressly told Defendants about the severe issues behind the scenes. The workforce reductions fell most heavily on the largest of the Company's three divisions, referred to as "Delivery," which included the tens of thousands of employees who were tasked with actually performing the contracts DXC had with its clients. (The two other functional divisions of the Company were "Build" and "Sell."). At the start of the Class Period, the senior executive in charge of this division and its approximately 120,000 employees was Executive Vice President, Head of Global Delivery, Stephen J. Hilton ("Hilton"), who reported directly to Defendant Lawrie and was listed in DXC's SEC filings as one of the five top named executive officers of DXC.

12.     In a complaint filed in federal court for the Southern District of New York, *Hilton v. DXC*, No. 19-cv-01157 (S.D.N.Y. Feb. 6, 2019) (the "Hilton Complaint"), Hilton details how Defendant Lawrie had focused so extensively on cutting costs and firing employees in order to present rosy short-term financials to Wall Street, that the Company was dangerously impaired in its ability to actually 'Deliver' on its client service contracts. Hilton explains how he personally warned Lawrie that the pace of DXC's cost cutting and massive layoffs was having direct "negative impacts on customer satisfaction" and compromised DXC's long-term success, and how Lawrie's budgets and forecasts were unachievable.

13.     As Hilton put it, the precipitous cuts that Defendant Lawrie forced on the Company were "disastrous for DXC's long-term revenue," because they would hamstring the Company's customer satisfaction and relationships. Hilton "repeatedly advised Lawrie" about these issues, but Lawrie pushed forward with a "chaotic and non-collaborative" layoff effort that harmed DXC. Hilton further alleges that Lawrie terminated him and attempted to deprive him of millions of

dollars of stock options to which Hilton was entitled because he directly confronted Lawrie about these issues.

14.     The Hilton Complaint also attaches an internal letter written by Defendant Lawrie himself on May 15, 2018. In this letter, Lawrie says that Hilton had failed to achieve the required cost-cuts and imperiled DXC relationships, and accuses Hilton of "material misconduct" and a "substantial and will failure to render services."

15.     Defendants concealed these shocking developments from the public. To the contrary, less than ten days after writing his alarming letter to Hilton, Lawrie spoke to investors on the Company's earnings call for the conclusion of its first fiscal year and disclosed not a hint of the failures he claimed were occurring in Hilton's division. To the contrary, he bragged that Defendants had "really successfully completed the overall year 1 integration road map," had "***track[ed] a bit ahead of plan on revenue***," and "profit was . . . ***better than expected*** as we were able to ***accelerate many of the cost takeout synergies***[.]" Indeed, as for Hilton's division, Lawrie told investors that "our delivery teams continued to drive increased productivity while improving service levels for our clients."

16.     These public statements cannot be squared with Defendant Lawrie's internal letter to Hilton. Nor can they be squared with information obtained from multiple former employees who, as described in more detail below, note that by the start of the Class Period, "Delivery" was on "pins and needles" because they simply did not have enough skilled employees to execute on their customer contracts. As experienced and essential employees were forced out, the problem only worsened and clients expressed enormous frustration with the Company. Numerous former employees noted that Lawrie knew (but did not care) that his workforce reductions "could not be

achieved at the pace required by his internal budget" and the Company was struggling to keep customers satisfied and marshal the resources to generate revenue from new contracts.

17.     On October 24, 2018, the truth began to emerge when *The Register* published another article reporting that DXC had fired a senior executive named Karan Puri ("Puri"). Puri had been hired just months before with Lawrie describing him as a "top-notch senior IT services business leader." The article quoted insiders at DXC who stated that the Company was "***descending into turmoil***" and in early October Lawrie had called a "town hall" meeting where he announced additional firings and blamed Puri for a "***10-15 percent shortfall in [forecast] revenues***." This news caused DXC's stock price to decline by more than 16%, from $87.56 per share to $73.25 per share.

18.     The Company responded by filing a Form 8-K "in response to today's movement in the stock of DXC" that reiterated the Company's previous EPS guidance. On November 6, 2018, DXC filed another Form 8-K, which reported the Company's second quarter fiscal year 2019 earnings. This Form 8-K disclosed that the Company had in fact—as Defendant Lawrie had been warned internally—suffered a disastrous 8% decline in year-over-year revenue, with a revenue shortfall of more than $440 million. As a result, DXC's stock price dropped over 12%, from $72.21 per share to $63.21 per share, on extremely high trading volume.

## II.     JURISDICTION AND VENUE

19.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a). DXC maintains its corporate headquarters in Tysons, Virginia, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.

22.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiffs

23.     Lead Plaintiff KBC Asset Management NV ("KBC") is a Belgium-based institutional investor established in 2000 that provides its services to pension funds, insurance companies, banks, and other private customers. As of the end of 2017, KBC managed assets of approximately EUR 219 billion (approximately $248 billion). As reflected in KBC's certification on file with the Court (ECF No. 22-2), KBC's funds purchased shares of DXC stock on the NYSE during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint.

24.     Lead Plaintiff Arbejdsmarkedets Tillægspension ("ATP") is a Denmark-based pension fund established in 1964 that provides retirement allowances and other benefits to Danish citizens. At the end of 2018, ATP managed more than 785 billion DKK (approximately $119 billion) in net assets for the benefit of more than 5 million members. As reflected in ATP's certification on file with the Court (ECF No. 22-2), ATP purchased shares of DXC stock on the

NYSE during the Class Period and suffered damages as a result of the violation of the federal securities laws alleged in this Complaint.

**B.      Defendants**

25.      Defendant DXC Technology Company is incorporated in the state of Nevada and trades on the NYSE under the symbol "DXC." The Company's principal place of business is located at 1775 Tysons Boulevard, Tysons, Virginia 22102.

26.      Defendant J. Michael Lawrie ("Lawrie") has served as DXC's Chairman of the Board, President, and Chief Executive Officer since April 1, 2017. Prior to starting DXC, Lawrie served as the Chief Executive Officer of Computer Sciences Corporation ("CSC"), beginning on March 19, 2012.

27.      Defendant Paul N. Saleh ("Saleh") has served as DXC's Executive Vice President and Chief Financial Officer since April 1, 2017. Prior to starting DXC, Saleh served as CSC's Chief Financial Officer, beginning on May 23, 2012.

28.      Defendants Lawrie and Saleh are collectively referred to herein as the "Individual Defendants."

**IV.      SUMMARY OF THE ACTION**

**A.      Lawrie and Saleh Orchestrate a Merger with HPE to Create DXC.**

29.      DXC was formed on April 1, 2017 through the merger of CSC and Hewlett Packard Enterprise Company ("HPE"). Founded in 1959, DXC's primary predecessor, CSC, grew dramatically during the 1990s, as large companies and the United States government moved to outsource IT operations.

30.      Defendants Lawrie and Saleh joined CSC as CEO and CFO, respectively, in 2012, at a time when CSC was embroiled in turmoil. An internal investigation conducted by outside counsel in 2011 had revealed that CSC and its former executives had falsified financial results to

hide losses from a failed deal with the United Kingdom's National Health Service. After Lawrie and Saleh joined the company, CSC settled related securities fraud claims with the SEC for $190 million and with a class of injured shareholders for $97.5 million in a civil class action in this District.

31.     In the wake of these scandals, CSC's old guard was replaced with Lawrie and Saleh. They immediately implemented significant cost-cutting and outsourcing, that had the short-term effect of raising CSC's stock price. However, while an August 1, 2015 article in *The Washington Post* noted that CSC could be viewed as "***a case study of everything people think is wrong with American capitalism***: Misleading investors through rosy accounting. Golden parachutes and excessive executive pay. Ruthless cost-cutting and outsourcing of jobs overseas. Plumping up share prices through stock buybacks, special dividends and other feats of financial engineering."

32.     By 2016, the negative news that had plagued CSC—which included several notable contract losses and employment disputes under Lawrie and Saleh's management– had created what was described in the press as "toxic" brand association for the company.

33.     In May 2016, Defendants Lawrie and Saleh announced their intention to create a new company through the merger of CSC and HPE, from which Defendants would form DXC.

34.     At the first DXC investor day for analysts on March 29, 2017—just prior to the close of the acquisition—Defendant Lawrie told investors that Defendants had a "very straightforward" plan: DXC would overcome the declining traditional IT market by leveraging the combined client base of CSC and HPE to drive costs lower, and in turn convince those clients to "reinvest that savings back into modernizing your application portfolio" and embark on a "Digital Transformation" through DXC's digital solutions and services.

35.     Thus, critical to this plan, were the billions of dollars in synergies that Defendants said would allow the Company to generate $2.5 billion in cost-savings over DXC's first three years, with $1 billion in cost-savings in DXC's first year alone.

36.     Chief among these "cost-savings" efforts was Defendants' "workforce optimization" plan, pursuant to which DXC would fire thousands of employees. Given the reasonable concern that such a massive disruption to the Company's workforce could threaten the Company's ability to deliver, Defendants actively reassured the market that the Company's cost-cutting efforts were not hurting the Company's "critical" ability to execute for clients. For example, on August 8, 2017, Defendant Lawrie stated on an investor conference call, "[W]e put 2 pretty big companies together and launched it, and we didn't see the disruption. ***We didn't see the disruption in our service delivery, which is critical.*** And we saw the sales engine continue to go."

37.     As Defendant Lawrie himself said, Defendants made these reassuring statements because, "[a]s a services business, our people are a key pillar of our strategy . . . it's critical that we have the right mix of people with the right skills to serve our clients and to drive innovation and to compete in a very dynamic workplace." In the same vein, Lawrie assured investors that the Company was aggressively investing in training for its employees, stating: "We're investing to enhance and increase the skills, knowledge and capabilities of our global workforce," including platforms "to identify and engage new pools of talent in near real-time . . . enabl[ing] us to bring new people and skills to DXC as we need them." Thus, Lawrie assured investors, while Defendants were "executing fairly expeditiously" on the synergies, they were "at the same time investing in the future," including by investing in DXC's remaining personnel.

38.     On September 8, 2017, Lawrie told the audience at a Citi Global Technology Conference that "the whole workforce optimization is pretty much progressing exactly as we thought it would. We have delayered the organization."

**B.      Throughout the Class Period, Defendants Assure The Market That The Reorganization Is Proceeding Well.**

1.      <u>The Individual Defendants reassure the market by boasting that they had cut $1 billion in costs ahead of schedule.</u>

39.     On January 18, 2018—just before the start of the Class Period—*The Register* reported the existence of an internal DXC memorandum sent by Defendant Lawrie revealing that DXC had upended its entire management structure, including most prominently the termination of Executive Vice President and General Manager Mike Nefkens, who had come over from HPE. In addition, Lawrie stated that DXC would appoint as General Manager for the Americas region someone whom Lawrie described in the memo as "a top-notch senior IT services business leader who has driven growth across multiple industry verticals in the region"—later revealed to be Puri. As quoted by *The Register*, Lawrie stated that the regions and industries portion of DXC would now report to Lawrie himself to "improve agility and speed of decision-making." Lawrie emphasized that "[a]ll of the changes being announced today have a single goal: creating long-term growth and success for DXC and our people. We will more effectively engage our clients, partners and employees, and will better position the company to innovate, sell, deliver and grow."

40.     The Class Period begins on February 8, 2018, when Defendants issued a press release announcing DXC's third quarter fiscal year 2018 results,[2] which quoted Defendant Lawrie as stating that DXC had "continued to execute on our strategic roadmap during the third quarter,

---

[2] DXC uses a fiscal year ending on March 31.

during which the company delivered year-over-year and sequential growth in earnings per share, margins and cash flow."

41.     During a conference call held after the close of business on February 8, 2018, Defendants explicitly tied the Company's improved financial performance to their cost-cutting efforts. For example, Defendant Lawrie stated that the Company's improved earnings "reflect[ed] ongoing cost actions we're taking, consistent with the synergy plans outlined at our Investor Day." Lawrie claimed that DXC had "continued to achieve merger integration milestones" by already reaching the $1 billion in cost savings projected for the fiscal year—with one quarter still left in DXC's fiscal year—and as a result the Company was now "on track to deliver $1.1 billion or more of year 1 cost savings, which implies roughly $1.6 billion of run rate cost saving exiting fiscal 2018."

42.     Lawrie attributed the cost savings to "workforce optimization actions, including the acceleration of management reductions and the global deployment of our automation program," Bionix. Lawrie assured investors that the Company's massive workforce reductions actually improved performance by allowing DXC "***to more cost-effectively deliver existing business while staffing the required labor for new business***."

43.     The "new business" Defendant Lawrie was referring to was the Company's purported mission of "Digital Transformation," which Defendants continued to tell investors was the Company's future for growth. During the call, Lawrie described how he personally had traveled on the road for two weeks visiting clients, and confirmed that they "all have plans" to digitize and needed help doing so from companies like DXC. As opposed to the overarching focus on cost savings in the business generally, Lawrie and Saleh spoke of the investments being made to capture this demand for digital services. While Lawrie acknowledged that "there's a lot of work

to do to capture that demand," he assured investors that DXC had taken significant steps towards that work. For example, he said that Defendants were "making a big, organic investment around trying to ignite . . . digital sales" by, among other things, specialization: "beginning to move in a direction of having one team responsible for the legacy or the run environments that we have, and then a separate team that is focused, in many cases, on disintermediating and driving digital platform growth."

44.     Lawrie also stated that Defendants would convert this "pipeline growth" into revenue for DXC through "the investment we're making in reskilling our people." Despite the Company's layoffs of tens of thousands of employees, Lawrie emphasized that the hunt for new, skilled people was a major focus that was already paying off, stating: "We are definitely ***attracting now some really good talent in the cyber business***" by "reengineering some of our most fundamental business processes, how we hire, how we recruit, how we onboard, how we train, how we retain. That whole end-to-end process around people is ***absolutely critical*** to a business that is people-based."

45.     Ultimately, Defendant Lawrie assured investors that DXC was making progress in "reshaping . . . capabilities relative to what clients are looking for," and noted that the creation of DXC "ha[d] not only generated significant synergies, as we are witnessing in terms of the results that are being published in here, ***but really is allowing us to respond and scale, and scale***. . . . [A]nd we think that's going to have long-term benefit."

46.     On February 9, 2018, Defendants filed DXC's Form 10-Q for the third quarter fiscal year 2018, which reiterated and expanded on some of the same messages.

47.     Analysts responded positively to Defendants' statements. For example, in its February 8, 2018 analyst report, Jefferies reported that the Company's "profit beat was driven by

cost synergies from workforce optimization and automation," with the "ongoing cost-cutting actions" creating "increasingly healthy" operating margins across the Company.

48.     Likewise, also on February 8, 2018, an analyst for SunTrust Robinson Humphrey wrote that DXC's "pipeline of work appears strong," citing "gains in digital." This analyst praised Lawrie and Saleh, noting that "[o]nce again, the management team met high expectations in driving margin improvement through efficiency gains, vendor management, cost control and profitable new work." The report concluded by valuing DXC shares "between $108 and $118 per share in the next 12 months"—approximately $28 to $38 more than it was trading at the close of the market that day—citing "the opportunity for continued growth through both acquisitions and *execution*."

