UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

|  |  |
|---|---|
| IN RE DXC TECHNOLOGY COMPANY SECURITIES LITIGATION | ) ) ) ) ) ) ) ) |

No. 1:18-cv-01599-AJT-MSN

<u>DEMAND FOR JURY TRIAL</u>

**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 3

LEGAL STANDARD ............................................................................................................... 6

ARGUMENT ............................................................................................................................ 6

I.     PLAINTIFFS ALLEGE ACTIONABLE MISSTATEMENTS ............................................... 6

       A     Defendants' Misstatements Are Not Forward-Looking Statements
             Protected By The PSLRA's Safe Harbor ................................................................ 8

       B     Plaintiffs Also Have Pleaded Facts Establishing Actual Knowledge That
             Defendants' Forward-Looking Statements Were False ....................................... 10

       C     Defendants' Statements Are Not Immaterial Puffery .......................................... 12

       D     Defendants' "Opinion" Statements Are Actionable ............................................ 15

       E     Plaintiffs Adequately Pled That Statements Of Current Or Historical Fact
             Were False When Made ........................................................................................ 16

II.    PLAINTIFFS PLEAD A STRONG INFERENCE OF SCIENTER ....................................... 17

       A     The Pleading Standard For Scienter .................................................................... 17

       B     Viewed Holistically, The Complaint's Allegations Support A Strong
             Inference Of Scienter .......................................................................................... 18

       C     Defendants' Knowledge Or Reckless Disregard Of The Inaccuracy Of
             Their Public Statements Bolsters A Strong Inference of Scienter ...................... 18

       D     Defendants' Attempts To Discredit The Former Employee Information
             Fail ....................................................................................................................... 24

       E     The Fraud Concerned DXC's "Core Operations" ............................................... 26

       F     The Proximity Between The Misstatements And Omissions And The
             Revelations Of The Truth Further Bolsters The Inference Of Scienter .............. 27

       G     Defendants' Stock Sales Support A Motive To Defraud ..................................... 27

III.   THE COMPLAINT ADEQUATELY ALLEGES LIABILITY UNDER SECTION 20(a) ...................... 30

CONCLUSION ........................................................................................................................ 30

# TABLE OF AUTHORITIES

**CASES**

*Arnlund v. Deloitte & Touche LLP*,
    199 F. Supp. 2d 461 (E.D. Va. 2002) ................................................................. 6, 27

*Bielousov v. GoPro, Inc.*,
    No. 16-cv-06654-CW, 2017 WL 3168522 (N.D. Cal. July 26, 2017) .................... 13

*California Public Employees' Retirement System v. Chubb Corp.*,
    No. 00-4285(GEB), 2002 WL 33934282 (D.N.J. June 26, 2002 ........................... 11

*Carlucci v. Han*,
    907 F. Supp. 2d 709 (E.D. Va. 2012) ..................................................................... 6

*City of Ann Arbor Employees' Retirement System v. Sonoco Products Co.*,
    827 F. Supp. 2d 559 (D.S.C. 2011) .................................................................. 8, 10

*City of Monroe Employees Retirement System v. Bridgestone Corp.*,
    399 F.3d 651 (6th Cir. 2005) ................................................................................ 13

*City of Pontiac General Employees' Retirement System  v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) .................................................................. 19

*Cozzarelli v. Inspire Pharmaceuticals Inc.*,
    549 F.3d 618 (4th Cir. 2008) ................................................................................ 17

*Dunn v. Borta*,
    369 F.3d 421 (4th Cir. 2004) ................................................................................ 12

*Epstein v. World Acceptance Corp.*,
    203 F. Supp. 3d 655 (D.S.C. 2016) ...................................................................... 15

*Epstein v. World Acceptance Corp.*,
    No. 6:14-cv-01606-MGL, 2015 WL 2365701 (D.S.C. May 18, 2015) ........... 6, 7, 10

*Feyko v. Yuhe International, Inc.*,
     No. 11-05511 DDP (PJWX), 2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ............ 16

*Gauquie v. Albany Molecular Research, Inc.*,
    No. 14 CV 6637 (FB) (SMG), 2016 WL 4007591 (E.D.N.Y. July 26, 2016) ....... 19

*In re Aetna Inc. Securities Litigation*,
    34 F. Supp. 2d 935 (E.D. Pa. 1999) ..................................................................... 13

*In re American Apparel, Inc. Shareholder Litigation*,
    No. CV 10-06352 MMM (RCx), 2012 WL 1131684 (C.D. Cal. Jan. 13, 2012) ....... 8

*In re Cardinal Health Inc. Securities Litigations*,
    426 F. Supp. 2d 688 (S.D. Ohio 2006) ................................................................. 29

*In re Century Business Services Securities Litigation*,
    No. 1:99CV02200, 2002 WL 32254513 (N.D. Ohio June 27, 2002) ................. 13, 29

*In re Citigroup Inc. Securities Litigation*,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010) .................................................................. 23

*In re Computer Sciences Corp. Securities Litigation*,
  890 F. Supp. 2d 650 (E.D. Va. 2012) ................................................................. 8

*In re Countrywide Financial Corp. Derivative Litigation*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008) ............................................................ 28

*In re Coventry Healthcare, Inc. Securities Litigation*,
  No. 08:09-CV-2337-AW, 2011 WL 1230998 (D. Md. Mar. 30, 2011) ................... 25

*In re Cree, Inc. Securities Litigation*,
  333 F. Supp. 2d 461 (M.D.N.C. 2004) ............................................................. 30

*In re Datastream Systems, Inc. Securities Litigation*,
  No. 6:99-0088-13, 2000 WL 33176025 (D.S.C. Jan. 27, 2000) ........................... 12

*In re Genworth Financial Inc. Securities Litigation*,
  103 F. Supp. 3d 759 (E.D. Va. 2015) ................................................. 15, 26, 27

*In re Grand Casinos, Inc. Securities Litigation*,
  988 F. Supp. 1273 (D. Minn. 1997) ................................................................ 27

*In re Guilford Mills, Inc. Securities Litigation*,
  No. 98 Civ. 7739(CLB), 1999 WL 33248953 (S.D.N.Y. July 21, 1999) ............... 28

*In re Impac Mortgage Holdings, Inc. Securities Litigation*,
  554 F. Supp. 2d 1083 (C.D. Cal. 2008) ............................................................ 12

*In re Intuitive Surgical Securities Litigation*,
  65 F. Supp. 3d 821 (N.D. Cal. 2014) ............................................................... 13

*In re JP Morgan Chase Securities Litigation*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005) .............................................................. 24

*In re Laboratory Corp. of America Holdings Securities Litigation*,
  No. 1:03CV591, 2006 WL 1367428 (M.D.N.C. May 18, 2006) ............................ 9

*In re Level 3 Communications, Inc. Securities Litigation*,
  667 F.3d 1331 (10th Cir. 2012) ...................................................................... 13

*In re Maximus, Inc. Securities Litigation*,
  No. 1:17-cv-0884 (AJT/IDD), 2018 WL 4076359 (E.D. Va. Aug. 27, 2018) ......... 11

*In re MicroStrategy, Inc. Securities Litigation*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ......................................................... 29, 30

*In re MTC Electronic Technologies Shareholders Litigation*,
  898 F. Supp. 974 (E.D.N.Y. 1995) .................................................................. 29

*In re Oxford Health Plans, Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ..................................................................... 30

*In re PTC Therapeutics, Inc. Securities Litigation*,
  No. 16-1124 (KM) (MAH), 2017 WL 3705801 (D.N.J. Aug. 28, 2017) ................ 19

*In re Questcor Securities Litigation*,
  No. SA CV 12-01623 DMG (FMOx), 2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) .... 30

*In re SCANA Corp. Securities Litigation,*
  No. 3:17-2616-MBS, 2019 WL 1427443 (D.S.C. Mar. 29, 2019) ............................ 8

*In re Tronox, Inc. Securities Litigation,*
  No. 09 Civ. 6220(SAS), 2010 WL 2835545 (S.D.N.Y. June 28, 2010) .................... 12

*In re Versant Object Technology Corp.,*
  No. C 98-00299 CW, 2001 WL 34065027 (N.D. Cal. Dec. 4, 2001) ...................... 28

*In re WorldCom, Inc. Securities Litigation,*
  294 F. Supp. 2d 392 (S.D.N.Y. 2003) ...................................................... 21

*Institutional Investors Group v. Avaya, Inc.,*
  564 F.3d 242 (3d Cir. 2009) ................................................................. 19

*Jui-Yang Hong v. Extreme Networks, Inc.,*
  No. 15-cv-04883-BLF, 2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) .................... 13

*Katyle v. Penn National Gaming, Inc.,*
  637 F.3d 462 (4th Cir. 2011) ................................................................. 2

*KBC Asset Management NV v. 3D Systems Corp.,*
  No. 0:15-CV-02393-MGL, 2016 WL 3981236 (D.S.C. July 25, 2016) .................... 19

*Kiken v. Lumber Liquidators Holdings, Inc.,*
  155 F. Supp. 3d 593 (E.D. Va. 2015) .............................................. 7, 17, 26

*Lefkoe v. Jos. A. Bank Clothiers,*
  No. WMN-06-1892, 2007 WL 6890353 (D. Md. Sept. 10, 2007) .................. 9, 24, 28