49.     Another analyst, Evercore ISI ("Evercore"), wrote that DXC's earnings release revealed "healthy demand globally, particularly in digital and demonstrating DXC's strong technology partnerships, which continue to deepen as DXC expands its digital assets through internal investments, people, and acquisitions."

50.     The market reacted positively to Defendants' February 8 and 9 statements, with the Company's stock climbing 5.7% on February 9, 2018.

51.     Throughout the quarter, Defendants met separately with analysts and made positive statements about DXC's sales and targeted staffing growth. For example, on March 15, 2018, Susquehanna published an analyst report entitled "DXC Technology: Meeting Reveals Improved Growth Prospects," which stated that "[m]eetings suggest increased conviction around growth prospects in DXC's ~$4 bln Digital practice," as "CEO Lawrie has committed to his sales organization to invest for growth in Digital, *with the company beginning to hire aggressively* in areas such as Analytics." The Susquehanna report also described being told "about a focused

strategy" for digital sales where "the legacy CSC and HPE sales force is being trained to take Analytics into the customer" with the use of "separate digital account leaders . . . pushing and driving revenue in those businesses."

52.     In a presentation available publicly on the DXC website on April 17, 2018, DXC told investors that the Company was "different" in part because of its "World-Class Talent," stating, "We are investing to attract and upskill the talent who will lead global business tomorrow." DXC also promoted the Company's "[d]eep experience in digital solutions," purporting to have tens of thousands of qualified digital employees. The presentation also promised DXC's "continued investment to upskill and attract next-level talent," with "22K+ certifications completed in FY16." In conclusion, the presentation quoted Defendant Lawrie: the Company's clients were "facing major disruptive changes" that Defendants were "meeting . . . with ***highly talented people***."

53.     Defendants continued these upbeat messages in announcing DXC's fiscal year earnings on May 24, 2018. In a press release issued that day, Defendant Lawrie stated that DXC "successfully executed on our strategic roadmap" and "continue[d] to invest in our digital capabilities and strategic partnerships, and we achieved strong growth in digital this year."

54.     Defendants went even farther during the earnings call that day, with Defendant Lawrie stating that "[p]rofit during the first year was . . . better than expected" thanks to "execution of the synergy plans we outlined at our Investor Day last March, including workforce optimization, supply chain efficiencies, policy harmonization and facilities rationalization." Defendant Saleh likewise attributed the Company's "improvement in profitability" to "cost actions we've taken to optimize our workforce, harmonize our policies, extract greater supply chain efficiencies and rationalize our real estate footprint," stating specifically that DXC had "continued to rebalance our

workforce" by reducing DXC's labor base by nearly 12.6% in the prior year, even as Defendants had hired "roughly 20,000 new employees during the year with a significant focus on digital capabilities."

55.     Defendants assured investors that these net reductions in the overall labor base did not negatively impact the Company's execution, but had actually improved performance. Defendant Lawrie equated "significant reductions [in headcount]" as synonymous with "increased productivity," and boasted, "Our delivery teams continued to drive increased productivity while improving service levels for our clients." Likewise, when asked by an analyst to "broadly outline . . . some of the work you're going to be doing on – the current drive revenue growth," Lawrie focused on DXC's achievements in improved customer service and ability to improve customer satisfaction results, affirmatively stating that "improved service levels . . . has an enormously positive impact on our business." Lawrie concluded by telling investors that, "Our customer satisfaction last year went up. So in the first year of integration, all we did, customer satisfaction continued to increase. So continuing to drive our cost structure and the productivity and improve service delivery is an absolutely critical objective as we look out."

56.     In addition, Defendant Lawrie emphasized that "workforce management, the reskilling of our people is *a key priority* [for] our whole digital initiative as we continue to want to increase the percent of revenue that we get from digital to offset the natural headwinds we have in the ITO business, some of the other legacy businesses[.]" Lawrie added that DXC "continue[s] to invest in our people," highlighting that DXC employees had in the last year "completed more than 1.5 million hours of training with a heavy focus on digital certifications" and that Defendants had "expanded our sales training and certification program beyond our go-to-market teams, and more than 17,000 employees have completed the training and passed the certification exam."

57.     Ultimately, Defendant Lawrie told investors, Defendants' strategy "is beginning to get some real traction with our larger clients," and stated, "No question, we're seeing some momentum in growth. I mean, I haven't been on a lot of earnings calls where I could actually use the word growth before the number." Alongside that backdrop, Defendants provided DXC's fiscal year 2019 guidance, telling investors to expect revenue of $21.5 billion to $22 billion; EPS of $7.75 to $8.15; and adjusted free cash flow of 90% or more of adjusted net income (the "Fiscal Year 2019 Guidance"). Discussing the "cadence" of the Fiscal Year 2019 Guidance, Defendant Saleh stated, "I think what we will see is a relatively consistent performance throughout the year, growing a little bit more in the second half of the year on a sequential basis."

58.     Analysts reacted positively to Defendants' statements of disciplined cost-cutting, digital growth, and revenue guidance. In its May 24, 2018 report, Jefferies described the Fiscal Year 2019 Guidance as "a notable acceleration," and adding that "[c]ontinued cost savings and revenue acceleration help to keep this story going in F19. The company sounded a confident tone around revenue acceleration . . . driven by solid demand for enterprise application transformation projects and other digital capabilities." In its May 25, 2018 report, J.P. Morgan wrote that "the underlying theme of solid execution on cost cutting remains intact" and that it was "continu[ing] to recommend DXC as a top pick in our coverage universe. . . ."

59.     On May 29, 2018, DXC filed its Form 10-K for fiscal year 2018, which was signed by the Individual Defendants and reiterated many of the same claims Defendants had made days earlier. For example, Defendants stated in the filing that, "[d]uring fiscal 2018, we surpassed our first year HPES Merger integration milestones, delivering over $1 billion of year one cost take-out . . . primarily driven by workforce optimization actions including the acceleration of management reductions and the global deployment of our automation program, Bionix." Indeed, in the Form

10-K, Defendants further described their restructuring plan, stating that it had been developed "to optimize the Company's operations in response to a continuing business contraction" and included "initiatives . . . intended to reduce the company's core structure and related operating costs, improve its competitiveness, and facilitate the achievement of acceptable and sustainable profitability" by "focus[ing] mainly on optimizing specific aspects of global workforce, increasing the proportion of work performed in low cost offshore locations and re-balancing the pyramid structure."

60.     The Form 10-K assured investors that the cost-cutting had not weakened the Company's ability to increase sales and service customers, but had, instead, "further enhanced our workforce management processes to cost-effectively deliver existing business while staffing the required labor for new business."

61.     As with the earnings release days earlier, the market accepted and reacted positively to Defendants' representations. For example, SunTrust issued a report that day entitled, "A Cleaner Story on the Horizon; Reiterate Buy." In it, SunTrust wrote that "Revenue guidance . . . was solid in our view" and noted positively that DXC's "workforce optimization" had "reduced headcount" while still "continu[ing] to invest in retraining and re-skilling employees."

## 2.     The Individual Defendants emphasize DXC's customer satisfaction as they tell investors that the Company is on track.

62.     On June 29, 2018, DXC filed its annual proxy statement (the "June 2018 Proxy"). In it, Defendants claimed that the Company's "performance in fiscal 2018" had "exceed[ed] its external expectations on revenue, profitability, and *customer satisfaction*," including "stable revenue" and "$1.1 billion of in-year synergies during fiscal 2018 driven by policy harmonization, workforce optimization, supply chain, and facilities rationalization." The June 2018 Proxy further emphasized that Defendants' "*continued focus on customer satisfaction*," which was a "key

metric" in the Company's executive compensation awards, had "yielded fiscal 2018 revenue, EBIT, and *customer satisfaction* results that exceeded external expectations." The June 2018 Proxy also revealed that, owing to DXC's "strong fiscal 2018 performance," including a 100% rating for "customer satisfaction," Defendant Lawrie earned a $2.5 million cash bonus, which the Company's Compensation Committee then ***doubled*** to $5 million in recognition of his "key leadership roles" played in "catalyzing the merger synergies that contributed to strong revenue and profitability results." This $5 million cash bonus was on top of his salary of $1.25 million. For the same reasons, Defendant Saleh received a 110% bonus on top of his salary, which was likewise doubled by the Compensation Committee, netting a total bonus of $1.584 million. These cash bonuses were themselves in addition to the already enormous stock and option-based awards given to the Individual Defendants that year, which brought Lawrie and Saleh's compensation totals to ***$32.185 million and $6.918 million***, respectively.

63.    In announcing DXC's earnings for the first quarter of fiscal year 2019 on August 7, 2018, Defendants disclosed that they had further cut the Company's workforce by thousands more employees, but again stressed that these cuts did not sacrifice client satisfaction. To the contrary, Lawrie again claimed that DXC was cutting while also "***improving client service levels***" through new techniques, stating, "For the first time in my career, we're achieving operating leverage in this business . . . . By automating core processes and tasks, we are able to scale client volumes and revenue without increasing variable costs" such as "labor investment." Similarly, Lawrie stated that the Company was "leveraging artificial intelligence, machine learning and bots . . . to eliminate labor from many processes."

64.    Yet, even as they boasted of their ability to cut thousands of jobs, Defendants acknowledged that a skilled workforce was "absolutely critical" for the Company to achieve the

Company's Fiscal Year 2019 guidance and broader strategic plans. Accordingly, Defendant Lawrie explained that Defendants were "making big investments" in the hiring and re-skilling of people that we have to deploy" on the Company's growing digital opportunities. Defendant Saleh concurred, stressing to investors, "I also want to tell you that we're reinvesting in the business. It's not just about cost reduction. We are -- as we mentioned, across the way, we're putting quite a bit of investment in our digital transformation ourselves and up-skilling our employee base and also training them and also attracting new talent . . . ."

65.     The market once again reacted positively to Defendants' statements. In Evercore's August 7, 2018 report, the analyst wrote that the results "reflect[ed] DXC's continual stabilization of declines in its legacy, traditional IT business" and reiterated its Outperform rating. Morgan Stanley even more assuredly wrote in its August 8, 2018 report that "revenue [is] approaching an inflection toward growth" as "Digital growth remains healthy." Susquehanna similarly wrote that "we sense increased confidence that DXC's plan is working and the surviving commercial business is easier to manage." In its August 13, 2018 report, CFRA reiterated its "Strong Buy opinion," noting that the Company's workforce reduction success was "a rarity in the IT consulting space where higher sales usually require linear headcount investment."

66.     On August 8, 2018, media reports noted that DXC share price had increased nearly 3.4% over the past month, and its market capitalization had jumped by $1 billion. When compared with the S&P 500 Index, which had fallen 2.9% in that same time period, this represented a relative price increase of 6.2%. This news demonstrated that DXC's shares had their best month since the month ending March 7, 2018.

67.     On August 15, 2018, Defendant Lawrie hosted DXC's annual shareholder meeting, where he boasted, "Today, DXC is a stronger and more versatile leading end-to-end global

technology services business that is ***providing unsurpassed value for our clients***, partners and shareholders, along with growth opportunities for our people. And we're building on the momentum established during the first 16 months with a focus on a number of key areas."

68.     The "[f]irst and foremost" "key area," according to Defendant Lawrie, was DXC's "continued shift to digital." Another "key area" was "continuing to invest in our people," with Lawrie noting that "DXC employees have completed more than 1.5 million hours of training with a focus on digital and expanded sales certifications. And we're continuing to ramp up training and certification programs and are recruiting people with the right next-gen skills." Lawrie said that Defendants would "continue to focus on [this] core priorit[y]" by "making smart strategic investments, especially in our people."

69.     Finally, Defendant Lawrie reiterated the Fiscal Year 2019 Guidance, stating Defendants' "first quarter performance ***positions us well to deliver on our financial targets for fiscal 2019***" and that "the progress we have made has enabled us to make the pivot to growth, positioning DXC to capitalize on the vast digital opportunities ahead across all industry and offering areas. . . . "

70.     That day, shareholders voted in favor of Defendants' recommendations, ensuring that Lawrie's control of the Company remained unchecked.

71.     Yet, just two days later, on August 17, 2018, *The Register* reported on additional staff firings at DXC, including that "customer support delivery – we are told by DXCers – is strained due to the headcount reduction . . . ."

72.     In response, Defendants met with analysts to deflect concerns about the Company's growth and reiterate the Company's revenue guidance. For example, on August 31, 2018, SunTrust issued an analyst report entitled "Continued Margin Expansion; Building Roots of Growth;

Takeaways from Investor Meetings," in which it described "data analysis and hosting meetings with DXC," after which the analyst "remain[s] positive on the firm's ability to drive steady margin expansion over the next 4-6 quarters." Noting as a "key topic" the Company's "growth potential and revenue trajectory," the analyst wrote that "Digital is likely to be a key growth driver – and the company believes it could growth 25% CAGR over next 3 years (including tuck-ins) offsetting declines in areas of legacy technology services work." The report also noted that DXC "believes it has competitive advantages in . . . steadily improving operational efficiency." SunTrust concluded by reiterating its Buy rating and estimates based on the Company's guidance.

73.     Similarly, on September 5, 2018, Evercore published an analyst report describing a meeting it had that day with Defendant Saleh and Jonathan Ford, DXC's Head of Investor Relations. The analyst wrote that the meetings "reinforced our conviction that, over time, DXC should generate sustainable constant currency revenue growth driven by recent investments in Cloud and Digital," and concluded, "Near-term Revenue Growth Likely: In 2H/FY19, DXC should achieve constant currency revenue growth for the first time aided by easier year-over-year comps, a moderation in declines in the legacy business, and 20%+ growth in Digital." The report also noted that Defendant Saleh "continues to see room to expand margin" through, among other things, additional workforce optimization. In a report issued the following month, on October 24, 2018, Evercore elaborated further on this September 5, 2018 meeting, stating that Defendant Saleh had explicitly "***confirmed to us that in 2H/FY19, DXC should achieve constant currency, organic revenue growth for the first time***."

## V.      THE TRUTH IS REVEALED IN THE FALL OF 2018

### A.      Reports Emerge That DXC's Business Is "In Chaos," But Defendants Reaffirm Their Guidance.

74.      On October 24, 2018, *The Register* published an "exclusive" article titled "DXC axes Americas boss amid latest deck chair musical." Citing an internal October 9, 2018 memorandum from Defendant Lawrie, *The Register* article revealed that the Company had abruptly fired the head of its Americas sales force, Puri. Puri had only been hired at DXC in January 2018, and had been touted by Lawrie at the time as "a top-notch senior IT services business leader who has driven growth across multiple industry verticals in the region" (¶39).