*Longman v. Food Lion, Inc.,*
  197 F.3d 675 (4th Cir. 1999) ................................................................. 7

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
  513 F.3d 702 (7th Cir. 2008) ................................................................. 17

*Matrix Capital Management Fund, LP v. BearingPoint, Inc.,*
  576 F.3d 172 (4th Cir. 2009) ................................................................. 23

*McCloud v. Funaiock,*
  No. 4:15cv5, 2015 WL 13439761 (E.D. Va. Aug. 17, 2015) ................................ 12

*Nieman v. Duke Energy Corp.,*
  No. 3:12-cv-00456-MOC-DSC, 2013 WL 4004274 (W.D.N.C. July 26, 2013) .......... 7

*Novak v. Kasaks,*
  216 F.3d 300 (2d Cir. 2000) ................................................................. 14

*Ollila v. Babcock & Wilson Enterprises, Inc.,*
  No. 3:17-cv-109, 2018 WL 792069 (W.D.N.C. Feb. 8, 2018) ................................ 8

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund,*
  135 S. Ct. 1318 (2015) ................................................................ 7, 15, 16

*Ottmann v. Hanger Orthopedic Group, Inc.,*
  353 F.3d 338 (4th Cir. 2003) ................................................................. 17

*Payne v. DeLuca*,
   433 F. Supp. 2d 547 (W.D. Pa. 2006)................................................................ 12

*Pearce v. UBS Paine Webber, Inc.*,
   No. 3:02-2409-17, 2003 WL 25518056 (D.S.C. Nov. 4, 2003) ............................... 7

*Phillips v. LCI International, Inc.*,
   190 F.3d 609 (4th Cir. 1999) ........................................................................ 7

*Phillips v. Triad Guaranty Inc.*,
   No. 1:09CV00071, 2013 WL 2403281 (M.D.N.C. May 31, 2013)................... 24, 25

*Proter v. Medifast, Inc.*,
   No. GLR-11-720, 2013 WL 1316034 (D. Md. Mar. 28, 2013) .............................. 29

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ................................................................... 19, 27

*Roberti v. OSI Systems, Inc.*,
   No. CV 13-9174-MWF (VBKx), 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015).................... 18

*Roofer's Pension Fund v. Papa*,
   No. 16-2805, 2018 WL 3601229 (D.N.J. July 27, 2018) ...................................... 25

*South Ferry LP # 2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009)........................................................ 20

*Teachers' Retirement System of Louisiana v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) .............................................................. 6, 7, 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).......................................................................... 17, 18

*Think Village-Kiwi, LLC v. Adobe Systems, Inc.*,
   No. C 08-04166 SI, 2009 WL 3837270 (N.D. Cal. Nov. 16, 2009) .......................... 2

*United States Securities & Exchange Commission v. Agora, Inc.*,
   No. MJG-03-1042, 2007 WL 9725170 (D. Md. Aug. 3, 2007)............................... 12

*United States Securities & Exchange Commission v. Pirate Investor LLC*,
   580 F.3d 233 (4th Cir. 2009) ........................................................................ 18

*Winslow v. BancorpSouth, Inc.*,
   No. 3:10-00463, 2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011) ........................... 29

*Yates v. Municipal Mortgage & Equity, LLC*,
   744 F.3d 874 (4th Cir. 2014) ................................................................ 24, 26

*Zuckerman v. Smart Choice Automotive Group, Inc.*,
   No. 6:99-CV-237-ORL-28A, 2000 WL 33996254 (M.D. Fla. Aug. 29, 2000) ...................... 29

## STATUTES

15 U.S.C. § 78u-4(b)(1)(B)........................................................................ 6

**R**ULES

Fed. R. Civ. P. 15(a) .................................................................................................................. 30

Lead Plaintiffs respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint (ECF No. 53).[1]

## INTRODUCTION

This case arises out of Defendants' misrepresentations and omissions about the purported success of a "strategic roadmap" for DXC.  Throughout the Class Period, in direct contrast to their public statements, Defendants knew that their reorganization plan was cutting DXC's workforce and costs so aggressively that it was crippling the Company's ability to service its clients and impairing its long-term sustainability.  While Defendants told investors their plan was "not just about taking costs out," in reality Defendants used cost-cutting to manage earnings and boost the Company' stock price in the short-term, allowing the Individual Defendants to profit from tens of millions of dollars' worth of insider sales while the Company's stock price was inflated.  The scheme could not continue forever: as Defendants were aware throughout, their cost-cutting measures resulted in serious execution issues, loss of contracts, and delayed DXC from adding resources necessary to support revenue projections, causing statistically significant stock price declines when the truth was revealed.

As is all too routine in securities class action litigation, Defendants have filed the obligatory motion to dismiss, improperly inserting their own counter-narrative in an attempt to explain away their wrongdoing, blaming "customer behavior beyond their control," and asserting that Plaintiffs

---

[1]    "Lead Plaintiffs" or "Plaintiffs" are KBC Asset Management NV and Arbejdsmarkedets Tillaegspension.  "Defendants" are DXC Technology Company ("DXC" or the "Company"), J. Michael Lawrie ("Lawrie"), and Paul N. Saleh ("Saleh," and together with Lawrie, the "Individual Defendants").  References to "Mem. _" are to pages of Defendants' Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 54).  Citations to "¶ _" are to paragraphs of the Consolidated Class Action for Violations of the Federal Securities Laws (ECF No. 50).  Unless otherwise noted, all emphasis is added and internal citations and quotation marks are omitted.

fail to plead any actionably false statements and that none of the challenged statements were made with scienter.[2]  Each of Defendants' arguments are without merit.

The Complaint readily alleges that Defendants made numerous misstatements while in possession of contradictory non-public information.  Among other things, one of the Company's most senior executives, Stephen J. Hilton ("Hilton"), personally warned Lawrie that the pace of DXC's cost-cutting and massive layoffs would have direct "negative impacts on customer satisfaction" and compromise DXC's long-term success, and also reported to Lawrie that his (Lawrie's) budgets and forecasts were unachievable.  There could not be a better-placed insider to corroborate Plaintiffs' allegations.  While not required to plead evidence, the Complaint also cites to a letter that Lawrie wrote terminating Hilton for the poor performance of the Company's largest division – just one week before Lawrie publicly claimed that Hilton's division had "continued to drive increased productivity while improving service levels for our clients" and telling investors to expect revenue of $21.5 billion to $22 billion for fiscal year 2019.

When the truth about Defendants' fraud was revealed to the market in October and November 2018, DXC's share price fell precipitously.  Tellingly, Defendants do not dispute the element of loss causation (i.e., "that the defendant's material misrepresentation or omission 'caused the loss for which the plaintiff seeks to recover damages'").  *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 465 (4th Cir. 2011).  In other words, Defendants do not contest that DXC's share price fell as the truth about Defendants' fraudulent misstatements was revealed.

---

[2]      As part of their Motion, Defendants have attached an 18-page appendix purporting to list all of the alleged misstatements.  *See* ECF No. 54-1.  Defendants contend that this appendix is "[f]or the Court's convenience," Mem. 2 n.1, but in reality this chart appears to be an attempt to exceed the 30-page limit and should be disregarded.  *See, e.g.*, *Think Village-Kiwi, LLC v. Adobe Sys., Inc.*, No. C 08-04166 SI, 2009 WL 3837270, at *7 (N.D. Cal. Nov. 16, 2009) (striking attorney-prepared chart as improper argument in excess of page limit).  In any event, each of the alleged misrepresentations should be sustained for the reasons stated herein.

## STATEMENT OF FACTS

DXC is an information technology ("IT") company that was formed on April 1, 2017 through the merger of two other IT companies, Computer Sciences Corporation ("CSC") and Hewlett Packard Enterprise Company ("HPE").  ¶ 29.  Defendants Lawrie and Saleh joined CSC as CEO and CFO, respectively, in 2012, and immediately implemented what *The Washington Post* described as "a case study of everything people think is wrong with American capitalism," including "plumping up share prices through stock buybacks, special dividends and other feats of financial engineering," as well as significant cost-cutting and outsourcing measures.  ¶¶ 30-31.  On March 29, 2017, just prior to the close of the merger, the Individual Defendants told investors of their "very straightforward" plan:  DXC would overcome the declining traditional IT market by leveraging the combined client base of CSC and HPE to drive down costs, and in turn convince clients to "reinvest that savings back into modernizing [their] application portfolio" and embark on a "Digital Transformation" through DXC's digital solutions and services.  ¶¶ 33-34.  Critical to this plan were the promised billions of dollars in cost-savings over the first three years, including chiefly through a "workforce optimization" plan.  *See, e.g.*, ¶¶ 35-36, 47, 54, 59, 161, 171, 173, 178-79.

To assuage investor concerns, throughout the Class Period, Defendants actively reassured the market that their plan was "not just about taking cost out" and that the Company's cost-cutting efforts were not hurting DXC's "critical" ability to execute for its clients.  *See, e.g.*, ¶¶ 37, 99, 204.  Defendants acknowledged that a skilled workforce was "absolutely critical" for the Company to achieve its Fiscal Year ("FY") 2019 guidance and broader strategic plans, ¶ 64, and that DXC was "staffing the required labor for new business," ¶ 171.  Unbeknownst to investors, however, the Company was not investing in the new employees required to meet demand.  To the contrary, Defendants implemented vast and uninformed "top-down" layoffs that were calculated to cause

3

short-term share price increases but that Defendants knew also created long-term problems, including the loss of contracts and reduced revenue and profits. *See, e.g.*, ¶¶ 10, 12, 104-09, 115, 117-20, 128, 132.