75.      Quoting a DXC insider, the article stated that "DXC is descending into turmoil," and that Lawrie had earlier in October called a "town hall" meeting during which he announced more firings and also "blamed Puri for *a 10 to 15 per cent shortfall in [forecast] revenues*." But, according to the insider, "There is no way Puri can have had any real chance to move the needle in the short time he was in office and this 'revolving door' style of leadership is what goes on at DXC."

76.      Finally, after noting that "*The Register* has often spoken to company sources that were concerned about the impact on serving customers," the article stated, "One of our sources on this occasion told us 'the company is in chaos as all the cuts are leading to mounting customer complaints.'"

77.      The news caused a rapid drop in DXC's stock price on high trading volume. The Company quickly responded in a Form 8-K filed before the close of business that day, titled "[i]n response to today's movement in the stock of DXC." The Form 8-K stated, "the Company reiterated guidance stated previously of earnings per share of $7.75 to $8.15 for Fiscal 2019, and that it is trending toward the higher end of that range." Later that day, the Company filed another

Form 8-K "clarifying the statement issued earlier today in its Form 8-K"—and again reaffirming its guidance.

78. Notwithstanding the Company's reassurances, the facts reported in *The Register* caused the Company's stock price to plummet 16.3% on high trading volume of 9.5 times its average daily volume, declining from $87.56 per share at the market close on October 23, 2018, to $73.25 at the market close on October 24, 2018.

79. Analysts explicitly linked *The Register* article to the dramatic drop in the Company's stock price. However, analysts mitigated these developments by relying on the Company's prior statements and express reaffirmation of its guidance that day. For example, on October 24, 2018, BMO Capital Markets issued a report stating that while "we believe DXC shares are meaningfully lower today following the publication of an article in the Register[,] [w]e don't know if the content of the article is true." BMO Capital Markets continued to place faith in Defendants, stating that "***such a steep drop in revenues would be very surprising***, as compared to bookings."

80. In another report issued on October 24, 2018, Cantor noted that, while the *The Register* article was "unsubstantiated," the analyst "believe[d] the article is causing the volatility in the name today -19%," because "investor primary focus is on DXC's ability to grow the business" and "[t]he articles contents would bring into question the company's ability to execute on growth initiatives."

81. Also on October 24, 2018, Evercore published an analyst report reporting on a direct conversation held with Defendant Saleh on September 5, 2018 where Saleh had "***confirmed to us that in 2H/FY19, DXC should achieve constant currency, organic revenue growth for the***

*first time* aided by easier year-over-year comps, a moderation in declines in the legacy business, and 20%+ growth in Digital."

82.    J.P. Morgan issued an alert entitled "Article on Americas Exec Departure Strikes a Raw Nerve," noting that "DXC stock is down 16% (vs. flat S&P 500) in response to an article from *The Register* highlighting the departure of DXC's Americas executive Puri amid sales weakness." Despite acknowledging that "Puri was a piece of the margin expansion story in our minds given background from HCL," J.P. Morgan's alert nonetheless opines that the stock decline was "overdone" after speculating—incorrectly, as the Company would soon reveal—that "our sense is that the article is referring to weak bookings (not revenue), which have been weak in recent reports."

83.    Likewise, in "Flash Comments," Wells Fargo stated that "[t]he article clearly has shaken investor confidence in what the forward outlook will be . . . Executive turnover is never a surprise at DXC, but if it relates to a notable revenue miss as the article suggest that would create concerns going into the November 8th event." Nonetheless, Wells Fargo concluded, "[g]iven reiteration of FY 19 (March) non-GAAP EPS range a lack of pre-announcement for FQ3 (September) suggests upcoming print (on November 6th) is likely near expectations . . . . Company release should help bring some near-term calm to the stock."

## B.    The Truth Fully Emerges As Defendants Reveal An Enormous Revenue Shortfall And Issue Revised Guidance Showing Decline, Not Growth.

84.    On November 6, 2018, DXC issued a press release, filed on Form 8-K, in which it reported its second quarter fiscal year 2019 earnings. This release revealed the full truth, that the Company was suffering significant revenue declines across all segments, with overall revenue down 8.1% year-over-year—or more than $440 million. The Company attributed the overall decline to "a stronger dollar, completion of several large transformation projects, and slower ramp-

up on a few large Digital contracts," while stating that declines in Global Business Services were "primarily driven by a decline in the traditional application maintenance and management business" and declines in Global Infrastructure Services "reflect[ed] the timing of client migrations from traditional to cloud environments."

85.     Defendants discussed the revenue decline further during an earnings call held after the close of business on November 6, 2018. Lawrie admitted that "revenue was down 6.2% year-over-year and roughly $200 million below our expectations for the quarter." Lawrie attributed this $200 million revenue shortfall to two "primary causes": 1) approximately $100 million from a "slower ramp-up on a few large Digital contracts"; and 2) approximately $80 million from "a decline in our application and maintenance management business," "particularly in the Americas," which Lawrie stated was down "about 3.5% year-over-year."

86.     During that call, Defendants also unexpectedly announced that, as a result of the revenue shortfall, the Company was reducing revenue guidance for the fiscal year by approximately $800 million, now projecting revenue of $20.7 billion to $21.2 billion. Thus, rather than the stabilization and growth that Defendants had promised investors during the Class Period, even the high range of Defendants' revised revenue guidance was still half a billion dollars *below* their fiscal year 2018 performance.

87.     Defendants attributed this revenue guidance reduction to the $200 million revenue shortfall that quarter as well as an additional $300 million in "revised phasing" of contracts, as well as $300 million in currency headwinds.

88.     To explain the $100 million revenue miss in "slower ramp-up" and the $300 million "revised phasing" on digital that drove the guidance reduction, Lawrie revealed for the first time, that "it is taking us longer than expected to *bring on resources to support the digital growth*."

While Lawrie had initially blamed some of the miss by claiming that "[s]everal clients were also behind in scaling their digital transformations," later in the call he admitted that was not the case: "[t]here's no question there's demand . . . when you see the bookings and you see that sequential growth in bookings, this isn't an issue with demand. ***It's an issue of being able to satisfy that demand***." Instead, Lawrie confessed that he had "run our workforce and labor programs very tightly, very tightly," and as a result they "had a very thin bench"—in other words, despite having promised throughout the Class Period that Defendants were on top of their workforce, Lawrie now revealed that Defendants did not have enough people to service demand and needed to "accelerate our hiring."

89.     The news surprised investors. For example, while Defendant Lawrie seemed to indicate that Defendants only now "recognize . . . there is substantial demand for digital skills" such that they needed to "hire ahead . . . of the demand," in fact Defendants had previously told investors that they had ***already done so***. Throughout the Class Period, Defendants told investors that they were hiring tens of thousands of new employees with a "significant focus on digital capabilities," and further that the Company had "enhanced our workforce management processes to cost-effectively deliver existing business while ***staffing the required labor for new business***."

90.     The second "primary cause" of the Company's poor results according to Defendant Lawrie was "a decline in our application and maintenance management business," to which he attributed approximately $80 million of the revenue miss. Lawrie explained the miss by stating neutrally that it "was largely driven by a reduction in application maintenance spend in several large accounts, particularly in the Americas, including HPE, as these clients remixed their IT investments"—something that Lawrie claimed he "didn't see" coming, [3] driven by clients

---

[3] Defendant Lawrie did concede that "[m]aybe Paul [Saleh]" saw this development coming.

beginning "to contemplate upgrades to some of their systems," but who "scal[ed] back on the maintenance of those existing systems." Lawrie continued: "And that did cause some of the shortfall, I think it was about $80 million, particularly in the U.S. where we're seeing some substantial plans to upgrade some of the big application platforms that our large clients have." At another point, Defendant Lawrie admitted that the $80 million shortfall related to "some execution issues" and that, "in this business, when you miss by $80 million in our application maintenance business in the second quarter, you don't make that up. You don't make that up. ***Now what you do is you fix the execution*** . . . ."

91.     The news that DXC's revenue suffered from execution issues caught investors off guard—as noted above, Defendant Lawrie had taken pains to emphasize customer satisfaction in prior communications to investors, and indeed the Individual Defendants' over $50 million in combined compensation for fiscal year 2018 in part related to supposed "100%" performance on "customer satisfaction."

92.     Finally, Defendant Lawrie implicitly blamed departing Americas executive Puri for execution issues, stating that Defendants had "made leadership changes in both our Americas region and global application services business" as part of their "steps to improve performance in these businesses." Lawrie continued, "[W]e went to a generalist sales model in the United States. And after watching that for 2 quarters, I concluded that wasn't the right approach. And the reason for that is we were missing some of the add-on work that we would get by having deployed a more specialized application sales force. So we have corrected that. And we've gone back, and we've put that dedicated application sales force in place, which will allow us to pick up on some of those incremental add-on projects that we didn't get, particularly in the second quarter."

93.     This revelation again surprised investors, because at the start of the Class Period, Defendants had indicated to investors that they were doing exactly that, stating that they were attempting to "ignite" sales through specialized sales teams, with "one team responsible for the legacy or the run environments that we have, and then a separate team that is focused, in many cases, on disintermediating and driving digital platform growth."

94.     The market reacted negatively—Defendants had not only confirmed the worst revelations of *The Register* article, but revealed that the Company's problems were even more widespread and worse than feared. In an analyst report issued that day, Deutsche Bank wrote that "DXCs 2Q19 results confirmed the revenue weakness highlighted in the recent *Register* article, as DXC was forced to cut revenue guidance[.]" Likewise, in its report that day, BMO Capital Markets wrote, "Against Low Expectations, Top Line Is Disappointing . . . Though we had trimmed our estimates on November 1, our revisions were not enough."

95.     Similarly, the following day, J.P. Morgan issued an analyst report stating, "While weak revenue is not new at DXC, high magnitude of miss could further pressure the stock today" as "investors' expectations of organic revenue growth turning around could get pushed out a bit." The report also refuted Defendants' halfhearted attempts to blame client demand, stating, "We believe IT services demand environment remains healthy, and DXC's weakness stemmed from company specific execution challenges (IBM Services revenue had improved in C3Q)."

96.     Over the following day, the price of DXC stock declined 12.46% on high trading volume, from a close of $72.21 per share on November 6, 2018 to a close of $63.21 per share on November 7, 2018. To date, DXC's stock price has not recovered.

## VI.    DEFENDANTS MISLED INVESTORS THROUGHOUT THE CLASS PERIOD ABOUT DXC'S TRANSFORMATION

97.    On November 8, 2018—just two days after investors learned the truth about DXC's internal turmoil and failed business strategy—Defendant Lawrie addressed at DXC's Investor Day "some of the things that occurred over the last couple of months and the last couple of weeks," and admitted that DXC's problem is "fundamentally about execution" and a need to "maintain[] or increas[e] the existing service levels." Lawrie admitted that he was "responsible" for the Company's failed "generalist" sales approach, and stated that he concluded it was not working after seeing two quarters of "*a continued lack of discipline and execution around some of the workforce optimization issues.*" Defendant Lawrie also conceded that the Company's digital staffing shortfalls had occurred because, despite repeatedly boasting that they were optimizing the Company's workforce, in fact "the way we've managed this over the last year is, first of all, *we have been primarily focused on taking people out*."

98.    During the Q&A, an analyst bluntly addressed "the *controversy* that, I think, investors are dealing with right now, and *it's a little bit of a tale of 2 cities*" between the Company's cost-cutting versus the revenue targets. The analyst continued, noting that "people are trying to get comfortable now with the revenue picture and being able to have confidence that you can hit those new revenue targets. It does seem that some of the revenue challenge of late is related to the focus on cost that you've had over the last year or so, and maybe there is some trade-off between revenues and cost." In response, Defendant Lawrie conceded that the analyst's "hypothesis is right in that the management team has been *more preoccupied with [cost-cutting] than growth*. Because that was what our plan was. Our plan was to get those costs out and then turn our attention to growth, which is what we are now in the early stages of doing . . . . I mean, listen, it's not an easy thing when you're living in those two worlds."

99.     But Defendant Lawrie's excuses for the Company's revenue declines contradicted Defendants' repeated assurances to investors, as Lawrie had on May 24, 2018, that "the key point here is we are investing back in the business. So this is not just about taking cost out." Defendant Saleh repeated that message when Defendants reiterated their guidance months later, on August 7, 2018, stating, "I also want to tell you that we're reinvesting in the business. It's not just about cost reduction. We are -- as we mentioned, across the way, we're putting quite a bit of investment in our digital transformation ourselves and up-skilling our employee base and also training them and also attracting new talent[.]"

100.    In truth, former employees have revealed that throughout the Class Period, Defendants knowingly misrepresented DXC's purported transformation.

### A.      DXC's Former Head of Global Delivery Exposes Defendants' Deception

101.    Stephen J. Hilton, formerly a senior member of DXC's management team who reported directly to Lawrie and was a candidate to replace Lawrie as CEO in the Company's formal "succession plan," recently filed a breach of contract lawsuit against DXC in federal court. The Complaint on file in that action exposes numerous incidents and circumstances that support and corroborate the knowing falsity of Defendants' Class Period misstatements and omissions. Hilton started his career at CSC as a service delivery executive, technical architect, and business development/sales director. After leaving in 2003, he spent the next twelve years in management-level roles at JP Morgan Chase and Credit Suisse.

102.    According to the Hilton Complaint, Hilton was personally hired by Lawrie in early 2015 as Executive Vice President and General Manager for CSC's Global Infrastructure Services. While at CSC, Hilton's division had an annual P&L of $4 billion and employed approximately 15,000 people worldwide. Between May 2016 and April 2017, Hilton alleged that he was one of a "small set of CSC executives who had to both run CSC and orchestrate the merger" with HP.

32

103.    As discussed above, after the CSC-HPE merger, Lawrie, as CEO of DXC, organized the operations structure of the newly formed company into a novel structure consisting of three functional divisions: "Build," "Sell" and "Deliver." "Deliver" was headed by Hilton, who was given the title Executive Vice President, Head of Global Delivery. This role greatly expanded Hilton's responsibilities such that he now managed approximately 120,000 DXC employees and 60,000 contractors worldwide, and had a total expense base of $14 billion across 6,000 clients and 70 countries. As noted in the Company's June 29, 2018 Proxy, Hilton was one of the five top named executive officers of DXC.

104.    The Hilton Complaint details how (a) Hilton warned Lawrie that the pace of DXC's cost cuts through primarily massive layoffs and other cuts would have direct "negative impacts on customer satisfaction;" (b) Lawrie engaged in a reckless campaign to force out experienced, highly valuable management and senior employees in order to avoid paying millions of dollars in compensation that could be add to the Company's bottom line; and (c) Lawrie touted DXC's successful completion of its revenue roadmap and continued focus on the "quality" and "productivity" of delivery in May 2018, days after secretly informing Hilton of his likely termination based on the poor performance of his division, failure to deliver on promised cost cuts, and poor customer relations.