On October 24, 2018, *The Register* published an "exclusive" article that cited an internal October 9, 2018 memorandum from Lawrie. The article revealed that the Company had fired the head of its Americas sales force, Karan Puri ("Puri"), and that "DXC [was] descending into turmoil" after Lawrie had internally announced more terminations and "blamed Puri for a 10 to 15 per cent shortfall in [forecast] revenues." ¶¶ 74-75. The article also reported that sources revealed that "the company is in chaos as all the cuts are leading to mounting customer complaints." ¶ 76. DXC's stock price fell by approximately 16.3%, prompting the Company to quickly reaffirm its guidance. ¶¶ 77-78.

More bad news was to follow. On November 6, 2018, DXC reported its second quarter FY 2019 earnings, which revealed the full truth, namely that the Company was suffering significant revenue declines across all segments, with overall revenue down 8.1% year-over-year – or more than $440 million. ¶ 84. During an investor call that same day, Defendants reduced revenue guidance for the FY by approximately $800 million, from $21.2 billion to $20.7 billion. ¶ 86. Lawrie admitted that this dismal news "isn't an issue with demand," but instead that, contrary to Defendants' Class Period reassurances, the Company could not "satisfy that demand." ¶ 88. This was because, as Lawrie admitted, DXC had "run our workforce and labor programs very tightly" and, as a result, the Company "had a very thin bench." *Id.* In response, DXC's stock price declined by 12.46%, further damaging investors. ¶ 96.

None of the above was a surprise to Defendants Lawrie and Saleh. By the start of the Class Period and continuing throughout, DXC's leaders had been repeatedly warned, including by their

most senior management, that their chaotic cuts to the Company's workforce and facilities were resulting in extreme customer dissatisfaction, the departure of key employees, and an inability to secure and generate revenue on new contracts.  For example, Hilton warned Lawrie that the pace of DXC's cost cuts through massive layoffs would have direct "negative impacts on customer satisfaction."  ¶¶ 12, 104.  In particular, Hilton "repeatedly advised Lawrie about his reservations concerning the pace of cuts" and "Lawrie understood that workforce reductions could not be achieved at the pace required by his internal budget without negative impacts on customer satisfaction."  ¶ 106.  Lawrie even acknowledged in a May 15, 2018 letter to Hilton that the "Delivery" division was performing poorly and suffered from poor customer relations.  ¶¶ 14, 104, 111.  Just days later, however, Lawrie boasted that DXC – and in particular Hilton's Delivery division – had "really successfully completed the overall year 1 integration road map for DXC," "track[ed] a bit ahead of plan on revenue," and that "[p]rofit during the first year was also better than expected as we were able to accelerate many of the cost takeout synergies."  ¶¶ 15, 112.  Hilton's account is corroborated by numerous well-placed former employees, including DXC's Chief Technology Officer for the Americas region, who reported that employment cuts prevented DXC from servicing its customers and resulted in the loss of contracts.  ¶¶ 116-18.

Defendants' false representations about their reorganization plans inflated DXC's stock price during the Class Period.  As the Company's stock price rose, Defendants Lawrie and Saleh reaped tens of millions of dollars in insider stock sales and unwarranted performance-based compensation awards for themselves.  For instance, during the eight-month Class Period, Lawrie profited more than *$10 million* from sales of 110,540 shares of DXC stock – more than 17% of his holdings (after selling no shares whatsoever for the eight months prior to the Class Period).

¶¶ 9, 228, 231.  Saleh, in turn, sold a staggering *seventy-seven percent* of his personal holdings for

more than $9 million in proceeds during the Class Period.  ¶¶ 9, 232.

## LEGAL STANDARD

In considering a motion to dismiss, the Court "must accept well-pleaded allegations as true

and must construe factual allegations in favor of the plaintiff."  *Carlucci v. Han*, 907 F. Supp. 2d

709, 720-21 (E.D. Va. 2012).  To state a claim for securities fraud, a plaintiff must allege:  "(1) a

material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a

connection with the purchase or sale of a security; (4) reliance . . . (5) economic loss; and (6) 'loss

causation.'"  *Epstein v. World Acceptance Corp.*, No. 6:14-cv-01606-MGL, 2015 WL 2365701,

at *2 (D.S.C. May 18, 2015) (alteration in original).  Defendants challenge only falsity and

scienter.  In addition to the well-settled Rule 12(b)(6) standards, the Court also must consider the

heightened pleading standards of Rule 9(b) and the PSLRA.  *See Teachers' Ret. Sys. of La. v.

Hunter*, 477 F.3d 162, 170-72 (4th Cir. 2007).  But, the law is clear that a securities fraud plaintiff

is *not* required to plead evidence.  *See Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461,

475 (E.D. Va. 2002) ("[I]t is prudent to keep in mind that the PSLRA does not require a plaintiff

to prove his case in his complaint.").

## ARGUMENT

### I.     PLAINTIFFS ALLEGE ACTIONABLE MISSTATEMENTS

To survive a motion to dismiss, a securities fraud complaint must first "specify each

statement alleged to have been misleading, the reason or reasons why the statement is misleading,

and, if an allegation regarding the statement or omission is made on information and belief, the

complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-

4(b)(1)(B).  This first element of a securities fraud claim is properly pled with particularity when

the complaint "set[s] forth the time, place and content of the misrepresentations which constitute

the alleged fraud." *Pearce v. UBS Paine Webber, Inc.*, No. 3:02-2409-17, 2003 WL 25518056, at *3 (D.S.C. Nov. 4, 2003).  Further, "'any statement or omission of fact must be material,' meaning objectively significant to a reasonable investor."  *Epstein*, 2015 WL 2365701, at *5 (quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682-83 (4th Cir. 1999)).  A statement is materially false and misleading under Section 10(b) "[i]f a reasonable investor, exercising due care, ***would gather a false impression from [the] statement***, which would influence an investment decision." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999).[3]  It "is not necessary for Plaintiff to prove absolute, incontrovertible falsity."  *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 601 (E.D. Va. 2015).   Rather, Plaintiffs need only "allege[] facts and 'circumstances that, drawing reasonable inferences in their favor, would render their claims [of falsity] plausible.'"  *Nieman v. Duke Energy Corp.*, No. 3:12-cv-00456-MOC-DSC, 2013 WL 4004274, at *8 (W.D.N.C. July 26, 2013) (alteration in original).

The Complaint plainly sets forth Defendants' misleading statements concerning DXC's revenue growth, ¶¶ 157-70, workforce management and "optimization," ¶¶ 171-91, "investment in people," ¶¶ 192-212, digital growth, ¶¶ 213-14, and goodwill valuation, ¶¶ 215-18, and explains why each statement was false when made by pleading "*sufficient* facts to support a *reasonable belief* in the allegation that the defendant's statement was misleading."  *Hunter*, 477 F.3d at 174.

In response, Defendants argue that this is a classic fraud-by-hindsight case.  *See, e.g.*, Mem. 1.  But, "[j]ust as plaintiffs must plead falsity with particularity to satisfy Rule 9(b) and the PSLRA, . . . defendants cannot use the mere 'incantation of fraud-by-hindsight' to 'defeat an

---

[3]     Moreover, once a defendant chooses to speak on an issue or topic, there is a duty to speak the "whole truth."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1331 (2015) ("[L]iteral accuracy is not enough:  [a]n issuer must as well desist from misleading investors by saying one thing and holding back another.").

allegation of misrepresentations and omissions that were misleading and false at the time they were made.'" *In re Am. Apparel, Inc. S'holder Litig.*, No. CV 10-06352 MMM (RCx), 2012 WL 1131684, at \*18 (C.D. Cal. Jan. 13, 2012); *see also Ollila v. Babcock & Wilson Enters., Inc.*, No. 3:17-cv-109, 2018 WL 792069, at \*4 (W.D.N.C. Feb. 8, 2018) ("[I]t is not fraud by hindsight if allegations forecast evidence that defendants' statements were false or misleading at the time they were made.") (collecting cases). Here, the "fraud by hindsight" defense is inapplicable because the Complaint alleges with particularity why Defendants' statements were knowingly or recklessly false and misleading when they were made. *See, e.g.*, ¶¶ 10-11, 16, 105-06, 126-28, 138, 157-218.

### A      Defendants' Misstatements Are Not Forward-Looking Statements Protected By The PSLRA's Safe Harbor

Defendants argue that "[t]he lion's share" of the challenged statements fall into the statutory safe harbor for forward-looking statements. *See* Mem. 11-16. They do not, as the statements were either (a) not "forward looking" under the statute, or (b) not "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the [purportedly] forward-looking statement." *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 827 F. Supp. 2d 559, 575 (D.S.C. 2011); *see also In re SCANA Corp. Sec. Litig.*, No. 3:17-2616-MBS, 2019 WL 1427443, at \*7 (D.S.C. Mar. 29, 2019) (same). To the extent only a component of a statement is forward looking, "mixed present/future statement[s]" are "not entitled to the safe harbor with respect to the part of the statement that refers to the present." *In re Computer Scis. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 668 n.21 (E.D. Va. 2012); *see also SCANA*, 2019 WL 1427443, at \*7 ("Statements that might arguably have some forward-looking aspect are unprotected by the PSLRA safe harbor provision to the extent that they

are premised on representations of present fact.").  Moreover, Defendants had actual knowledge that their statements were false, eliminating any safe harbor.