105.    The Hilton Complaint describes how Lawrie's internal budget demanded that Hilton's Global Delivery division achieve $2.7 billion of savings by mid-2018, largely through workforce reductions. Hilton alleges that he "knew there was no way for Global Delivery to spend $2.7 billion less in the first twelve months after the merger than its constituent entities [CSC and HPE] had spent in the twelve months leading up to the merger" because changes such as firing people and reducing asset-heavy fixed costs "take[] considerable time and accounting efforts."

Most importantly, Hilton knew that "it was people employed by Global Delivery who provided customer support to the clients won for DXC by sales" and that "[p]recipitous cuts in Global Delivery could be disastrous for DXC's long-term revenue, because those cuts would have a direct impact on customer satisfaction, a point routinely expressed to Hilton by his 'Sell' and 'Build' peers."

106.    Hilton did not keep these serious concerns over Lawrie's directive to drastically cut costs to himself. Rather, he "repeatedly advised Lawrie about his reservations concerning the pace of cuts." According to Hilton, "Lawrie understood that workforce reductions could not be achieved at the pace required by his internal budget without negative impacts on customer satisfaction." Yet, the Hilton Complaint reveals that Lawrie was not dissuaded, describing as an example how Lawrie would "mov[e] the goal posts . . . . In one instance dating to September and October 2017, Lawrie gave Hilton one set of targets for workforce reductions in the U.K. and Ireland region team and in the North Central Europe region team—and then, two weeks later, nearly doubled the size of the expected cuts and said he expected those cuts to happen within just weeks."

107.    Hilton also raised his concerns with Joanne Mason, DXC's head of Human Resources and a close ally of Lawrie. Hilton believed that he should express his concerns because he was the leader of approximately 120,000 people who would be affected by major organizational and workforce decisions. Despite his concerns, Hilton alleges that Mason implemented "chaotic and non-collaborative" processes that led to firing decisions that were "sub-optimal for the future success of DXC."

108.    Despite his reservations, Hilton alleges that he complied with Lawrie's directives and Global Delivery's cuts led to "remarkable increases in earnings per share" during the first five quarters after the merger. In total, by the end of first few months of the Class Period, Hilton

"reduced Global Delivery's workforce by approximately twenty percent worldwide," effectively 24,000 terminations, and achieved "hundreds of millions of dollars of reductions" as a result of those terminations and other reductions in IT expenditures. As described herein, these forced terminations did exactly what Hilton warned of, and led directly to DXC's inability to satisfy and service customer demands and implement new strategies vital to the Company's long-term success.

109.    Despite the fact that Hilton complied with Lawrie's drastic cost-cutting directives—actions that he and Lawrie knew would have negative impact on the Company's long-term success—Hilton was still a victim of Lawrie's other deceptive firing practices employed on the most senior and high-earning employees and executives. Like Lawrie's decision to fire some of the Company's most integral sales and delivery personnel without regard to client needs, these practices were also short-sighted and stripped the Company of some of its most important employees. Hilton alleges that he came to learn that Lawrie "had a pattern of terminating subordinates shortly before their stock grants would vest, finding various ways to avoid paying out compensation that was owed." For example, Lawrie gloated about how much money Hilton's predecessor had "left on the table" when CSC fired him.

110.    Lawrie's practice of firing executives before their stock grants vested has been corroborated by former Company employees. For example, FE[4]-1, DXC's Chief Technology Officer for the Americas region from April 2017 through January 2018, stated that DXC let him go several months before $1.5 million in options vested, and further confirmed that he had heard anecdotally that Lawrie would regularly terminate senior people before their stock vested.

---

[4] "FE" refers to "Former Employee." All former employees' roles are delineated when introduced and in Appendix A.

111.    Hilton alleges that he fell victim to Lawrie's improper compensation manipulation when, as Hilton himself fell out of favor with Lawrie, Lawrie called Hilton into a meeting on May 15, 2018, and presented him with a letter providing grounds for Lawrie's termination for "Cause." Hilton argues that the impact of the for "Cause" termination unlawfully deprived him of nearly $15 million of vested options and grants—money that could be added to the Company's profits. The May 15 Letter, which was attached to the Hilton Complaint, expressed Lawrie's "dissatisfaction with [Hilton's] performance as a leader of DXC," including his "failure to achieve over $1 billion" of the cost cuts that he had been tasked with—cuts that Hilton had explicitly warned would harm the Company. Lawrie gave Hilton 60 days to remedy his "material misconduct" and "'substantial and willful failure' to render services."

112.    Less than ten days later, on May 24, 2018, Lawrie spoke to investors at DXC's quarterly earnings call. Lawrie not only failed to disclose that DXC had just accused the Executive Vice President in charge of its largest division of "material misconduct" and a "substantial and willful failure" to render services, he boasted that Defendants had "really successfully completed the overall year 1 integration road map for DXC," "track[ed] a bit ahead of plan on revenue," and that "[p]rofit during the first year was also better than expected as we were able to accelerate many of the cost takeout synergies, including reduced management layers and global deployment of our automation program, Bionix"—Hilton's own product. Lawrie also reported that "we achieved [] key merger integration milestones and exceeded our synergy targets" by achieving $1.1 billion in cuts, more than the projected $1 billion target. Further, Lawrie emphasized that "Our delivery teams continued to drive increased productivity while improving service levels for our clients." These statements were in direct conflict with the concerns expressed in the May 15 Letter to

Lawrie, and concealed from the public that one of the top executive leaders of the Company was effectively fired for "Cause" based on poor performance over the previous year.

113.    The Hilton Complaint alleges that following the May 15 Letter, DXC secretly altered the vesting dates on millions of dollars' worth of Hilton's options to a date just beyond the 60-day cure date provided for in the May 15 Letter. According to Hilton, DXC's Compensation Committee acted as nothing more than "a rubber stamp for Lawrie" and exercised no meaningful oversight of this decision to change the vesting dates. Notably, while DXC's June 29, 2018 proxy issued two weeks before his termination noted that Hilton was awarded no fiscal 2018 annual cash incentive award based on poor performance of the Company's largest division, the Compensation Committee approved massive incentive awards to Defendants Lawrie and Saleh of $5 million and $1.58 million, respectively, for "successfully driving and executing the company's post-merger business."

114.    Hilton was formally fired by Lawrie on July 17, 2018. Hilton alleges, based on his experience at CSC and DXC, and his knowledge of other, similar examples, that the true reason Lawrie terminated Hilton for "Cause" was to prevent Hilton from receiving well over $20 million in compensation that was due to him through stock options and his severance agreement.

**B.    Former Employees Corroborate that Defendants Made "Chaotic" and "Sub-Optimal" Firing Decisions.**

115.    Numerous former employees have corroborated Hilton's allegation that the Company's massive workforce reductions were actually "chaotic and non-collaborative" processes that led to firing decisions that were "sub-optimal for the future success of DXC." In fact, the Company ordered aggressive headcount reductions to meet predetermined expense targets, without regard to the Company's ability to execute—and indeed were informed of the harm it was causing during the Class Period.

116.    FE-1 was DXC's Chief Technology Officer for the Americas Region, from April

2017 until January 2018. During that time, as well as for several years prior at CSC, FE-1 reported

to senior executives who themselves reported directly to Defendant Lawrie, including for example

former Executive Vice President Mike Nefkens and Chief Technology Officer Dan Hushon.

117.    FE-1 explained that, as a senior DXC executive, he regularly expected that, the

month before the end of each quarter, there would be workforce cuts because Lawrie ordered that

another 5% to 10% of the workforce be cut any time the Company looked like it was coming up

short on quarterly numbers. FE-1 explained that Lawrie was merciless about these cuts, which

were ordered with no real plan or intent. FE-1 disputed the Company's most common contention,

that these cuts were directed at people with redundant functions. Instead, FE-1 stated—consistent

with what Hilton states in the Hilton Complaint—the vast majority of the workforce cuts were

focused on the Delivery organization. However, the customers that those employees were serving

still needed to be serviced after employees were fired. As revealed, these cuts prevented DXC from

servicing its customers. FE-1 also disputed Defendants' claims that cuts were being driven by

automation, calling them "nonsense." The former Chief Technology Officer for the Company's

Americas region estimated instead that any advances in automation could not make up for the

workforce cuts, which were made at approximately three times the pace that DXC could deploy

automation. Rather, FE-1 said, the cuts were purely a "numbers game"—Lawrie would order the

cuts, and the teams had to figure out how to get the work done with the reduced workforce. FE-1

noted that thousands of workforce cuts were ordered in the Americas, even when that region was

tracking to growth and other regions were not, because the labor laws in the region allowed firings

quick enough to impact quarterly numbers. That the Company specifically targeted the Americas

region for workforce reductions due to favorable labor laws—not "optimization"—concealed a risk that materialized when the region suffered massive revenue shortfalls.

118.    As a result, FE-1 said, the cuts so decimated the Delivery division that decades-old relationships began in-sourcing or moving to other players. FE-1 relayed as an example that his own team had been cut by 50%, and that FE-1 and his team received very vocal feedback that DXC clients were unhappy about these cuts because they removed many of the key DXC people that the customers relied on. FE-1 also explained that customers grew upset because some of the enhancements they had been told about did not materialize, and because there were not sufficient personnel to deliver what had been sold to them.

119.    Several other former employees likewise corroborated that the order for headcount reductions would come down from senior management in a "top-down" fashion that did not consider the resulting negative consequences to the Company's ability to execute.

120.    FE-2 was a Senior Manager, Global Service Desk—Americas, from DXC's inception until March 2018. Prior to the merger, FE-2 had worked at Hewlett-Packard since 1987. FE-2 reported to Greg Betz ("Betz"), DXC's then-Vice President of Americas Delivery, who in turn reported to Samson David ("David"). (As explained in the Hilton Complaint, David was Hilton's direct report, and to whom the vast majority of the Global Delivery organization reported to.) Corroborating both Hilton's and FE-1's accounts, FE-2 described how David would receive monthly instructions on how many people had to be laid off in a "top-down" process—meaning a number that was a "a tell, not an ask" that came from corporate headquarters. FE-2 and his peers had frequent discussion with his supervisor, Betz, about how the cuts affected delivery and service. Like FE-1, FE-2 disputed Defendants' claims that "automation" drove the headcount reductions, explaining instead that managers simply had to roll the dice with the "hope" that automation

initiatives "would save the day." According to FE-2, as a result of the cuts, the Delivery group "was on pins and needles" when he left in March 2018, with Delivery already having significant execution problems.

121. FE-3 was a Senior Finance Manager at DXC from its inception until September 2018, and had worked for over a decade prior at CSC. As Senior Finance Manager, FE-3 was responsible for the finances of the Company's Consulting group. FE-3 worked closely with the Operations Manager for that group, Carlos Lopez-Abadia, and confirmed that the Company would tell managers how many people they needed to lay off to hit a profit target.

122. FE-3 also revealed that one deliberate component of Defendants' expenses-driven approach to "workforce optimization" was an aggressive focus on terminating senior, higher-salaried subject matter experts, a process referred to as "greening." FE-3 described how this "greening" in turn accelerated turnover within the Consulting group, explaining that, as the knowledgeable personnel saw their friends getting laid off, they in turn expected to be laid off, so they would preemptively leave. As a result, FE-3 stated, turnover for the Consulting group was 35%—much higher than even the Company's targeted 20%. This high turnover, FE-3 continued, negatively impacted the Company's much-discussed hiring and training efforts, because there were no sufficiently knowledgeable employees to train new recruits.

123. FE-4 was a former Client Sales Executive from the Company's inception until he left in June 2018. FE-4 specialized in defense and intelligence sales and reported to Sean Mullen, then-Senior Vice President at DXC. FE-4 experienced firsthand how the Company's approach to workforce reduction and "greening" removed "mission critical people." Specifically, FE-4 described how DXC's $2 billion contract for the Navy's NGEN ("Next Generation Enterprise Network") was "the crown jewel" of the federal business. However, FE-4 explained, DXC fired

40

experienced employees, which harmed his ability to make sales in the future. FE-4 stated how he was personally told in numerous meetings at the Pentagon that DXC's terrible execution was making "a shit show" out of NGEN and that "nobody fucking trusts you."

124.    Another former employee described how the Company deliberately got rid of its "bench" of skilled employees. FE-5 worked at DXC from its inception until February 2019 as a Technology Principal Consultant, reporting to Karen Romanello ("Romanello"), who was the practice lead for all of Delivery in the data analytics/information management side in any verticals DXC had clients in. FE-5 explained that, prior to merging with CSC, HPE kept employees between projects on "the bench," where they would work with the hiring manager to try and get a new client, sometimes for as long as six months or a year. However, FE-5 explained, Defendants eliminated "the bench." FE-5 described how DXC's senior leadership sent the practice leads, including his supervisor Romanello, a monthly report of employees who were not actively billable to a client (i.e., those on the "bench"), together with instructions to lay off a certain portion of those employees.

125.    FE-5 explained that this Company's getting rid of the "bench" not only caused the Company to lose knowledgeable employees, but further impacted the Company by driving in-sourcing, the practice where DXC's clients would hire fired employees to preserve the employees' knowledge of that clients' systems. Indeed, FE-5 himself now works for the client—Blue Cross and Blue Shield Association ("BCBSA")—that he had previously serviced for DXC and its predecessors, and which FE-5 revealed that DXC lost in October 2018.

**C.    Defendants Personally Learned About "Negative Impacts On Customer Satisfaction" From Their Workforce Reductions.**

126.    Former employees have also confirmed Hilton's allegation that Defendant Lawrie "understood that workforce reductions could not be achieved at the pace required by his internal

budget ***without negative impacts on customer satisfaction***." In fact, Defendants were specifically confronted with the performance failures caused by their cuts, but nonetheless concealed that information from investors.

127.    Defendants Lawrie and Saleh repeatedly emphasized to investors their personal knowledge of DXC's business and clients, and hands-on approach. For example, DXC stated in its June 29, 2018 proxy statement that "Mr. Lawrie takes an ***active approach*** to overseeing and managing our global operations."

128.    FE-6 was Chief Technologist for DXC's Americas Travel and Transportation Industry from the Company's inception to December 2018. In this role, FE-6 both assisted with client delivery and also worked with sales to help close deals. As a result, FE-6 witnessed firsthand how the Company's unending layoffs negatively affected delivery, and also that these delivery failures made it harder to sell the Company's services because customers knew that DXC could not deliver. In addition, FE-6 said, the Company's workforce reductions made it harder and harder to find DXC employees who actually understood the product lines. FE-6 personally heard complaints from customers all the time and that customers were very concerned about the turmoil within the Company, and stated that the Individual Defendants learned firsthand that these cuts were impacting DXC's ability to grow their revenue.

129.    Specifically, FE-6 described how, for one of the Company's "key" accounts, United Airlines, which was worth approximately $176 million, DXC caused at least two IT outages, including one that led to a system shutdown. As a result of DXC's performance failures, United Airlines Executive Vice President Linda Jojo demanded to speak with Defendant Lawrie about these deficiencies personally. Ultimately, in October 2018, United Airlines declined to renew a significant amount of its servicing and maintenance contract with DXC due to these service issues.