As a threshold matter, the Complaint is replete with allegations that Defendants misrepresented current and historical facts.  *See infra* Part I.E.  Thus, this Court should reject Defendants' contention that majority of the statements at issue are "statutorily exempt from liability."  Mem. 11.  For example Lawrie's May 24, 2018 statement about making a "major investment . . . in our people," ¶ 201, and "continuing to invest very heavily in the retraining and reskilling of employees," *id.*, pertained to **the then-current state of affairs** within DXC.  *See also* ¶¶ 163, 213 (digital business had actually "been a little more successful than we had planned in terms of offsetting the decline in the legacy infrastructure business" not forward-looking).

Moreover, with respect to Defendants' statements regarding DXC's financial forecasts and future business plans, *see* Mem. 11-12 (challenging statements in ¶¶ 157-61, 181), even if those statements potentially may be considered "forward-looking," they were not accompanied by meaningful cautionary language that "convey[ed] substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement."  *In re Lab. Corp. of Am. Holdings Sec. Litig.*, No. 1:03CV591, 2006 WL 1367428, at *5 (M.D.N.C. May 18, 2006).  Indeed, "the adequacy of cautionary language is a question of fact, and, typically, **is not a question to be resolved on a motion to dismiss**."  *Lefkoe v. Jos. A. Bank Clothiers*, No. WMN-06-1892, 2007 WL 6890353, at *5 n.10 (D. Md. Sept. 10, 2007).

In their brief, Defendants point to the following purported risk disclosures:

- ▪ "Our ability to continue to develop and expand our service offerings to address . . . the demand for digital technologies and services may impact our future growth."

- ▪ "Our ability to provide customers with competitive services is dependent on our ability to attract and retain qualified personnel."

- "[A]n inability to adequately develop and train personnel and assimilate key new hires or promoted employees could have a material adverse effect on . . . our financial condition and result of operations."

Mem. 14 (alterations in original). But, it is axiomatic that "cautionary language cannot be 'meaningful' when defendants know that the potential risks they have identified have in fact already occurred and that the positive statements they are making are false." *City of Ann Arbor*, 827 F. Supp. 2d at 576 (holding it was "for a jury to decide" whether "Defendants knew the 'potential' risks identified had already occurred"). Nothing in DXC's "risk disclosures" cautioned investors that by the start of the Class Period and continuing throughout, the Company's massive workforce reductions had resulted in increased customer dissatisfaction and lost contracts that materially impacted the Company's financial health. ¶¶ 3, 10, 74-83, 108, 126-43. For example, the Complaint alleges that throughout the Class Period, Defendants' reduced, unqualified workforce was unable to service valuable long-time customers properly, resulting in tens of millions of dollars of lost contracts directly related to the failed "workforce optimization." ¶¶ 101-43. *See Epstein*, 2015 WL 2365701, at *6 (noting statements not protected by safe harbor provision if accompanying risk disclosures "purport to warn investors of risks concerning [Defendants'] practices of which Defendants were already aware"). Because the risks already had materialized, the safe harbor does not shield Defendants' statements.

**B      Plaintiffs Also Have Pleaded Facts Establishing Actual Knowledge That Defendants' Forward-Looking Statements Were False**

Finally, because Defendants made any forward-looking statements with actual knowledge of their falsity, they can find no protection under the safe harbor. Contrary to Defendants' assertion, the Complaint need not "identif[y] known facts that existed at the time of Defendants' forward-looking statements and rendered [them] ***impossible to achieve***," Mem. 16, but rather "information inconsistent with their statements," *In re Maximus, Inc. Sec. Litig.*, No. 1:17-cv-0884

(AJT/IDD), 2018 WL 4076359, at *15 (E.D. Va. Aug. 27, 2018) (Trenga, J.).  Short of a signed confession, it is difficult to imagine more sufficient allegations than those pled here:  the Complaint alleges that former Executive Vice President Hilton "routinely express[ed]" to his direct supervisor, Lawrie, and other DXC senior executives that the "pace of DXC's cost cuts . . . would have 'negative impacts on customer satisfaction.'"   ¶¶ 105-06; *see also* ¶ 12.  The Complaint further describes how, on May 15, 2018, Lawrie personally sent a letter terminating Hilton and accusing him of "material misconduct" and a "substantial and willful failure" to render services – yet, ***less than ten days later***, Lawrie told investors that Hilton's Delivery division had "continued to drive increased productivity while improving service levels for our clients," ¶¶ 14, 111-12, 181, while telling investors to expect revenue of $21.5 billion to $22 billion for fiscal year 2019, ¶¶ 7, 57, 157-58.

Accordingly, Defendants' reference to *California Public Employees' Retirement System v. Chubb Corp.*, No. 00-4285(GEB), 2002 WL 33934282 (D.N.J. June 26, 2002), is misplaced.  That decision did not address the "safe harbor," but rather held that executives' knowledge of whether an initiative eventually failed could not be inferred from the opinion of low-level "branch and commercial line managers . . . ***at the time the initiative was proposed***."  *Id.* at *21.  That is a far cry from the situation presented here:  the Complaint describes contemporaneous information that directly involved Lawrie and one of the Company's most senior executives and that was directly contrary to Defendants' statements.[4]

---

[4]     Defendants' attempts to downplay and minimize the information offered by Hilton are unavailing.  *See* Mem. 20 ("[T]he individual performance of a single employee – involved with just one of DXC's business divisions – was plainly not the sole (or even primary) driver of DXC's overall performance."); *see also id*. at 15 n.7 (contending Plaintiffs or their counsel had not "independently verified" Hilton's information).  But, Hilton was "the senior executive in charge of this [Delivery] division and its approximately 120,000 employees . . . who reported directly to

**C**      **Defendants' Statements Are Not Immaterial Puffery**

"Puffery comes into play when a court is considering the materiality of statements alleged

to have been misleading."  *Payne v. DeLuca*, 433 F. Supp. 2d 547, 561 (W.D. Pa. 2006).  In the

context of a securities fraud claim, materiality is an objective and fact-specific determination that

"involv[es] the significance of an omitted or misrepresented fact to a reasonable investor."  *In re*

*Datastream Sys., Inc. Sec. Litig.*, No. 6:99-0088-13, 2000 WL 33176025, at *2 (D.S.C. Jan. 27,

2000) (alteration in original).  Ordinarily, materiality is a "mixed question" of law and fact ***left to***

***the finder of fact to determine***.  *Id*.  Only "forward-looking statements of optimism that are 'not

capable of objective verification' and 'lack a standard against which a reasonable investor could

expect them to be pegged'" are considered puffery.  *In re Impac Mortg. Holdings, Inc. Sec. Litig.*,

554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008); *see also Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir.

2004) ("[F]actual allegations regarding [defendants'] business dealings and prospects are not

simply [puffery] but rather ***can be proven true or false***.").[5]

Ignoring this mandate, Defendants argue that "[m]any" of the challenged statements are

inactionable immaterial puffery.  *See* Mem. 16-18.  In so doing, Defendants fail to cite the

---

Defendant Lawrie and was listed in DXC's SEC filings as one of the five top named executive
officers of DXC."  ¶ 11.  And, while Defendants' claim that Hilton is not disinterested, Mem. 15
n.7, the credibility determination that they seek must await another day, *see McCloud v. Funaiock*,
No. 4:15cv5, 2015 WL 13439761, at *3 (E.D. Va. Aug. 17, 2015) ("[C]redibility determinations
are inappropriate at the motion to dismiss stage.").  Finally, the Complaint corroborates Hilton's
information with numerous accounts of other former employees, including FE-14, a former
Director, and FE-9, a former Engagement Manager, both of whom described how management
overrode division budgets with projections that did not change even when they were told the
numbers were unattainable, explaining identically that this practice was understood internally as
"MSU" – "make shit up."  ¶¶ 145-46; *see also In re Tronox, Inc. Sec. Litig.*, No. 09 Civ.
6220(SAS), 2010 WL 2835545, at *7 (S.D.N.Y. June 28, 2010) (noting "[w]hen viewed in tandem
with the other sources of information relied upon by plaintiffs, [a related] Complaint is sufficiently
reliable" for pleading purposes).