Indeed, Lawrie acknowledged this event at DXC's November 8, 2018 Investor Day, stating that Defendants had "made some mistakes" in "maintaining the existing systems. United Airlines doesn't want to hear that we grounded 800 jets because we were trying to integrate a digital project into the existing mainstream IT architecture."

130.    FE-3 corroborated that the Company's poor service caused by its cost-cuts hurt the Company's contract with United Airlines, and generally stated that Defendants Lawrie and Saleh were aware that their headcount reductions fired employees who supported the contracts and delivered service to the clients.

131.    FE-7 was an Account Delivery Lead at DXC from the Company's inception until March 1, 2019. FE-7 described another instance where the Company's "workforce optimization" backfired, causing the Company to drop the ball on FE-7's client, Baker & Taylor, a 30-year legacy CSC customer. Specifically, FE-7 explained that the Company had fired the people with knowledge to configure the storage area network that Baker & Taylor used to store all of their data, including their ordering system. As a result, in approximately April 2017, Baker & Taylor's order system went down and could not be restored for days, which FE-7 learned that Baker & Taylor claimed cost it nearly $10 million in lost orders alone. Thereafter, FE-7 revealed, Baker & Taylor threatened a lawsuit, and settlement discussions continued for over a year—i.e., well into the Class Period—before DXC finally agreed to pay Baker & Taylor nearly half a million dollars. As a result of this issue and others, DXC lost the ability to capitalize on large opportunities with Baker & Taylor's corporate parent, Follett, who as recently as June 2017 had discussed numerous possible opportunities, none of which were launched with DXC.

132.    FE-8 was a Pricing Consultant at DXC from the Company's inception until January 2019, during which time he participated in meetings with Defendants Lawrie and Saleh concerning

high-profile deals. FE-8 described how, after 4-5 months of work, the Company in early 2018 had agreed to a strategic, $41 million deal to provide "digital" services to its existing IT client, Mondelēz International, Inc. ("Mondelēz"). In other words, this was exactly the sort of digital transformation that Defendant Lawrie had told investors DXC would pursue. However, the deal collapsed around April 2018 as a result of DXC's continued failure to address issues in its existing service contract. FE-8 had personal conversations with Mondelēz and the DXC account manager, Pat Vondette, about the failure of this deal, and FE-8 said that Defendants Saleh and Lawrie would have learned of the situation.

133.    FE-9 was an Engagement Manager at DXC from the Company's inception until the end of March 2019, working as a delivery manager for the Company's financial services division. FE-9 revealed that, in approximately June or July 2018, one of the clients that he provided service to—MassMutual—cancelled early a "BPO" (Business Process Outsourcing) contract that had extended through 2022 and which provided approximately half of the $30 million in annual revenue from the MassMutual account. FE-9 learned directly from MassMutual that the contract was cancelled because DXC was not meeting service level agreements as a result of the layoffs. FE-9 discussed this reason for this cancellation with his superiors, including Ashish Kumar, then-Operations Manager, and that FE-9's understanding was that this would have been discussed further up the chain including to the Individual Defendants.

**D.     Defendants Knew That They Could Not Bring On The Resources Needed To Support Their Promised Growth.**

134.    On March 26 and 27, 2019, *The Register* published articles describing a March 19, 2019 internal DXC conference call led by Dean Clemons ("Clemons"), global services leader at DXC's Offering division. During the Class Period, Defendants had bragged repeatedly about the thousands of certifications completed by its employees. *See, e.g.*, ¶52. Yet, in March 2019,

Clemons admitted that DXC had not been paying for "certs [certifications] that are fundamental to our business" – something that its competitors "do . . . much more grandly than we do."

135.    Clemons also revealed that the Company's employees were stuck using poorly functioning laptops due to the Company's unforgiving purchase order request procedures, admitting that "we cannot do this more poorly." As a result, according to a source quoted by *The Register*, some "employees gave up" on DXC's internal procurement department to provide equipment and were forced to "use their own PC." As a result, "DXC has no idea where confidential customer information is stored." Ultimately, Clemons acknowledged during the call that DXC's cost-cutting had hurt the Company by creating challenges in attracting, developing, and retaining talent—describing the situation as "one step forward, two back, two steps forward, one back."

136.    This frank internal admission contrasts remarkably with Defendants' statements during the Class Period, during which they informed investors at-length that their plan was "not just" cost-cutting, but instead involved serious investment by the Company, including specifically hiring the talent necessary to make the Company's growth through digital transformation.

137.    However, FE-1—DXC's Chief Technology Officer for the Americas Region from April 2017 until January 2018—explained that, while DXC had given the Company a clean start, Defendants quickly attained a deservedly poor reputation and could therefore only hire "B or C players" or free agents that demanded a very high price tag.

138.    Defendant Lawrie was well aware of this problem by the start of the Class Period. FE-10 was a Vice President of Talent Acquisition at DXC from the Company's inception until November 2017. Every Thursday at 6 a.m. CT, FE-10 participated in a workforce planning call that provided updates on recruiting and strategy. Also on these calls were Defendant Lawrie and

his direct reports; Kevin Jones, Senior Vice President and General Manager, Americas, and the

Senior Vice Presidents of various other regions; and the leaders of the Company's practice groups.

During those calls, recruiting and strategy updates were provided. During one of these calls in the

summer of 2017—by which time DXC had already begun firing thousands of employees—FE-10

reported on feedback that people were declining to be interviewed for DXC positions because they

believed they were going to be laid off quickly if they worked there. According to FE-10, ***Lawrie***

***and the leadership team "lost it,"*** screaming and yelling at FE-10 and told her the issue was that

her team did not know how to "tell the story" of DXC. After the call, FE-10 states, five of the

leaders reached out and told her that she was right and was brave for bringing it up to Lawrie, but

none of them had been willing to back her up on the call because "you don't cross Mike."

139.    Even more, while Defendants repeatedly assured investors they were hiring

prolifically to meet need, numerous former employees revealed that the staffing shortage

ultimately disclosed in November 2018 should have been no surprise to Defendants.

140.    For example, at the start of the Class Period, Defendant Lawrie told investors during

an earnings call that DXC was "definitely attracting now some really good talent in the cyber

[security] business." However, according to FE-11—a former Vice President and General

Manager from DXC's inception until January 2018, who reported to Marilyn Crouther

("Crouther"), who in turn reported directly to Defendant Lawrie—DXC was not hiring people fast

enough to fill cyber security demand, in part because "every single decision had to be made by

Mike Lawrie to hire somebody or not." Specifically, FE-11 explained, employees had to submit

all requests for hiring on Tuesday in advance of a weekly Thursday meeting, in which Lawrie

would make a decision—decisions which, according to FE-11, seemed to have "no rhyme or

reason." FE-11 revealed that the U.S. Public Service ("USPS") segment had validated

requirements in six contracts, yet they still could not get their hires approved, costing the Company to lose millions of dollars a month in revenue because they could not staff the positions. According to FE-11, this revenue loss had been an issue since DXC was formed because of Lawrie's requirement to approve all hires at DXC. FE-11 said that at one point his supervisor, Crouther, directly confronted Lawrie about the Company's losing millions of dollars a month in revenue, and also recalled incidents where his group was not believed and had to actually show the contracts to prove hiring was necessary.

141.    FE-12 was a Director of Security Consulting & Integration, Americas, from the Company's inception until September 2018. FE-12 similarly described getting approval to hire employees as "painful," requiring multiple levels of approvals until it eventually reached someone on the "L2" level, the level that reports directly to Defendant Lawrie.

142.    FE-13 was a Director, Americas, Enterprise and Cloud Applications, from the Company's inception until February 2018. FE-13 stated that Defendant Lawrie had over two thousand requests awaiting approval on his desk, including requests to bring in new immediately billable employees, but that DXC simply would not stock bodies. As a result of Lawrie's failure to approve the requests in a timely manner, many customers walked away, describing as just one example an instance where DXC lost a $72 million deal with PNC because they could not staff it.

143.    FE-7, an Account Delivery lead, also discussed how he and his peers could not get approval to hire personnel needed to do work, even when they were "screaming" at management that the requested hires were for "Time and Materials" projects—meaning that the Company was *losing* revenue by not hiring them. According to FE-7, the problem was so severe that Defendant Lawrie was directly asked at a North Americas town hall meeting in January 2019 if there was a "hiring freeze" in place. In response, Lawrie stated only that Defendants were "selectively hiring."

FE-7 also recalled an earlier town hall meeting, in 2018, when DXC's Executive Vice President and Chief Human Resources Officer, Jo Mason, explicitly admitted that the Company's internal systems to find resources for projects were no good.

> **E. Defendants Had Access To, And Knowledge Of, Information Undermining Their Projections And Revenue Guidance.**

144. Former employees have described other information known by Defendants—but concealed from investors—that called into question their revenue projections.

145. FE-14 was a Director at DXC from the Company's inception until September 2019, and previously had been at CSC for over 20 years. FE-14 stated that the Company's various divisions did not complete their budgets on the timeline required, causing the Company to just assign their own projections in preparing the budget. However, even when those divisions finally completed their budgets—some well after the start of the Company's fiscal year—FE-14 stated that the Company would just use the original numbers they came up with, even though they were in many instances materially higher. FE-14 described this process as "MSU"—"make shit up."

146. FE-9 corroborated this practice, including the Company's reliance on "MSU" (make shit up). FE-9 stated that, on a quarterly basis, he was involved in the preparation from the "bottom-up" a budget that included projections of revenue growth and margin for his accounts. However, when those numbers were then discussed with FE-9's superior, FE-9 was told that his numbers were no good and given new numbers from the "top-down." Even though FE-9 insisted that these numbers were not attainable, the "top-down" numbers did not change: "MSU."

147. Further, former employees have revealed that the implausibility of the revenue projections became even more apparent as the Class Period went on.

148. FE-14 described how, throughout his time at DXC, he prepared monthly an "Integrated Watchlist" and various documents derived therefrom, which showed the revenue for

all accounts across the Company, and—among other things—calculated the delta against the Company's projected revenue. At times, FE-14 would get asked about these reports in detail with DXC Vice President Robbie Braddock, who FE-14 understood would in turn report this information up, including to former Executive Vice President Mike Nefkens prior to his departure in the Company's reorganization in January 2018. FE-14 recalled that on July 1, 2018, at the end of the first quarter fiscal year 2019, FE-14 distributed these documents, which identified a "huge" delta between the projections and the Company's current pave of revenue. Yet, the next month, Defendant Lawrie would misleadingly tell investors at DXC's annual shareholder conference that the Company's "first quarter performance ***positions us well to deliver on our financial targets for fiscal 2019***."

149.    FE-15 was a Principal, Digital Experience Consulting, who was at the Company from July 2017 until January 2019. FE-15 stated that she and the other consultants in her offering referred to themselves as being on the "Netflix plan"—meaning they would literally just watch Netflix at their desks all day—because DXC had backlogs of work put on hold by the customer that FE-15 estimated were 10-20 times higher than normal. The customer initiated these holds based on their concerns about DXC's delivery and service. This backlog created what FE-15 described as a "number gap," the gap between revenue targets and consultant billability. This number gap was known by DXC management: FE-15 described a meeting in September 2018, where Mike Gillis, Leader of DXC Eclipse (FE-15's offering group), stated there was a plan to close the numbers gap. In response, according to FE-15, employees all laughed because they could not see how this was possible: the Company had not had the business in the last month, and the employees could not see how DXC was going to get the numbers in the current month to make up for it, with every month having had a compounding revenue shortfall.

150. Most remarkably, *after* that meeting, a colleague told her FE-15 that he was invited to join a call to come up with a plan to close the gap because the Company didn't actually have one yet.

151. Finally, FE-9 recalled personally submitting a question for Defendant Lawrie to address during a townhall meeting in or around July 2018 asking how employees could be expected to meet the Company's new revenue targets. However, FE-9 stated, Lawrie did not address this question.

**F. Defendants Classified "Digital" Offerings To Manipulate The Market.**

152. Former employees have revealed that Defendants deceptively classified their digital offerings, including particularly their "Cloud" revenue, in an effort to manipulate market perception about DXC's digital growth.

153. FE-3—a DXC Senior Finance Manager until September 2018—described how the Company would manipulate the "digital" categorization of its cost centers at whim as part of an effort to seem "cutting edge," show digital growth, and talk about how it was converting business to digital. Specifically, FE-3 participated in meetings, including some with Defendant Lawrie present, where there were "very political" decisions to re-categorize certain offerings as "digital." FE-3 participated in one meeting, in approximately December 2017, in which the decision was made to re-classify certain work already done by the Consulting group as relating to the Company's Cloud offering

154. Yet, Lawrie did not acknowledge this reclassification when, at the start of the Class Period on February 8, 2018, he bragged about the Company's Cloud performance in bragging about Defendants' move towards digital, stating, "We have been a little more successful than we had planned in terms of offsetting the decline in the legacy infrastructure business. We've been more successful offsetting that with cloud and some of our other digital offerings. So that has gone,

in all candor, a little better than what we had modeled and what we had communicated . . . . I mean, we're seeing 24%, 25% growth in our enterprise cloud apps business."

155.    FE-3's account is very similar to allegations in *Computer Sciences Corporation v. Eric Pulier* (C.A. No. 11011-CB). There, the Delaware Court of Chancery sustained on April 3, 2017 counterclaims brought in September 2016 by a former CSC executive, Eric Pulier ("Pulier"), who joined CSC in 2013 when CSC—in one of Defendant Lawrie's first achievements as CEO—orchestrated the purchase of Pulier's company ServiceMesh, which provided enterprise cloud platform services. The purchase dramatically expanded CSC's cloud services offering, which ultimately became a key point in selling the narrative to create DXC. However, Pulier alleges that the sale had been fraudulently induced because CSC (including Lawrie specifically) had made false assertions about "the enormous growth and profitable forecast for the coming year of CSC's cloud business unit," when in fact:

> CSC mischaracterized its cloud revenue to make its cloud program look more profitable to ServiceMesh and technologically capable than it really was—a practice known as "cloud washing." For example, CSC counted as cloud revenue from its managed hosting business and revenue from managing traditional mainframe computing systems. Attributing revenue from these legacy businesses to cloud products is inaccurate.

156.    FE-7 generally corroborated that the Company's "digital" classification was a "hokey game," stating: "You would not believe some of the stuff that got recategorized as digital so that they could say digital growth is rising." FE-7 stated that the definition of "digital" changed all the time, as the Company wanted to show improvement to analysts.