[5]      *See also U.S. S.E.C. v. Agora, Inc.*, No. MJG-03-1042, 2007 WL 9725170, at *5 n.5
(D. Md. Aug. 3, 2007) (acknowledging the "not capable of objective verification" test).

challenged statements in full.  *See id.* at 16 (asserting Plaintiffs are "challeng[ing] vague statements regarding DXC's growth strategy – *e.g.*, that after a 'solid start' to the 2019 fiscal year, DXC's 'growth' and 'strong momentum' 'position[ed]' it 'to capitalize on . . . vast digital opportunities' going forward, and achieve 'stable' and 'organic' revenue.").  This attempt to take "soundbites" out of context and analyze them in isolation should be rejected.  *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005).  For example, when these "soundbites" that Defendants plucked from, among other places, ¶¶ 157, 160-61, 165, and 169, *see* Mem. 16, are read in context, their meaning is very different as they are offered as support for Lawrie's claim that "the progress we have made has enabled us to make the pivot to growth, positioning DXC to capitalize on the vast digital opportunities ahead across all industry and offering areas," ¶ 161.  This is ***exactly*** the sort of statement about the current status of affairs within an organization that courts recognize as actionable as "objectively verifiable matters of fact."  *Jui-Yang Hong v. Extreme Networks, Inc.*, No. 15-cv-04883-BLF, 2017 WL 1508991, at *12 (N.D. Cal. Apr. 27, 2017) ("integration was . . . 'on track'" not "corporate optimism and puffery").[6]  *See also In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 944-45 (E.D. Pa. 1999) ("the business is ***on track*** to meet all the objectives that were set at the time of the merger" not puffery).[7]

---

[6]     *See also In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012) ("ahead of plan" statement actionable); *In re Century Bus. Servs. Secs. Litig.*, No.1:99CV02200, 2002 WL 32254513, at *17-18 (N.D. Ohio June 27, 2002) (defendant's statements that the company is "better positioned than ever" and "on a solid footing for continued rapid growth" not puffery because the statements, in context, make "characterizations of the present state of the company based on verifiable facts"); *Bielousov v. GoPro, Inc.*, No. 16-cv-06654-CW, 2017 WL 3168522, at *4 (N.D. Cal. July 26, 2017) (statement "that GoPro was still '*on track*' to make its previously-issued revenue guidance" not puffery because statement concerned present condition of business when it "was not then 'on track' to reach the revenue guidance").

[7]     Moreover, "[e]ven if these statements amount only to corporate puffery, they may still be plausibly actionable" because Defendants knew they were false at the time they were made.  *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 n.3 (N.D. Cal. 2014) ("'[P]rojections and

The same reasoning applies to Defendants' challenges (*see* Mem. 17-18) to statements concerning DXC's workforce optimization efforts, "investment in people," digital growth, and goodwill.[8]  *See, e.g.*, ¶ 209 ("We are – as we mentioned, across the way, we're putting quite a bit of investment in our digital transformation ourselves and up-skilling our employee base and also training them and also attracting new talent.").  Likewise, with respect to the digital growth statement challenged by Defendants (*see* Mem. 18), when considered in full, it is clear that Lawrie was making specific representations about the then-current status of DXC's operations:

> [We] have been a little more successful than we had planned in terms of offsetting the decline in the legacy infrastructure business. We've been more successful offsetting that with cloud and some of our other digital offerings. So that has gone, in all candor, a little better than what we had modeled and what we had communicated . . . . I mean, we're seeing 24%, 25% growth in our enterprise cloud apps business.

¶ 213.  Plaintiffs readily allege this statement is actionable because in December 2017, DXC had re-classified certain work done by the Company's Consulting group as part of its Cloud offering in a deliberate effort to manipulate the public impression of DXC's digital business.  *See* ¶¶ 152-53; *see also* ¶ 156 (FE7 describing DXC's "digital" classification as a "hokey game").

In sum, because the Complaint unquestionably includes misrepresentations of existing material fact, Defendants' puffery argument should be summarily disregarded.

---

general expressions of optimism may be actionable under the federal securities laws' ***if the speaker is aware of any underlying facts that seriously undermine the statement***."); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ( "the inventory situation was 'in good shape' or 'under control'" not puffery when defendants "***allegedly knew that the contrary was true***").

[8]    Contrary to Defendants' assertions, Mem. 18, the Complaint includes "particularized allegations explaining exactly how – and to what degree – DXC had purportedly misstated goodwill."  The Complaint specifically alleges DXC's goodwill was overstated because it did not represent expected "cost-saving opportunities" and "expected synergies," but represented cost-cutting measures that caused serious execution issues and delayed DXC from bringing in resources to support promised digital growth.  *See* ¶¶ 215-18.

**D**      **Defendants' "Opinion" Statements Are Actionable**

Defendants argue that "[s]everal alleged misstatements are also not actionable for the independent reason that they reflect only the speakers' opinion and personal judgment." Mem. 18-19.[9]  Statements of opinion are misleading to a reasonable investor (and are therefore actionable) if they "fail[ed] to 'align[] with the information in the [Defendants'] possession at the time.'" *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 668 (D.S.C. 2016) (second alteration in original) (quoting *Omnicare*, 135 S. Ct. at 1329); *see also In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 779 (E.D. Va. 2015) ("[M]aterial omissions rendered Defendants' statements misleading 'because the excluded fact[s] show[] that [Defendants] lacked the basis for making those statements that a reasonable investor would expect.'") (alterations in original).

Here, Defendants challenge two statements:  (i) "I think what we will see is a relatively consistent performance throughout the year, growing a little bit more in the second half of the year on a sequential basis," ¶ 158 (Saleh); and (ii) "I think the investment we're making in reskilling our people are all critical factors in helping to expand the revenue payment," ¶ 192 (Lawrie).  *See* Mem. 19.  These two statements are actionable because Defendants either "lacked the basis for making those statements that a reasonable investor would expect" or the opinions they expressed did not "fairly align[] with the information in [their] possession." *Omnicare*, 135 S. Ct. at 1329, 1333.  Here, at the time of the challenged statements, May 24, 2018 and February 8, 2018, respectively, Defendants were aware that the Company was not seeing a "relatively consistent performance" or "expand[ing] the revenue."  In fact, Defendants were aware of the fact that the precipitous cuts in the "Delivery" division had a direct negative impact on customer satisfaction.

---

[9]      While Defendants contend that "several" of the challenged statements are inactionable opinion statements, they provide only two illustrations to support their assertion. *See* Mem. 18-19 (challenging statements in ¶ 158 and ¶ 192).

*See, e.g.*, ¶¶ 12-13, 16, 104-09.  Simply adding "I think" to the start of a statement does not insulate it.  *See Omnicare*, 135 S. Ct. at 1328-29 (finding statements including "I think" or "I believe" actionable because they did not "fairly align[] with the information in [speaker's] possession").  Accordingly, Defendants' statements are not protected as statements of opinion.

### E      Plaintiffs Adequately Pled That Statements Of Current Or Historical Fact Were False When Made

Defendants next contend that the Complaint "fails to allege any particularized facts showing that any statement was false when made."  Mem. 19.  Not so.  The Complaint contains numerous allegations from Hilton and other former employees demonstrating contemporaneous falsity.[10]  *See, e.g.*, ¶ 16 ("[B]y the start of the Class Period, 'Delivery' was on 'pins and needles' because they simply did not have enough skilled employees to execute on their customer contracts.").  The Complaint also alleges the following relevant facts, among others:  (1) Hilton personally warned Lawrie that the pace of DXC's cost cutting and massive layoffs was having direct "negative impacts on customer satisfaction" and compromised DXC's long-term success, and that Lawrie's budgets and forecasts were unachievable, ¶ 12; *see also* ¶ 104; yet, (2) "less than ten days after writing his alarming [May 15, 2018] letter to Hilton, Lawrie spoke to investors on the Company's earnings call for the conclusion of its first fiscal year and disclosed not a hint of the failures he claimed were occurring in Hilton's division," ¶ 15; *see also* ¶ 112.

Defendants' assertion that Plaintiffs do not allege "facts showing that DXC was *not* actively recruiting new employees with digital talent" is a red herring.  Mem. 20.  Regardless of whether or not DXC was recruiting new employees, the Complaint alleges that, contrary to

---

[10]      It is well-established that a plaintiff need only plead the existence of a single materially misleading statement or omission in order to withstand a motion to dismiss.  *See, e.g.*, *Feyko v. Yuhe Int'l, Inc.*, No. 11-05511 DDP (PJWX), 2013 WL 816409, at *4 n.2 (C.D. Cal. Mar. 5, 2013) ("Plaintiff can survive a motion to dismiss by alleging a single material misrepresentation.").

Defendants' representations, DXC was not providing the resources necessary to support the digital growth projections made to the market.  For example, Lawrie stated that DXC was "staffing the required labor for new business," ¶ 171, and attributed profit to the "execution of the synergy plans . . . including workforce optimization," ¶ 178, which had "improved service levels" and "has an enormously positive impact on our business," ¶ 181.  All of the above statements were contradicted by numerous allegations from Hilton and other former employees, as well as Lawrie's own admission at the end of the Class Period that he had "run our workforce and labor programs very, very tightly" and "had a very thin bench," ¶ 88, such that he had to "correct[]" the failings with the sales force application, ¶ 92.

## II.    PLAINTIFFS PLEAD A STRONG INFERENCE OF SCIENTER

### A        The Pleading Standard For Scienter

Pleading scienter does not require a single, irrefutable "'smoking-gun' allegation." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 626 (4th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).  Rather, the allegations, considered holistically, must together raise an inference of scienter that is only "at least as compelling as any opposing inference." *Kiken*, 155 F. Supp. 3d at 601-02.  In the case at bar, "[i]t is exceedingly unlikely" that "the allegedly false statements . . . were the result of merely careless mistakes at the management level . . . rather than of an intent to deceive or a reckless indifference to whether the statements were misleading." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008).  Courts routinely find such allegations sufficient even without any alleged motive. *See Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 345 (4th Cir. 2003) ("[C]ourts should not restrict their scienter inquiry by focusing on specific categories of facts, such as those relating to

motive and opportunity, but instead should examine all of the allegations in each case to determine whether they collectively establish a strong inference of scienter.").[11]

As addressed more fully below, the Complaint describes several examples of Defendants' "possession of facts suggesting that the statements are false" (i.e., "classic evidence of scienter"). *U.S. S.E.C. v. Pirate Inv'r LLC*, 580 F.3d 233, 243 (4th Cir. 2009).