VII.    **DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

A.    **Defendants' False and Misleading Statements and Omissions Concerning DXC's Revenue Growth**

1.    **The Fiscal Year 2019 Guidance**

157.    On May 24, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the fourth quarter and fiscal year 2018, during which Defendants provided the Company's fiscal year 2019 guidance (the "Fiscal Year 2019 Guidance"). Specifically, during that call, Defendant Lawrie stated:

> For fiscal 2019, *we expect revenue to be $21.5 billion to $22 billion*, which excludes the USPS business. There are several positive things contributing to that target as well as a couple of mitigating factors. *We continue to accelerate the growth in our digital and industry IP offerings, and our BPS business is also demonstrating strong momentum.* We do expect some additional revenue dis-synergies next year as well as the ongoing headwinds in traditional services that we had previously discussed. Also, the revenue from our HPE contract associated with the merger will normalize this year at a bit lower rate, and we continue to gauge the potential impact of Brexit in our U.K. business. We're targeting non-GAAP EPS of $7.75 to $8.15 and adjusted free cash flow to be 90% or more of adjusted net income.

158.    Likewise, during that May 24, 2018 call, Defendant Saleh stated:

> Now let me close with fiscal '19 targets, all of which will now exclude USPS. *We're targeting revenue for the fiscal year to be $21.5 billion to $22 billion. This compares with $21.7 billion in fiscal '18.* Our fiscal 2019 target for non-GAAP EPS from continuing operations is $7.75 to $8.15. Now this compares with roughly $6.70 for fiscal 2018, which was recast to exclude earnings per share associated with the USPS business and adjusted for any stranded G&A cost. Our EPS target assume a tax rate of 24% to 28% for the full year, and our adjusted free cash flow target for fiscal 2019 is 90% or more of adjusted net income. . . .
>
> I think *what we will see is a relatively consistent performance throughout the year*, growing a little bit more in the second half of the year on a sequential basis.

159.    On August 7, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the first quarter fiscal year 2019, during which they reiterated the previously provided

fiscal year 2019 guidance, and assured investors that they were on track to achieve those targets.

Specifically, during that call, Defendant Lawrie stated:

> [F]or fiscal '19, **we continue to target revenue of $21.5 billion to $22 billion** and on a non-GAAP EPS of $7.75 to $8.15. Although we are trending to the upper end of that EPS range. And we continue to target adjusted free cash flow of 90% or more of adjusted net income. . . .

> Now, before I turn this over to Paul [Saleh], just to reiterate, **for fiscal 2019, we continue to expect revenue to be $21.5 billion to $22 billion,** and we also continue to target non-GAAP EPS of $7.75 to $8.15. And as I said before, we are trending to the upper end of that range. And we expect adjusted free cash flow to be 90% or more of adjusted net income.

160.    Likewise, during that August 7, 2018 call, Defendant Saleh stated, "[I]n closing, we had a solid start to the year, and we're on pace to deliver against our financial targets for the fiscal year."

161.    On August 15, 2018, DXC held its annual shareholder meeting, during which Defendant Lawrie again reiterated that DXC would achieve its fiscal year 2019 guidance, stating:

> [T]he progress we have made has enabled us to make the **pivot to growth**, positioning DXC to capitalize on the vast digital opportunities ahead across all industry and offering areas. This momentum was reflected in our fiscal year '19 first quarter earnings announced last week. In the first quarter, we've delivered year-over-year growth in revenue, margins and earnings per share. We had significant margin expansion . . . driven by continued execution of our synergy levers. These levers include workforce optimization, supply chain efficiencies and facilities rationalization. And our first quarter performance **positions us well to deliver on our financial targets for fiscal 2019**.

162.    Defendants' statements quoted in ¶¶157-61 above were materially false and misleading when made because, as Defendants have admitted and as discussed further above: 1) Defendants had "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," which they understood—but concealed from investors—undermined the Company's "pivot to growth" in revenue because "there is some trade-off between revenues and cost"; 2) Defendants knew—but concealed from investors—that, on May 15, 2018, DXC had

accused the Executive Vice President in charge of its largest division of "material misconduct" and a "substantial and willful failure" to render services, yet that Executive Vice President would remain in his role even into the second quarter of fiscal year 2019; 3) Defendants were engaged in reckless cost-cutting measures, including quota-driven workforce optimization designed to manage earnings, that Defendants knew—but concealed from investors—caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth; and 4) Defendants had no reasonable basis for their revenue projections.

##### 2.   Other False and Misleading Statements Concerning DXC's Revenue.

163.   Also during the February 8, 2018 earnings call, Defendant Lawrie stated that Defendants' digital business had actually "been a little more successful than we had planned in terms of offsetting the decline in the legacy infrastructure business . . . a little better than what we had modeled and what we had communicated," and also that Defendants would "continue with the same play that has given us some of the success around offsetting that decline in the traditional ITO business."

164.   Defendant Lawrie's statements quoted in ¶163 above were materially false and misleading when made because, as Defendants have admitted and as discussed further above: 1) Defendants had "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," which they understood—but concealed from investors—undermined the stabilization of the Company's revenue because "there is some trade-off between revenues and cost"; and 2) Defendants' "same play that has given us some of the success around offsetting that decline" primarily consisted of reckless cost-cutting measures, including quota-driven workforce optimization designed to manage earnings as well as the manipulation of compensation targets, that Defendants knew—but concealed from investors—caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth.

165.    On June 29, 2018, Defendant DXC filed its annual proxy statement, which was signed by Defendant Lawrie. In it, Defendants stated that Defendants had "continued to successfully execute on our value creation levers," attaining "stable revenue."

166.    Likewise, on July 18, 2018, DXC filed additional proxy materials, consisting of a presentation entitled "Key Discussion Topics," in which Defendants again boasted that Defendants had "successfully executed on our value creation levers," attaining "Stable revenue."

167.    DXC's statements quoted in ¶¶165-66 above were materially false and misleading when made because, as Defendants have admitted and discussed further above: 1) Defendants had "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," which they understood—but concealed from investors—undermined the stabilization of the Company's revenue because "there is some trade-off between revenues and cost"; and 2) Defendants knew—but concealed from investors—that, on May 15, 2018, DXC had accused the Executive Vice President in charge of its largest division of "material misconduct" and a "substantial and willful failure" to render services; and 3) Defendants' "value creation levers" primarily consisted of reckless cost-cutting measures, including quota-driven workforce optimization designed to manage earnings as well as the manipulation of compensation targets, that Defendants knew—but concealed from investors—caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth.

168.    On August 7, 2018, DXC issued a press release announcing its earnings for the first quarter of fiscal year 2019, which quoted Defendant Lawrie as stating, "We continue to build momentum in digital, with double-digit growth in each of our digital areas, and we also drove growth in our industry offerings."

55

169.    On or about September 5, 2018, Defendant Saleh and other members of DXC management met with analysts at Evercore. At that meeting, as described by Evercore analysts in a October 24, 2018 report, Saleh "confirmed to [Evercore] that in 2H/FY19, DXC should achieve constant currency, organic revenue growth for the first time aided by easier year-over-year comps, a moderation in declines in the legacy business, and 20%+ growth in Digital."

170.    Defendants' statements quoted in ¶169 above were materially false and misleading when made because, as Defendants have admitted and discussed further above: 1) Defendants had "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," which they understood—but concealed from investors—undermined the Company's revenue growth because "there is some trade-off between revenues and cost"; and 2) Defendants were engaged in reckless cost-cutting measures, including quota-driven workforce optimization designed to manage earnings as well as the manipulation of compensation targets, that Defendants knew—but concealed from investors—caused serious execution issues that would accelerate, not moderate, declines in the legacy business and delayed DXC from bringing on the resources needed to support digital growth.

**B.      Defendants' False and Misleading Statements and Omissions Concerning DXC's Workforce Management and "Optimization"**

171.    On February 8, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the third quarter fiscal year 2018. During that call, Defendant Lawrie stated that Defendants had "enhanced" their "workforce management process," which allowed DXC "to more cost-effectively deliver existing business while staffing the required labor for new business."

172.    Defendant Lawrie's statements quoted in ¶171 above were materially false and misleading when made because, as discussed further above, Defendants' "enhancement" to their "workforce management process" were primarily quota-driven workforce reductions designed to

manage earnings, not the Company's workforce, which Defendants knew—but concealed from investors—caused serious execution issues in "deliver[ing] existing business" and prevented DXC from "staffing the required labor for new business."

173.    Also during the February 8, 2018 earnings call, Defendant Saleh discussed "cost actions we're taking to optimize our workforce," including specifically that Defendants had "reduced our labor base by an additional 3% in the quarter through a combination of automation, best shoring and pyramid correction."

174.    Defendant Saleh's statements quoted in ¶173 above were materially false and misleading when made because, as discussed further above, Defendants' reduction of the Company's labor base was primarily quota-driven workforce reductions designed to optimize earnings, not the Company's workforce, and which Defendants knew—but concealed from investors—caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth.

175.    Also during the February 8, 2018 earnings call, Defendant Lawrie said that Defendants were "making a big, organic investment around trying to ignite . . . digital sales" by "beginning to move in a direction of having one team responsible for the legacy or the run environments that we have, and then a separate team that is focused, in many cases, on disintermediating and driving digital platform growth."

176.    Defendant Lawrie's statements quoted in ¶175 above were materially false and misleading when made because, as discussed further above, Defendants instituted this sales model after they had already fired, and continued to fire throughout the Class Period, substantial numbers of DXC's "subject matter experts" as part of their workforce reduction quotas designed to optimize earnings, which Defendants knew—but concealed from investors—caused serious execution

issues and delayed DXC from bringing on the resources needed to support digital growth. In fact, at the end of the Class Period, Defendant Lawrie would admit that for the past two quarters, Defendants had been using a "generalist sales model" and not a "specialized application sales force"—a decision that, on November 8, 2018, Lawrie also explicitly admitted that he was "responsible" for the Company's failed "generalist" sales approach, and in connection therewith that he had observed several quarters of "a continued lack of discipline and execution around some of the workforce optimization issues."

177.    On May 24, 2018, Defendant DXC issued a press release, filed on Form 8-K, announcing their fourth quarter and full fiscal year 2018 earnings. That press release quoted Defendant Lawrie as stating that Defendants had "successfully executed on our strategic roadmap, including the integration of CSC and HPE Enterprise Services, achievement of our first-year financial objectives, and a strengthened leadership position in digital transformation."

178.    Also on May 24, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the fourth quarter and full fiscal year 2018. During that call, Defendant Lawrie stated that "[p]rofit during the first year was . . . better than expected" thanks to "execution of the synergy plans we outlined at our Investor Day last March, including workforce optimization, supply chain efficiencies, policy harmonization and facilities rationalization."

179.    Likewise, also during the May 24, 2018 call, Defendant Saleh attributed DXC's "improvement in profitability" to "cost actions we've taken to optimize our workforce, harmonize our policies, extract greater supply chain efficiencies and rationalize our real estate footprint."

180.    Defendants statements quoted in ¶¶177-80 above were materially false and misleading when made because, as Defendants have admitted and as discussed further above: 1) Defendants' "plan" had actually "been primarily focused on taking people out" and "more

preoccupied with [cost-cutting] than growth," which they understood—but concealed from investors—undermined the Company's growth because "there is some trade-off between revenues and cost"; 2) Defendants knew—but concealed from investors—that, on May 15, 2018, DXC had accused the Executive Vice President in charge of Delivery, DXC's largest division and thus the group most impacted by Defendants' workforce actions, of "material misconduct" and a "substantial and willful failure" to render services, yet that Executive Vice President remained in that role; and 3) the "successful[] execut[ion]" of Defendants' "strategic roadmap" and "synergy plans" were actually reckless workforce reductions and other cost-cutting measures designed to optimize earnings, not the Company's workforce, and which Defendants knew—but concealed from investors—caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth.

181. Also during the May 24, 2018 earnings call, Lawrie stated that DXC had achieved "significant reductions [in headcount] or, said another way, increased productivity," and boasted, "Our delivery teams continued to drive increased productivity while improving service levels for our clients." Later, Lawrie stated that the Company would "continue to drive productivity and the quality of our service delivery" and that DXC's "improved service levels . . . has an enormously positive impact on our business." Finally, Lawrie stated, "Our customer satisfaction last year went up. So in the first year of integration, all we did, customer satisfaction continued to increase. So continuing to drive our cost structure and the productivity and improve service delivery is an absolutely critical objective as we look out."

182. Defendant Lawrie's statements quoted in ¶181 above were materially false and misleading when made because, as discussed further above: 1) Defendants knew—but concealed from investors—that, on May 15, 2018, DXC had accused the Executive Vice President in charge

of Delivery, DXC's largest division and thus the group most responsible for the Company's service levels and customer satisfaction, of "material misconduct" and a "substantial and willful failure" to render services, yet that Executive Vice President remained in his role until weeks into the second quarter of fiscal year 2019; and 2) DXC's "significant reductions [in headcount]" were reckless workforce reductions designed to optimize earnings, not increase productivity, and which Defendants knew—but concealed from investors—had not "improv[ed] service levels for our clients" but instead caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth.

183.    On May 29, 2018, DXC filed its Form 10-K for fiscal year 2018, which was signed by Defendants Lawrie and Saleh. In the Form 10-K, Defendants stated as a "Fiscal 2018 Highlight" that DXC had "further enhanced our workforce management processes to cost-effectively deliver existing business while staffing the required labor for new business." Defendants further stated, "During fiscal 2018, we took actions to optimize our workforce, extract greater supply chain efficiencies and rationalize our real estate footprint. We reduced our labor base by approximately 13% through a combination of automation, best shoring and pyramid correction."

184.    Defendants statements quoted in ¶183 above were materially false and misleading when made because, as discussed further above: 1) Defendants knew—but concealed from investors—that, on May 15, 2018, DXC had accused the Executive Vice President in charge of Delivery, DXC's largest division and the group responsible for delivering existing business, of "material misconduct" and a "substantial and willful failure" to render services, yet that Executive Vice President remained in his role until weeks into the second quarter of fiscal year 2019; and 2) DXC's "enhancement" to its "workforce management process" and "actions to optimize our workforce" were primarily workforce reduction quotas designed to optimize earnings, not the

Company's workforce, and which Defendants knew—but concealed from investors—caused serious execution issues in "deliver[ing] existing business" and prevented DXC from "staffing the required labor for new business."

185.   On June 29, 2018, Defendant DXC filed its annual proxy statement, which was signed by Defendant Lawrie. In it, Defendants claimed that the Company's "performance in fiscal 2018" had "exceed[ed] its external expectations on revenue, profitability, and customer satisfaction." Elsewhere, the proxy further discussed Defendants' "continued focus on customer satisfaction," which was a "key metric" in the Company's executive compensation awards, and stated that that Defendants' "focus" had "yielded . . . customer satisfaction results that exceeded external expectations" and awarded both Defendants Lawrie and Saleh a "100%" weighting for customer satisfaction.

186.   Defendants' statements quoted in ¶185 above were materially false and misleading when made because, as Defendants have admitted and as discussed further above: 1) DXC had actually "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," rather than on "customer satisfaction"; 2) Defendants knew—but concealed from investors—that, on May 15, 2018, DXC had accused the Executive Vice President in charge of Delivery, DXC's largest division and thus the group most responsible for the Company's service levels and customer satisfaction, of "material misconduct" and a "substantial and willful failure" to render services, yet that Executive Vice President remained in his role until weeks into the second quarter of fiscal year 2019; and 3) Defendants knew—but concealed from investors—that their reckless cost-cutting measures, including quota-driven workforce reductions designed to manage earnings, not the Company's workforce, had caused serious execution issues and had adversely affected "customer satisfaction."