### B    Viewed Holistically, The Complaint's Allegations Support A Strong Inference Of Scienter

Plaintiffs have alleged numerous particularized facts that support a strong inference of scienter, including numerous reports from Hilton and other former employees that show the material disconnect between what Defendants knew and what they told the market, ¶¶ 15-16, 115-56; how Defendants Lawrie and Saleh engaged in unusual and suspicious insider trades while the Company's stock price was artificially inflated, ¶¶ 225-35; and Lawrie's post-Class Period admissions demonstrating the falsity of his Class Period statements, ¶¶ 88, 92.  Defendants also made a number of specific statements that demonstrate their familiarity with the matters at hand. *See, e.g.*, ¶¶ 15, 56, 64, 68-69, 157, 181, 185, 192, 195, 197, 201, 204, 208-09, 211.

### C    Defendants' Knowledge Or Reckless Disregard Of The Inaccuracy Of Their Public Statements Bolsters A Strong Inference of Scienter

It is well-settled that "an inference of scienter can be established by the fact that the Defendants touched on the specific issue . . . in their public statements."  *Roberti v. OSI Sys., Inc.*, No. CV 13-9174-MWF (VBKx), 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015); *see also In re PTC Therapeutics, Inc. Sec. Litig.*, No. 16-1124 (KM) (MAH), 2017 WL 3705801, at *17 n.28

---

[11]    Defendants' argument that a failure to allege a motive to commit fraud "cuts against" any inference of scienter, Mem. 23, is wrong:  Plaintiffs **have** alleged a motive to commit fraud, namely the Individual Defendants' sales of tens of millions of dollars' worth of the Company's securities while DXC's stock price was artificially inflated.  *See* ¶¶ 9, 225-34.  In any event, the Supreme Court has made clear that "the absence of a motive allegation is not fatal."  *See Tellabs*, 551 U.S. at 325.

(D.N.J. Aug. 28, 2017) ("Through their public statements, [the defendants] demonstrated personal knowledge of the ACT DMD results and PTC's conversations with the FDA."); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (finding specific pronouncements provide "strong circumstantial evidence" speakers were "receiving some form of specific information" about matters at hand).

Indeed, "[a]ctively communicating with the public about [an] issue demonstrates defendants' sensitivity to it." *Gauquie v. Albany Molecular Research, Inc.*, No. 14 CV 6637 (FB) (SMG), 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) (citing *Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014) (finding it "'absurd' to consider senior vice-president did not have knowledge of information contradicting her statements when she took an active role in communicating with the press" about the particular matter at hand)). Moreover, the "most powerful evidence of scienter is the content and context of [defendants'] statements themselves." *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 0:15-CV-02393-MGL, 2016 WL 3981236, at *9 (D.S.C. July 25, 2016) (alteration in original) (quoting *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009)).

Throughout the Class Period, Defendants made repeated and specific statements on the subjects concealed by the fraud, including the Company's investment in its workforce, as well as increased customer satisfaction. *See, e.g.*, ¶ 56 (Lawrie emphasized that "reskilling of our people is a **key priority** [for] our whole digital initiative," specifying that employees have "completed more than 1.5 million hours of training with a heavy focus on digital certifications"); ¶ 208 (Lawrie detailed continued investment in digital workforce, describing "digital boot camps where our employees as well as our client executives are provided training"); ¶ 181 (Lawrie stated that "[o]ur customer satisfaction last year went up. So in the first year of integration, all we did, customer satisfaction continued to increase."). Those specific pronouncements provide strong

19

circumstantial evidence that Defendants were receiving specific information about those matters and give rise to an inference of scienter.[12]

Additionally, the Complaint is replete with allegations that Lawrie made numerous, specific statements that clearly were at odds with the information in his possession, including the May 15, 2018 letter.  Specifically, numerous former employees reveal:

1.     <u>Defendants knew their "chaotic" firing decisions hurt revenue:</u>  Hilton, DXC's former EVP in charge of the Company's largest division, "Delivery," and who reported directly to Lawrie, "repeatedly advised Lawrie about his reservations concerning the pace of cuts," including that "[p]recipitous cuts in Global Delivery could be disastrous for DXC's long-term revenue, because those cuts would have a direct impact on customer satisfaction," and also "routinely expressed" these concerns to other senior executives.  Nonetheless, even after Hilton's warnings, the Company continued to implement "chaotic and non-collaborative" processes that led to firing decisions that were "sub-optimal for the future success of DXC."  ¶¶ 101-07.

Other former employees corroborate Hilton's experience.  For example, FE-1, DXC's Chief Technology Officer for the Americas Region from its inception until January 2018, who reported to senior executives who themselves reported directly to Lawrie, routinely expected workforce cuts in the month before the end of each quarter, as Lawrie mercilessly ordered cuts any time the Company looked like it was coming up short on quarterly numbers.  FE-1 explained that these cuts were a "numbers game" ordered with no real plan or intent.  As a result of these firings,

---

[12]     Alternatively, if the Individual Defendants were not knowledgeable about such matters before they spoke about them or were unaware of the issues at hand at the time they made the various challenged statements, then their representations were actionably reckless *per se*.  *See S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (when defendant speaks but does not have "actual knowledge" about the subject, "it would be at least actionably reckless to reassure the public about these matters at all").

customers with decades-old relationships with DXC began in-sourcing or moving to other players, after FE-1's own team was cut by 50% and received unhappy feedback from clients when the team lacked personnel to deliver promised enhancements.  ¶¶ 116-18.

Likewise, other former employees described an aggressive focus on terminating senior, higher-salaried subject matter experts, known as "greening."  *See* ¶¶ 121-22.  FE-4, a former Client Sales Executive, experienced firsthand how the Company's "greening" jeopardized the "crown jewel" of DXC's federal business, its $2 billion contract for the Navy's Next Generation Enterprise Network.  As DXC fired "mission critical people," FE-4 was personally told in numerous meetings at the Pentagon that DXC's terrible execution was creating "a shit show," hurting FE-4's ability to make sales.  ¶ 123.

2. _Defendants knew about customer dissatisfaction:_  Consistent with Defendants' assertion that Lawrie took an "active approach to overseeing and managing" the Company, ¶ 127, Hilton explained that Lawrie "understood that workforce reductions could not be achieved at the pace required by his internal budget without negative impacts on customer satisfaction," ¶¶ 106, 126.[13]  Former employees corroborate that Defendants directly learned of customer dissatisfaction. FE-6, a Chief Technologist for DXC's Americas Travel & Transportation Industry group, described that DXC's indiscriminate cost-cutting caused at least two IT outages for one of the Company's "key" accounts, worth approximately $176 million, United Airlines, causing a United Airlines Executive Vice President to demand to speak with Lawrie personally.  Ultimately, in October 2018 – just before the truth was revealed – United Airlines declined to renew a significant amount of its DXC contract due to these service issues.  ¶¶ 128-29; *see also* ¶ 130 (FE-3, a former

---

[13]     *See also In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 416 (S.D.N.Y. 2003) ("hands-on management style" supports strong inference of scienter).

Senior Finance Manager, corroborated that the Company's cost-cuts led to the poor service that hurt the Company's contract with United Airlines).  Lawrie himself admitted his awareness of these incidents two days after the close of the Class Period at DXC's Investor Day, stating that DXC had "made some mistakes . . . maintaining the existing systems.  United Airlines doesn't want to hear that we grounded 800 jets because we were trying to integrate a digital project into the existing mainstream IT architecture."  ¶ 129.[14]

3.   <u>Defendants knew they could not bring on the needed resources:</u>  Dean Clemons, the Company's global services leader, admitted in an internal non-public conference call that DXC's cost-cutting created challenges in attracting and retaining talent, such as not paying for "certs [certifications] that are fundamental to our business" and providing employees poorly functioning equipment – describing the situation as "one step forward, two back, two steps forward, one back."  ¶¶ 134-35.

Several former employees described how Lawrie insisted on personally approving hiring decisions – creating a logjam that sometimes cost the Company millions of dollars a month in revenue because they could not staff positions, and in one instance, resulting in the loss of a $72 million deal with PNC.  ¶¶ 140-43.  According to FE-7, the problem was so severe that DXC's

---

[14]   Other former employees give similar accounts of customer losses due to the massive layoffs and reveal how the Individual Defendants would have been aware of the negative implications this had on customer satisfaction.  *See, e.g.*, ¶ 132 (FE-8, a Pricing Consultant who personally participated in meetings with Defendants Lawrie and Saleh concerning high-profile deals until his departure after the Class Period, described the collapse in April 2018 of a $41 million deal to provide "digital" services to Mondelēz International, Inc. because of DXC's continuing failure to address issues in its existing service contract.  FE-8 had personal conversations about this failure and said that Defendants would have learned of the situation); ¶ 133 (FE-9, an Engagement Manager, described how in approximately June or July 2018 MassMutual cancelled a contract extending through 2022 that provided approximately $15 million in annual revenue because of DXC service failures caused by the layoffs and discussed this with his superiors and understood that it would have been discussed with the Individual Defendants).