187.    On August 7, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the first quarter of fiscal year 2019. During the call, Defendant Lawrie stated that Defendants would "expand margins while also improving client service levels" through automation, and that DXC was "leveraging artificial intelligence, machine learning and bots . . . to eliminate labor from many processes."

188.    Likewise, also during the August 7, 2018 earnings call, Defendant Saleh discussed DXC's continued efforts "to optimize our workforce," stating that the Company had "reduced our total headcount by an additional 3.7% in the quarter . . . driven by automation, overhead rationalization and productivity improvements."

189.    Defendants Lawrie and Saleh's statements quoted in ¶¶187-88 above were materially false and misleading when made because, as discussed further above, Defendants' reduction in headcount and "eliminat[ion] of labor from many processes" were primarily driven by workforce reduction quotas designed to optimize earnings, not the Company's workforce, and which Defendants knew—but concealed from investors—had not "improv[ed]" client service levels" but instead caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth.

190.    On August 15, 2018, DXC held its annual shareholding meeting. At that meeting, Defendant Lawrie stated, "Today, DXC is a stronger and more versatile leading end-to-end global technology services business that is providing unsurpassed value for our clients, partners and shareholders, along with growth opportunities for our people."

191.    Defendants Lawrie's statements quoted in ¶190 above were materially false and misleading when made because, as discussed further above, DXC was engaged in reckless workforce reductions and other cost-cutting measures that Defendants knew—but concealed from

investors—did not provide "unsurpassed value for our clients" but caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth.

### C. Defendants' False and Misleading Statements and Omissions Concerning DXC's "Investment in People"

192.    On February 8, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the third quarter fiscal year 2018. During that call, Defendant Lawrie stated, "I think the investment we're making in reskilling our people are all critical factors in helping to expand the revenue payment" and that "[w]e are definitely attracting now some really good talent in the cyber business." Lawrie also said that DXC was "reshaping [its] capabilities relative to what clients are looking for," which was "allowing us to respond and scale, and scale" and further that that DXC was "going to run a lot of the same plays that we ran this year," including specifically "ramping up our investment in digital skills, both the retraining of our people as well as the recruiting of our people[.]"

193.    Also during the February 8, 2018 earnings call, Defendant Saleh stated that DXC had "continue[d] to rebalance our skill mix, including the addition of 5,300 new employees and the ongoing retraining of the existing workforce."

194.    Defendant Lawrie and Saleh's statements quoted in ¶¶192-93 above were further materially false and misleading when made because, as Defendants have admitted and as discussed further above, 1) the "same plays that [Defendants] ran this year" had actually "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," which Defendants understood—but concealed from investors—undermined the Company's ability to "expand the revenue payments" because "there is some trade-off between revenues and cost"; and 2) as a result of Defendants' reckless cost-cutting practices, Defendants knew—but concealed from investors—that they were unable to "rebalance" the Company's "skill mix" sufficiently to

"respond" "to what clients are looking for" and "expand the revenue payments" on the Company's digital business.

195.     On February 28, 2018, DXC issued a press release that stated, among other things, that DXC was "empowering our workforce by investing in our people, driving a cultural shift and elevating skillsets to ensure that DXC has the right digital-generation talent to optimally meet current and future clients' needs" and that DXC could "quickly build and deliver partner-engineered, at-scale, repeatable offerings and solutions that help drive client digital transformations."

196.     Defendant DXC's statements quoted in ¶195 above were materially false and misleading when made because, as discussed further above, as a result of Defendants' reckless cost-cutting practices, Defendants knew—but concealed from investors—that they could not attract and retain the "right digital-generation talent to optimally meet current and future clients' needs."

197.     On or about April 17, 2018, DXC made publicly available a presentation delivered to investors during March 2018, entitled "Leading our clients' digital transformations [-] DXC Technology Corporate Overview." Among other things, this presentation told investors that DXC was "different" in part because of its "World-Class Talent," stating, "We are investing to attract and upskill the talent who will lead global business tomorrow." The presentation also stated that Defendants had "Deep experience in digital solutions" and purported to have tens of thousands of qualified digital employees. Finally, the presentation also quoted Defendant Lawrie as stating, "Our clients are facing major disruptive changes. We're meeting these challenges with highly talented people, an experienced hand and an independent view of technology solutions[.]"

198.    Defendants' statements quoted in ¶197 above were materially false and misleading when made because, as discussed further above, as a result of DXC's reckless cost-cutting measures Defendants knew—but concealed from investors—the Company could not "attract and upskill" the "highly talented people" needed to support the Company's digital growth.

199.    On May 24, 2018, Defendant DXC issued a press release, filed on Form 8-K, announcing its fourth quarter and full fiscal year 2018 earnings. That press release quoted Defendant Lawrie as stating that Defendants had "successfully executed on our strategic roadmap" over the past year and that DXC "continue[s] to invest in our digital capabilities and strategic partnerships."

200.    Defendants DXC and Lawrie's statements quoted in ¶199 above were materially false and misleading when made because, as Defendants have admitted and as discussed further above: 1) Defendants' plan had actually "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," rather than "invest[ing] in our digital capabilities"; and 2) the "successful[] execut[ion]" of Defendants' "strategic roadmap" actually involved reckless cost-cutting measures that Defendants knew—but concealed from investors—prevented the Company's from sufficiently obtaining the "digital capabilities" needed to support the Company's digital growth.

201.    On May 24, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the fourth quarter and full fiscal year 2018. During that call, Defendant Lawrie said that Defendants were making a "major investment . . . in our people. We're continuing to invest very heavily in the retraining and reskilling of employees." Lawrie further stated that Defendants would "continue to focus on . . . our ability to more accurately predict what skills we're going to need, how many we're going to need, how we source them." Lawrie continued, "the reskilling of our

people is a key priority [for] our whole digital initiative as we continue to want to increase the percent of revenue that we get from digital to offset the natural headwinds we have in the ITO business, some of the other legacy businesses[.]"

202.   Likewise, during the May 24, 2018 call, Defendant Saleh stated that DXC had "continued to rebalance our workforce . . . including the hiring of roughly 20,000 new employees during the year with a significant focus on digital capabilities."

203.   Defendants Lawrie and Saleh's statements quoted in ¶¶201-02 above were materially false and misleading when made because, as discussed further above, as a result of Defendants' reckless cost-cutting measures, Defendants knew—but concealed from investors— the Company could not "rebalance" the Company's workforce sufficiently to "increase the percent of revenue that we get from digital to offset the natural headwinds we have in the ITO business, some of the other legacy businesses."

204.   Also during that May 24, 2018 earnings call, Defendant Lawrie assured investors, "the key point here is we are investing back in the business. So this is not just about taking cost out."

205.   Defendant Lawrie's statement quoted in ¶204 above was materially false and misleading when made because, as Defendants have admitted and as discussed further above, 1) in fact, Defendants had actually "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth"; and 2) Defendants were engaged in reckless cost-cutting measures that Defendants knew—but concealed from investors—delayed DXC from bringing on the resources needed to support digital growth.

206.   On May 29, 2018, DXC filed its Form 10-K for fiscal year 2018, which was signed by Defendants Lawrie and Saleh. In the Form 10-K, DXC stated as a "Fiscal 2018 Highlight" that

it had "rebalanced our skill mix, including the addition of more than 18,000 new employees and the ongoing retraining of the existing workforce."

207.    DXC's statements quoted in ¶206 above were further materially false and misleading when made because, as discussed further above, Defendants were engaged in reckless cost-cutting measures that Defendants knew—but concealed from investors—frustrated the Company's efforts to "rebalance" and "retrain" the Company's "skill mix" as needed to support the Company's digital growth.

208.    On August 7, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the first quarter of fiscal year 2019. During the call, Defendant Lawrie stated that DXC "continue[s] to invest in the business and in attracting and developing our digital workforce," describing "digital boot camps where employees as well as our client executives are provided training" and "investing to scale our digital General Manager capabilities." Lawrie further stated that DXC is:

> investing in our digital centers in the U.S., the U.K. and other countries. We're hiring into our global delivery centers and leveraging our graduate program to continuously refresh our talent base . . . . We're making a huge commitment to hiring graduates globally. We'll hire somewhere between 3,000 and 5,000 graduates this year. . . training . . . [and] deploying [them] along many of these digital solution opportunities . . . .
>
> [W]e're building career paths with -- for these graduates that come in. . . . The digital business, much more onshore, much more customer intimate, and we're making big investments in those centers. Not only the centers themselves but then in the hiring and re-skilling of people that we have to deploy against those opportunities.

209.    Likewise, during the August 7, 2018 earnings call, Defendant Saleh stated that DXC had "hired more than 6,000 new employees to support our continued shift to digital and drive location mix and pyramid improvements." Saleh further stated, "I also want to tell you that we're reinvesting in the business. It's not just about cost reduction. We are -- as we mentioned, across

the way, we're putting quite a bit of investment in our digital transformation ourselves and up-skilling our employee base and also training them and also attracting new talent[.]"

210.   Defendants Lawrie and Saleh's statements quoted in ¶¶208-09 above were materially false and misleading when made because, as Defendants have admitted and as discussed further above: 1) in fact, Defendants had actually "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth"; and 2) Defendants knew—but concealed from investors—that their reckless cost-cutting measures undermined the Company's investments to attract and train the talent needed to support the Company's digital growth.

211.   On August 15, 2018, DXC held its annual shareholding meeting. At that meeting, Defendant Lawrie stated that Defendants were "building on the momentum established during the first 16 months with a focus on a number of key areas," including DXC's "continued shift to digital" and "continuing to invest in our people." Lawrie continued, "[W]e're continuing to ramp up training and certification programs and are recruiting people with the right next-gen skills."

212.   Defendants Lawrie's statements quoted in ¶211 above were materially false and misleading when made because, as Defendants have admitted and as discussed further above: 1) DXC's "momentum established during the first 16 months" had actually "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," which Defendants knew—but concealed from investors—undermined the Company's ability to "recruit[] people with the right next-gen skills"; and 2) as a result of Defendants' reckless cost-cutting measures, Defendants knew—but concealed from investors—Defendants could not train and "recruit[] people with the right next-gen skills" as needed to "continue[] [the] shift to digital."

### D. Defendants' False and Misleading Statements and Omissions Concerning DXC's Digital Growth

213. During the Company's February 8, 2018 earnings call, Defendant Lawrie stated that "Cloud revenue was up 13% year-over-year, and book-to-bill in the quarter was 1x," and spoke generally of Cloud's importance to the Company's pivot to growth through digital, stating that Defendants "have been a little more successful than we had planned in terms of offsetting the decline in the legacy infrastructure business. We've been more successful offsetting that with cloud and some of our other digital offerings. So that has gone, in all candor, a little better than what we had modeled and what we had communicated . . . . I mean, we're seeing 24%, 25% growth in our enterprise cloud apps business."

214. Defendant Lawrie's statements quoted in ¶213 above were materially false and misleading when made because, as discussed further above, just months earlier, in December 2017, DXC had re-classified certain work done by the Company's Consulting group as part of the Company's Cloud offering in a deliberate effort to manipulate the impression of the Company's digital business.

### E. Defendants Overstated the Value of the Company's Largest Asset

215. On February 9, 2018, DXC filed its Form 10-Q for third quarter fiscal year 2018, which was signed by Defendants Lawrie and Saleh. In it, Defendants reported "Goodwill" of $9.32 billion, making it the largest asset on the Company's balance sheet. Of that total, over 77% came from the $7.208 billion in goodwill recognized from the acquisition of HPE by CSC (which created DXC), which itself was over 73% of the purchase price of $9.85 billion. The Company stated that this goodwill "was attributable to the synergies expected to be achieved by combining the businesses of CSC and HPES, expected future contracts and the acquired workforce. The

cost-saving opportunities are expected to include improved operating efficiencies and asset optimization."

216.    On May 29, 2018, DXC filed its Form 10-K for fiscal year 2018, which was signed by Defendants Lawrie and Saleh. In it, DXC reported that "Goodwill" had increased by $332 million, to $9.652 billion, still the largest asset on the Company's balance sheet. This increase in Goodwill in part reflected the Company's $184 million increase in goodwill it recognized from the HPE acquisition, now $7.392 billion—75% of the HPE purchase price—as a result of "a number of refinements to the . . . purchase price allocation," including an increase in liabilities of $436 million from a "valuation adjustment for outsourcing and other customer contracts taking into account continuing performance obligations." The Company again ascribed the goodwill from the HPE merger as "attributable to the synergies expected to be achieved by combining the businesses of CSC and HPES, expected future contracts and the acquired workforce. The cost-saving opportunities are expected to include improved operating efficiencies and asset optimization."

217.    On August 8, 2018, DXC filed its Form 10-Q for first quarter fiscal year 2019, which was signed by Defendants Lawrie and Saleh. In it, DXC reported that "Goodwill," now $7.451 billion[5], was 25% of the Company's assets and still the largest asset on the Company's balance sheet. As in the 2018 Form 10-K, the Company allocated as goodwill $7.392 billion of the purchase price of the HPE merger; thus, even after subtracting the $2.0 billion of that goodwill that DXC had allocated to the now spun-off USPS operating segment, goodwill from the HPE merger still amounted to 72% of the Company's total goodwill.

---

[5] As the Company disclosed, the reduction in "Goodwill" reflects its spin-off on June 1, 2018 of the Company's USPS segment into its own entity, Perspecta.

218.    DXC's statements quoted in ¶¶215-17 above were materially false and misleading when made because, as discussed further above, a substantial amount of the Company's Goodwill related to the over $7 billion in goodwill that the Company acquired from the HPE merger that created DXC, which the Company attributed to "cost-saving opportunities" and "expected synergies" but which Defendants knew—but concealed from investors—were actually reckless cost-cutting measures, including quota-driven workforce reductions designed only to manage earnings, that had already caused and would continue to cause serious execution issues and delay DXC from bringing on the resources needed to support its promised digital growth. As a result, throughout the Class Period, the Company overstated the value of the Company's Goodwill, the largest asset on its balance sheet.

## VIII.    LOSS CAUSATION

219.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiffs and the Class to suffer substantial losses.

220.    During the Class Period, Lead Plaintiffs and the Class purchased or otherwise acquired shares of DXC common stock at artificially inflated prices and were damaged thereby when the price of those shares declined when the truth was revealed and when the risks that Defendants concealed with their false statements materialized. The price of DXC shares declined by statistically significant amounts, causing investors losses, when Defendants' misrepresentations and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed and/or the foreseeable risks that had been fraudulently concealed by Defendants materialized.