EVP and Chief Human Resources Officer admitted in a 2018 townhall that the Company's systems to find resources for projects were no good, and, at a later townhall in January 2019, confused employees even asked Lawrie if there was a "hiring freeze" in place.  ¶ 143.

4.      Defendants knew their projections were unreliable:  Hilton describes how Lawrie set facially impossible internal budgets that called for cuts many times beyond Defendants' publicly provided goals.   ¶ 105.   Indeed, less than one week after the May 15, 2018 letter terminating Hilton for "material misconduct" and a "substantial and willful failure" to render services, Lawrie (i) boasted that DXC had "track[ed] ahead of plan on revenue," and achieved $1.1 billion in cuts, thereby "achiev[ing] key merger integration milestones and exceed[ing] our synergy targets"; and (ii) emphasized that "[o]ur delivery teams continued to drive increased productivity while improving service levels for our clients."  ¶ 112.  *See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 238 (S.D.N.Y. 2010) ("This incongruity between word and deed establishes a strong inference of scienter.").

The Complaint provides other examples of Defendants' knowledge that their projections were unreliable.  As an example, FE-14 explained that he prepared monthly an "Integrated Watchlist" that showed the Company's revenue and the delta against projected revenue.  ¶ 148. FE-14 discussed these reports in detail with DXC Vice President Robbie Braddock, and also understood the information was at times discussed directly with former Executive Vice President Mike Nefkens.[15]  FE-14 stated that when he distributed these documents on July 1, 2018 (the end

---

[15]      In *Matrix Capital Management Fund, LP v. BearingPoint, Inc.*, the Fourth Circuit held that a "complaint that alleges facts giving rise to a strong inference that at least one corporate agent acted with the required state of mind satisfies the PSLRA *even if the complaint does not name the corporate agent as an individual defendant*."  576 F.3d 172, 189 (4th Cir. 2009).  Thus, corporate scienter may be shown through the scienter of any corporate agent – such as Hilton or Company officers Braddock or Nefkens – even if that agent did not make any of the alleged

of the first quarter fiscal year 2019), they identified a "huge" delta between the projections and the Company's current pace of revenue.  Yet, the next month Lawrie misleadingly told investors that the Company's "first quarter performance positions us well to deliver on our financial targets for fiscal 2019."  *Id.*; *see also* ¶ 149 (FE-15 described a meeting in September 2018 at which employees laughed at a plan to close "number gap" between revenue targets and billability); ¶¶ 145-46 (FE-9 and FE-14 discussed management's unattainable budget projections, which were internally known as "MSU," or "make shit up.").

### D        Defendants' Attempts To Discredit The Former Employee Information Fail

Defendants assert that the information provided by former employees is insufficiently pled. *See, e.g.*, Mem. 26.  To the contrary, courts routinely credit allegations with similar – or even less – particularity.  *See, e.g.*, *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 885-88 (4th Cir. 2014) (crediting allegations that provided occupation and tenure of confidential witnesses and noting statements were linked to witnesses' personal experiences); *Phillips v. Triad Guar. Inc.*, No. 1:09CV00071, 2013 WL 2403281, at *8 (M.D.N.C. May 31, 2013) ("A confidential witness' testimony can be used in pleading under the PSLRA so long as the testimony involves facts of which the witness had personal knowledge."); *Lefkoe*, 2007 WL 6890353, at *5 (crediting confidential witness allegations that include "titles and job descriptions and the statements presented from the witnesses arise from their individual personal knowledge and concern the core facts underlying the [claims]").

---

misstatements.  *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) ("[N]othing in Rule 9(b) or the PSLRA requires a plaintiff to allege that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter.").

For example, Defendants criticize the Complaint for not stating certain former employees' direct supervisors or for not describing the roles of certain former employees. *See* Mem. 26-27. However, even the cases relied on by Defendants credit descriptions similar to those employed here. *See, e.g.*, *Hunter*, 477 F.3d at 176-81 (crediting allegations from witnesses described as "project manager," "technician," and "process engineer"). Likewise, Defendants cite no authority requiring that the Court disregard information from former employees who had left the Company before the Class Period began or who did not have personal interactions with the Individual Defendants. Instead, courts routinely credit such allegations so long as the former employees "spoke to issues within their sphere of knowledge," as is the case here. *Triad Guar.*, 2013 WL 2403281, at *8 (crediting allegations of former employee who left the company roughly two years before the class began); *Roofer's Pension Fund v. Papa*, No. 16-2805, 2018 WL 3601229, at *23 (D.N.J. July 27, 2018) (crediting allegations from former employees who "spoke to issues within their sphere of knowledge," despite no direct communication with defendants).

Ultimately, Defendants' formalistic criticisms provide no substantive reason to doubt the information provided.[16] Further, none of these criticisms apply to former employees who provide some of the most damning information, including specifically Hilton, who continued to work directly for Lawrie for most of the Class Period and who directly stated that Lawrie knew his "chaotic" workforce optimization "could be disastrous for DXC's long-term revenue, because those cuts would have a direct impact on customer satisfaction." ¶ 105.

---

[16]     Defendants rely extensively on *In re Coventry Healthcare, Inc. Securities Litigation*, No. 08:09-CV-2337-AW, 2011 WL 1230998 (D. Md. Mar. 30, 2011). But in *Coventry*, the court rejected allegations that "fail[ed] to state how [the confidential witnesses] acquired the information regarding *scienter* that they ***attribute*** to the executive level defendants." *Id.* at *6 (second emphasis added). Here, any knowledge specifically "attribute[d]" to the Defendants *is* described, such as Hilton's personal conversations with Lawrie.

### E      The Fraud Concerned DXC's "Core Operations"

Senior executives may be presumed to know material facts about their company's "core operations."  *Kiken*, 155 F. Supp. 3d at 606.  Although in this Circuit a plaintiff may not plead scienter based solely on core operations, "such allegations are relevant to the court's holistic analysis of scienter."  *Yates*, 744 F.3d at 890; *see also Genworth*, 103 F. Supp. 3d at 784 (same).

Here, the Complaint details Defendants' knowledge related to two of the Company's "key area(s)" for growth.  Specifically, during the August 15, 2018 annual shareholder meeting, Lawrie boasted that DXC was "providing unsurpassed value for our clients, partners and shareholders, along with growth opportunities, for our people.  And we're building on the momentum established during the first 16 months with a focus on a number of key areas."  ¶ 67.  Two of those "key areas" mentioned were, "[f]irst and foremost," a "continued shift to digital," as well as "continuing to invest in our people."  ¶ 68; *see also* ¶ 201 ("the reskilling of our people is a key priority [for] our whole digital initiative"); ¶ 204 ("[T]he key point here is we are investing back in the business. So this is not just about taking cost out.").  Lawrie specifically noted that "DXC employees have completed more than 1.5 million hours of training with a focus on digital" and that the Company was "continuing to ramp up training and certification programs and are recruiting people with the right next-gen skills."  ¶ 68; *see also* ¶ 211 (same); ¶ 208 (discussing a "digital boot camp" for employees).  In closing, Lawrie said that DXC would "continue to focus on [this ***core priorit[y]***" by "making smart strategic investments, especially in our people."  ¶ 68; *see also* ¶¶ 56, 201 (Lawrie emphasized that "the reskilling of our people is a ***key priority*** [for] our whole digital initiative as we continue to want to increase the percent of revenue that we get from digital").

**F       The Proximity Between The Misstatements And Omissions And The Revelations Of The Truth Further Bolsters The Inference Of Scienter**

"An inference of scienter [also] can be supported by the temporal relationship among several events." *Arnlund*, 199 F. Supp. 2d at 482; *Genworth*, 103 F. Supp. 3d at 786 (same); *see also Reese*, 747 F.3d at 574 ("Temporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter."). Here, Defendants continued to mislead the market about the Company's positive revenue projections and provided other encouraging guidance to the market as late as August 15, 2018, ¶¶ 160-62, including representing that the Company's "first quarter performance positions us well to deliver on our financial targets for fiscal 2019," ¶ 161. The following month, Defendants also "confirmed" that the Company "should achieve constant currency, organic revenue growth for the first time." ¶¶ 73, 169. *Less than three months after these misstatements*, Defendants were forced to reveal that DXC had suffered significant revenue declines across all segments, with overall revenue down 8.1% – or more than $440 million, ¶ 84, and that they thereby had to reduce revenue guidance for the fiscal year by approximately $800 million, ¶ 86. This fact adds to the inference of scienter. *See, e.g.*, *Reese*, 747 F.3d at 574 (finding proximity of "three to six months" between misrepresentation and disclosure to be evidence of scienter); *In re Grand Casinos, Inc. Sec. Litig.*, 988 F. Supp. 1273, 1283 (D. Minn. 1997) ("[G]iven the short time frame from the December offering, through the opening of [defendants' project] in late April 1996, to the revelations of mammoth problems beginning on July 22, 1996, it is reasonable to infer that management was on notice of these problems during the class period.").