221.    First, as discussed more fully above, a news article published in *The Register* on October 24, 2018, began to reveal the falsity of, and materialize the risks concealed by, Defendants' materially false and misleading statements and omissions by exposing the growing

customer dissatisfaction as a result of the Company's much-discussed cost-cutting efforts. *See, e.g.*, ¶¶74-83. As a result, the price of DXC shares suffered a statistically significant decline of over 16%, from $87.56 per share at the close on October 23, 2018, to $73.25 at the close on October 24, 2018, on high trading volume.

222.    Then, on November 6, 2018, the truth became fully revealed, and the concealed risks fully materialized, when DXC announced hundreds of millions of dollars in revenue shortfalls as the Company finally admitted it was suffering from "execution issues" and was unable to muster the resources needed for the digital growth it discussed throughout the Class Period. *See, e.g.*, ¶¶84-96. As a result, the price of DXC common stock suffered a statistically significant one-day decline of over 12%, from $72.21 per share at the close on November 6, 2018, to $63.21 per share on November 7, 2018, on high trading volume.

223.    Accordingly, as a result of their purchases of DXC stock during the Class Period, Lead Plaintiffs and other members of the Class suffered significant harm.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

224.    In addition to the facts alleged in Section VI above and elsewhere herein,[6] additional facts give rise to the strong inference that, throughout the Class Period, Defendants knew or recklessly disregarded that their statements and omissions, as set forth in Section VII, were materially false and misleading when made.

225.    Specifically, the Individual Defendants were motivated to artificially inflate the price of DXC's stock so that they could maximize the sales of substantial amounts of their personal

---

[6] The cumulative knowledge of all members of the Company's management team, including the Individual Defendants, is properly imputed to DXC.

holdings. The Individual Defendants' transactions during the Class Period were made at times and amounts that were highly suspicious, unusual, and out of character with prior sales.

226.    The charts below compare the Individual Defendants' sales during the nine-month Class Period with their sales made in the nine months immediately preceding the Class Period (the "Control Period"):

**Class Period Sales by Defendant Lawrie**

| Trade Date | Shares Sold | Gross Proceeds |
|---|---|---|
| 03/28/18 | 100 | $10,202 |
| 04/10/18 | 7,400 | $757,101 |
| 04/11/18 | 2,500 | $256,188 |
| 04/26/18 | 2,500 | $257,899 |
| 04/27/18 | 2,500 | $257,297 |
| 05/08/18 | 2,500 | $256,042 |
| 05/09/18 | 2,500 | $257,348 |
| 08/28/18 | 55,549 | $4,989,600 |
| 09/13/18 | 30,000 | $2,771,163 |
| 09/27/18 | 2,500 | $235,373 |
| 09/28/18 | 2,500 | $234,127 |
| **Total** | **110,549** | **$10,282,339** |

**Class Period Sales by Defendant Saleh**

| Trade Date | Shares Sold | Gross Proceeds |
|---|---|---|
| 08/08/18 | 19,285 | $1,735,650 |
| 08/24/18 | 5,715 | $514,476 |
| 09/07/18 | 25,678 | $2,340,806 |
| 09/11/18 | 4,322 | $389,066 |
| 09/13/18 | 50,000 | $4,601,385 |
| **Total** | **105,000** | **$9,581,384** |

**Summary of Shares Sold**

| Name | Control Period | | Class Period | |
| | Shares Sold | Gross Proceeds from Sale | Shares Sold | Gross Proceeds from Sale |
|---|---|---|---|---|
| Lawrie, John Michael | 0 | $0 | 110,549 | $10,282,339 |
| Saleh, Paul N. | 181,206 | $14,808,909 | 105,000 | $9,581,384 |
| **Grand Total** | **181,206** | **$14,808,909** | **215,549** | **$19,863,723** |

227.    The timing of DXC stock sales by the Individual Defendants was highly suspicious and unusual.

228.     Defendant Lawrie did not sell any shares of DXC stock during the Control Period. During the Class Period, however, Defendant Lawrie sold DXC stock on eleven occasions for total sale of 110,549 shares for proceeds of *$10,282,339*.

229.     While Defendant Saleh did sell stock during the Control Period, those sales were made pursuant to conversions of stock that he was awarded at prices significantly below DXC's then-market price. Specifically, during the Control Period: on July 17, 2017, Saleh sold 59,824 shares of DXC stock following a conversion of the same number of shares that same day; on August 9, 2017, Saleh sold 40,460 shares of DXC stock following a conversion of the same number of shares that same day; and, finally, on August 15, 2017, Defendant Saleh sold 80,922 shares following a conversion of the same number of shares that same day. Accordingly, all of Defendant Saleh's Control Period sales were made pursuant to conversions of stock he was awarded at prices significantly below DXC's then-market price, and are not comparable to his massive Class Period open market sales.

230.     The Individual Defendants' stock sales represented meaningful decreases in Defendants' overall holdings, and these sales were not offset by personal acquisitions of DXC stock.

231.     At the start of the Class Period, Defendant Lawrie held 646,110 shares of DXC common stock. He had net sales of 110,549 shares during the Class Period, representing a decrease of *more than 17% of his holdings*.

232.     Likewise, Defendant Saleh held 136,289 shares of DXC stock at the start of the Class Period. He sold 105,000 shares during the Class Period, including the RSUs awarded to Defendant Saleh during the Class Period, representing a decrease of approximately 77%.

233. Finally, the timing of these sales is also suspicious. All of the Individual Defendants' sales occurred before the first corrective disclosure in *The Register* on October 24, 2018, which caused the Company's stock price to decline. Indeed, the vast majority of these sales occurred just weeks earlier, in August and September 2018, just before Lawrie "blamed Puri for a 10 to 15 per cent shortfall in [forecast] revenues" in a nonpublic meeting at DXC.

234. Considered collectively, the Individual Defendants' Class Period DXC stock sales support an inference of scienter because: (i) Defendant Lawrie sold no stock during the Control Period and then sold over $10 million worth of shares (excluding an exercise) during the Class Period; (ii) the quantity of shares sold by Defendants Lawrie and Saleh represented a significant percentage of the Individual Defendants' overall total holdings; and (iii) many of these sales were timed to capitalize on DXC's inflated stock price before Defendants' fraud first became partially known to investors.

235. The enormous personal benefits that Defendants Lawrie and Saleh received through their insider sales were in addition to other significant compensation they received. Indeed, Hilton, who as noted above was a senior executive with the Company during much of the Class Period, has alleged in the Hilton Complaint that Defendant Lawrie controlled DXC's Compensation Committee, which acted "as a rubber stamp for Lawrie." According to Hilton, the Compensation Committee  exercised no meaningful independent oversight of Lawrie. This is evidenced by, among other things, the awards of $5 million and $1.584 million in incentive awards in June 2018, at a time when Hilton—the head of Global Delivery—was not approved for a single dollar.

## X.  PRESUMPTION OF RELIANCE

236. At all relevant times, the market for DXC stock was an efficient market for the following reasons, among others:

(a)     DXC stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     DXC stock traded at high weekly volumes;

(c)     As a regulated issuer, DXC filed periodic public reports with the SEC and the NYSE;

(d)     DXC was eligible to, and did, file registration statements with the SEC on Form S-3;

(e)     DXC regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(f)     DXC was followed by several securities analysts employed by major brokerage firms, including Barclays, BMO Capital Markets, Cantor Fitzgerald, CFRA, Cowen, Deutsche Bank, Evercore, Jefferies, J.P. Morgan, Morgan Stanley, RBC Capital Markets, Sadif Investment Analytics, Susquehanna Financial Group, SunTrust Robinson Humphrey, and Wells Fargo. Each of these reports was publicly available and entered the public marketplace.

237.    As a result of the foregoing, the market for DXC stock promptly digested current information regarding DXC from all publicly available sources and reflected such information in the price of DXC common stock. Under these circumstances, all purchasers of DXC stock during the Class Period suffered similar injury through their purchase of DXC stock at artificially inflated prices and the presumption of reliance applies.

238.    In the alternative, Lead Plaintiffs are also entitled to a class-wide presumption of reliance under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406

U.S. 128 (1972), because the claims asserted herein are predicated on Defendants' omissions of material fact that there was a duty to disclose. Specifically, reasonable investors would have considered the following facts, among others, important in making investment decisions: 1) that Defendants had "been primarily focused on taking people out" and "more preoccupied with [cost-cutting] than growth," even as they understood that "there is some trade-off between revenues and cost"; 2) that, on May 15, 2018, DXC had accused the Executive Vice President in charge of its largest division of "material misconduct" and a "substantial and willful failure" to render services, yet that Executive Vice President would remain in his role even into the second quarter of fiscal year 2019; 3) DXC's "workforce optimization" was actually reckless, quota-driven workforce reductions that were designed to manage earnings, not optimize the workforce; 4) DXC's reckless cost-cutting measures were causing serious execution issues and delaying DXC from bringing on the resources needed to support digital growth; 5) Defendants did not have a reasonable basis for DXC's revenue projections and instead had access to information contradicting it; and 6) DXC's "digital" classifications were changed based on political decisions made to influence the market.

239.    Because this action involves Defendants' failure to disclose material adverse information regarding the above—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of this information to investors, as set forth above, that requirement is satisfied here.

## XI.     INAPPLICABILITY OF STATUTORY SAFE HARBOR

240.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

241.    Alternatively, to the extent that the statutory safe harbor otherwise would apply to any of the allegedly false or misleading forward-looking statements, Defendants are liable for those statements because, at the time each of these statements was made, the speaker knew the statement was false or misleading and the statement was authorized or approved by an executive officer, director, or other control person of DXC who knew that the statement was false. These and similar arguably forward-looking statements cannot be protected under the PSLRA safe harbor.

## XII.    CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5,
Against All Defendants**

242.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

243.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause economic harm to Lead Plaintiffs, KBC's funds, and other members of the Class.

244.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

245.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged, and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

246.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

247.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal DXC's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

248.    Lead Plaintiffs, KBC's funds, and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased DXC stock and were harmed when the truth about DXC negatively impacted the price of those securities. Lead Plaintiffs, KBC's funds, and the Class would not have purchased DXC stock at the prices they paid, or at all, had they been aware of the truth about DXC.

249.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered harm in connection with their respective purchases of the Company's stock during the Class Period.

250.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

<u>**COUNT II**</u>

**For Violations of Section 20(a) of the Exchange Act and Rule 10b-5,
Against the Individual Defendants**

251.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

252.    The Individual Defendants acted as controlling persons of DXC within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about DXC, the Individual Defendants had the power and ability to control the actions of DXC and its employees.

253.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**XIII.    CLASS ACTION ALLEGATIONS**

254.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and on behalf of a Class of persons who purchased or otherwise acquired DXC stock during the Class Period, and were damaged thereby.

255.    Excluded from the Class are the Defendants, members of the immediate family of each Defendant, any person, firm, trust, corporation, officer, director or other individual or entity

in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any of these excluded persons.

256. This action is properly maintainable as a class action for the following reasons:

(a) The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds of thousands of members in the Class. As of January 31, 2019, DXC has over 268 million shares of stock outstanding, owned by at least hundreds or thousands of investors. Further, DXC's stock was actively traded throughout the Class Period on NYSE, an efficient market.

(b) Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

(1) Whether Defendants violated the federal securities laws;

(2) Whether Defendants omitted and/or misrepresented material facts;

(3) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(4) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were materially false and misleading;

(5) Whether Defendants' misconduct impacted the price of DXC stock; and

(6) Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

(c)     Lead Plaintiffs' claims are typical of those of the Class. Lead Plaintiffs and KBC's funds were damaged from their purchases (or their Fund's purchases) of DXC common stock during the Class Period. Lead Plaintiffs have no interests that are adverse or antagonistic to the interests of the Class.

(d)     Lead Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature. Accordingly, Lead Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

(e)     Lead Plaintiffs anticipate that there will not be any difficulty in the management of this litigation as a class action.

257.    For the reasons stated above, a class action is superior to other available methods for the fair and efficient adjudication of the claims asserted in this Complaint. Because of the size of the individual class members' claims, few, if any, class members could afford to seek legal redress individually for the wrongs complained of in this action.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding damages to Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all harm sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest on the damages;

(c)     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

       (d)      Awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## XV.    JURY DEMAND

Lead Plaintiffs demand a trial by jury.

Dated: April 15, 2019               Respectfully submitted,

*/s/ Nathan D. Finch*

**MOTLEY RICE LLC**

Nathan D. Finch (VSB No. 34290)
401 9th St. NW, Suite 1001
Washington, DC 20004
Telephone: (202) 232-5504
Facsimile: (202) 232-5513
nfinch@motleyrice.com

-and-

Gregg S. Levin
Christopher F. Moriarty
Erin Casey Williams
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
glevin@motleyrice.com
cmoriarty@motleyrice.com
ecwilliams@motleyrice.com

**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**

John C. Browne
Lauren A. Ormsbee
Jesse L. Jensen
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 554-1400
Fax: (212) 554-1444
johnb@blbglaw.com
lauren@blbglaw.com

jesse.jensen@blbglaw.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

**WEBSTER BOOK LLP**

Steven T. Webster (VSB No. 31975)
Aaron S. Book (VSB No. 43868)
300 North Washington Street, Suite 404
Alexandria, VA 22314
Telephone: (888) 987-9991
Facsimile: (888) 987-9991
swebster@websterbook.com
abook@websterbook.com

*Liaison Counsel*

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Steven J. Toll
1100 New York Avenue
Fifth Floor
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com

*Liaison Counsel*

**APPENDIX A**
**Former Employee Key**

| FE No. | Tenure | Relevant Position(s) or Role(s) |
|---|---|---|
| 1. | 2017 – 2018 | Chief Technology Officer for Americas Region |
| 2. | 2017 – 2018 | Senior Manager, Global Service Desk – Americas |
| 3. | 2017 – 2018 | Senior Finance Manager |
| 4. | 2017 – 2018 | Client Sales Executive |
| 5. | 2017 – 2019 | Technology Principal Consultant |
| 6. | 2017 – 2018 | Chief Technologist for DXC's Americas Travel & Transportation Industry |
| 7. | 2017 – 2019 | Account Delivery Lead |
| 8. | 2017 – 2019 | Pricing Consultant |
| 9. | 2017 – 2019 | Engagement Manager |
| 10. | 2017 | Vice President of Talent Acquisition |
| 11. | 2017 – 2018 | Vice President & General Manager |
| 12. | 2017 – 2018 | Director of Security Consulting & Integration |
| 13. | 2017 – 2018 | Director of Enterprise & Cloud Applications, Americas |
| 14. | 2017 – 2019 | Director |
| 15. | 2017 – 2019 | Principal, Digital Experience Consulting |

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2019, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

*/s/ Nathan D. Finch*
Nathan D. Finch (VSB No. 34290)
401 9th St. NW, Suite 1001
Washington, DC 20004
Telephone: (202) 232-5504
Facsimile: (202) 232-5513
nfinch@motleyrice.com