**G       Defendants' Stock Sales Support A Motive To Defraud**

Finally, while not required, Plaintiffs also allege detailed facts regarding the Individual Defendants' motive to deceive the Company's investors, namely that by engaging in the alleged

scheme, they were able to sell tens of millions of dollars' worth of DXC stock at artificially inflated prices prior to the corrective disclosures in October and November 2018. *See* ¶¶ 9, 225-35.[17]

In response, Defendants rely on purported 10b5-1 trading plans. *See* Mem. 23. While the presence of such a plan may, under certain circumstances, provide an ***affirmative defense*** to a charge of insider trading, that defense is premature at the pleading stage. *See Lefkoe*, 2007 WL 6890353, at *6 n.11 ("Raising the affirmative defense of trading under a 10b5-1 trading . . . is 'typically premature . . . in a motion to dismiss.'") (second alteration in original).[18]

Defendants also contend that the sales at issue were not large enough to create an inference of scienter.[19] Once again, Defendants get it wrong – as their own case law makes clear. In *Proter*

---

[17]    Defendants erroneously assert that "Plaintiffs' lone theory is that the Individual Defendants benefited from the alleged fraud because they each sold DXC shares while the Company's stock price was allegedly inflated." Mem. 23. This contention ignores Plaintiffs' well-pled allegations, which clearly show that the insider trading analysis was part of "additional allegations of scienter." *See* ¶ 224 ("***In addition to the facts alleged in Section VI and elsewhere herein***, additional facts give rise to the strong inference that, throughout the Class Period, Defendants knew or recklessly disregarded that their statements and omissions, as set forth in Section VII, were materially false and misleading when made.").

[18]    Equally unavailing is Defendants' argument, Mem. 25-26, that scienter is undermined because the Company repurchased its stock during the Class Period, *see In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1068 (C.D. Cal. 2008) (defendants' reliance on corporate stock repurchase program failed because that program "could properly be viewed as an attempt to keep the ball rolling – i.e. to propel the Company forward (steadying the stock price, or sending it upward) for a period of time before the weight of the [allegedly fraudulent] practices began taking its toll on the Company's operations and the value of its stock."); *In re Guilford Mills, Inc. Sec. Litig.*, No. 98 Civ. 7739(CLB), 1999 WL 33248953, at *5 (S.D.N.Y. July 21, 1999) ("Defendants also argue that the fact that Guilford Mills bought back approximately 2.44 million shares of its stock from public shareholders during the Class Period shows that the Company had no motive to commit fraud. This appears to the Court to be a non-sequitur.").

[19]    Defendants criticize Plaintiffs for alleging that only two persons (the Individual Defendants) sold shares during the Class Period. But, the reason for this is simple: those two persons are the named defendants and sales by other individuals have no bearing on the scienter analysis. *See, e.g., In re Versant Object Tech. Corp.*, No. C 98-00299 CW, 2001 WL 34065027, at *5 (N.D. Cal. Dec. 4, 2001) ("Plaintiffs include the sales of non-Defendant Pulkownik, which

*v. Medifast, Inc.*, No. GLR-11-720, 2013 WL 1316034 (D. Md. Mar. 28, 2013), the court held that "there is no bright-line test as to an amount or percentage of holdings that must be sold to give rise to a strong inference of scienter." *Id.* at *21 n.20 (summarizing cases). Indeed, courts routinely hold that sales of holdings far less than those at issue here are relevant to the scienter analysis. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 646 (E.D. Va. 2000) (even the sale of as little as 2.2% of holdings can be probative of scienter).[20] During the eight-month Class Period, Lawrie sold 110,540 shares of DXC stock – more than *17%* of his holdings – for personal proceeds of more than *$10 million* (after selling no shares for the eight months immediately preceding the Class Period). *See* ¶¶ 9, 226, 228, 231. Likewise, Saleh sold *77%* of his personal holdings for more than *$9 million* in proceeds during the Class Period. *See* ¶¶ 9, 226, 232.[21] All of those sales were made while Defendants were misleading the market about the Company's success with its reorganization efforts.[22]

---

are irrelevant to alleging scienter against the named Defendants."); *Century Bus. Servs.*, 2002 WL 32254513, at *7 n.18 (trading by non-defendants "not . . . probative of defendants' scienter").

[20]    Simply put, even selling small percentages of stock *can* give rise to a strong inference of scienter. *See, e.g.*, *In re MTC Elec. Techs. S'holders Litig.*, 898 F. Supp. 974, 980 n.4 (E.D.N.Y. 1995) (noting sales by one defendant of approximately 8,000 shares of stock for profit of $173,000 raised strong inference of fraudulent intent).

[21]    Defendants' contention that Lawrie and Saleh were not motivated to increase their compensation, Mem. 25 n.15, also is a non-starter. "While bonuses do not necessarily equate with motivation to commit fraud, 'they can be catalysts to fraud and so serve as external markers to the required state of mind.'" *Winslow v. BancorpSouth, Inc.*, No. 3:10-00463, 2011 WL 7090820, at *23 (M.D. Tenn. Apr. 26, 2011); *see also Zuckerman v. Smart Choice Auto. Grp., Inc.*, No. 6:99-CV-237-ORL-28A, 2000 WL 33996254, at *5 (M.D. Fla. Aug. 29, 2000) (allegations that "compensation package had incentive provisions tied to the [company's] financial performance" supported scienter); *In re Cardinal Health Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 738 (S.D. Ohio 2006) ("[T]he Court may consider [the] motivation to keep [the Company]'s stock price high in order to profit from their executive compensation packages in analyzing scienter.").

[22]    Plaintiffs are not required to demonstrate that either Individual Defendant maximized his profit, but only must show that he "traded in such a way as to indicate [he] took advantage of [his] false statements." *In re Questcor Sec. Litig.*, No. SA CV 12-01623 DMG (FMOx), 2013 WL

Finally, Defendants contend that Plaintiffs' omission of the Individual Defendants' vested shares acquired during the Class Period somehow diminishes the insider trading analysis. *See* Mem. 25. Not so. Vested options are frequently omitted from insider trading analysis because they are not considered shares. *See, e.g.*, *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (declining to include vested options because they "are not shares" and noting "without more information, this Court cannot evaluate the true value of the options exercised by the Individual Defendants").

## III.   THE COMPLAINT ADEQUATELY ALLEGES LIABILITY UNDER SECTION 20(a)

Defendants contend that "[b]ecause Plaintiffs have not established a primary Section 10(b) violation, their derivative Section 20(a) claim for control person liability also fails." Mem. 30 n.19. However, because the Complaint sufficiently alleges securities fraud violations under Section 10(b), control person liability has been adequately alleged as to the Individual Defendants. *See MicroStrategy*, 115 F. Supp. 2d at 661.

## CONCLUSION

Defendants' motion to dismiss the Complaint should be denied in its entirety.[23]

---

5486762, at *17 (C.D. Cal. Oct. 1, 2013). Thus, that the Individual Defendants retained shares at the end of the Class Period does not dilute the inference of scienter emanating from their Class Period trades. *See MicroStrategy*, 115 F. Supp. 2d at 647 ("[A]n insider may not always trade all his shares in the company for which he possesses the inside information; the trader may hold on to a portion of his shares to hedge against the unforeseen or to obscure the insider trading from the SEC.").

[23]     As their investigation is ongoing, Plaintiffs respectfully request the opportunity to respond to the Court's guidance if the Complaint is found lacking in any respect. Plaintiffs will make a more detailed application at the appropriate time to support any request for leave to amend. *See* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 478 (M.D.N.C. 2004) (granting leave to amend securities fraud class action when there was no prejudice, bad faith, or futility).

Dated:  June 17, 2019                    Respectfully submitted,


                                         */s/ Nathan D. Finch*
                                         **MOTLEY RICE LLC**

                                         Nathan D. Finch (VSB No. 34290)
                                         401 9th St. NW, Suite 1001
                                         Washington, DC  20004
                                         Telephone:  (202) 232-5504
                                         Facsimile:  (202) 232-5513
                                         nfinch@motleyrice.com

                                         -and-

                                         Gregg S. Levin
                                         Christopher F. Moriarty
                                         Erin Casey Williams
                                         28 Bridgeside Blvd.
                                         Mt. Pleasant, SC  29464
                                         Telephone:  (843) 216-9000
                                         Facsimile:  (843) 216-9450
                                         glevin@motleyrice.com
                                         cmoriarty@motleyrice.com
                                         ecwilliams@motleyrice.com


                                         **BERNSTEIN LITOWITZ BERGER &**
                                         **GROSSMANN LLP**

                                         John C. Browne
                                         Lauren A. Ormsbee
                                         Jesse L. Jensen
                                         1251 Avenue of the Americas
                                         New York, NY  10020
                                         Telephone:  (212) 554-1400
                                         Facsimile:  (212) 554-1444
                                         johnb@blbglaw.com
                                         lauren@blbglaw.com
                                         jesse.jensen@blbglaw.com

                                         *Co-Lead Counsel for Lead Plaintiffs and the Class*

31

**WEBSTER BOOK LLP**

Steven T. Webster (VSB No. 31975)
Aaron S. Book (VSB No. 43868)
300 North Washington Street, Suite 404
Alexandria, VA  22314
Telephone:  (888) 987-9991
Facsimile:  (888) 987-9991
swebster@websterbook.com
abook@websterbook.com

*Liaison Counsel*

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Steven J. Toll
1100 New York Avenue
Fifth Floor
Washington, D.C.  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
stoll@cohenmilstein.com

*Liaison Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2019, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

*/s/ Nathan D. Finch*
Nathan D. Finch (VSB No. 34290)
401 9th St. NW, Suite 1001
Washington, DC 20004
Telephone: (202) 232-5504
Facsimile: (202) 232-5513
nfinch@motleyrice.com