IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| IN RE DXC TECHNOLOGY COMPANY SECURITIES LITIGATION | Civil Action No. 1:18cv01599 (AJT/MSN) |

**ORDER**

In this securities class action, Lead Plaintiffs KBC Asset Management NV and Arbejdsmarkedets Tillægspension (collectively, the "Lead Plaintiffs" or "Plaintiffs") allege that the defendants "lied about the purported success of the 'strategic roadmap' for their new Company [DXC Technology Company]" in violation of Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, and related regulations. [Doc. No. 50] at 4. Pending before the Court is Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint for Violations of the Federal Securities Laws [Doc. No. 53] (the "Motion") against Defendants DXC Technology Company ("DXC"), its Chief Executive Officer J. Michael Lawrie ("Lawrie"), and its Chief Financial Officer Paul N. Saleh ("Saleh") (the "Individual Defendants" and collectively with DXC, "Defendants").

For the following reasons, the Motion is **GRANTED;** and this action is **DISMISSED**.

**I. BACKGROUND**

Briefly summarized, Lead Plaintiffs' 262-paragraph Amended Complaint [Doc. No. 50] ("Am. Compl."), alleges the following:

Defendant DXC is an information technology ("IT") services company formed in April 2017, following the merger of Computer Sciences Corporation ("CSC") and the Enterprise

Services business of Hewlett Packard Enterprise Company ("HPE"). Am. Compl. ¶¶ 2, 29. Lead Plaintiffs and the putative class are persons or entities who purchased or otherwise acquired publicly-traded securities of DXC during the period February 8, 2018 through November 6, 2018 (the "Class Period"). Am. Compl. ¶¶ 23, 24.

Just prior to the merger in April 2017, Defendant Lawrie publicly previewed his objectives as DXC's incoming CEO. In that regard, Lawrie announced that "DXC would overcome the declining traditional IT market by leveraging the combined client base of CSC and HPE to drive costs lower, and in turn convince those clients to 'reinvest that savings back into modernizing your application portfolio' and embark on a 'Digital Transformation' through DXC's digital solutions and services." *Id.* ¶ 34. This strategy was predicated on cost-saving efforts including Defendants' "workforce optimization" plan, through which many employees at DXC were fired. *Id.* ¶ 36. Following the merger, Lawrie made a number of public statements in which he summarized DXC's experience following the merger and the implementation of his business plan and strategies. For example, in an investor conference call in August 2017, Defendant Lawrie stated "[W]e put 2 pretty big companies together and launched it, and we didn't see the disruption. We didn't see the disruption in our service delivery, which is critical. And we saw the sales engine continue to go." *Id.* On September 8, 2017, Defendant Lawrie stated at a public investor conference that "the whole workforce optimization is pretty much progressing exactly as we thought it would." *Id.* ¶ 38. And a January 2018 news article identified specific personnel changes and revealed that DXC "had upended its entire management structure." *Id.* ¶ 39.

On May 24, 2018, DXC announced financial results for fiscal year 2018 (April 1, 2017 to March 31, 2018), which included $24.5 billion in revenue, earnings per share of $6.04, and more

than $1.1 billion in cost savings.[1] DXC also forecasted revenue of $21.5 to $22 billion and earnings per share of $7.75 to $8.15 for the coming 2019 fiscal year. *Id.* ¶ 157. On August 7, 2018, DXC announced its financial results for the first quarter of fiscal year 2019 (April 1 to June 30, 2018), including year-over-year growth in both revenue ($5.282 billion) and earnings per share ($0.78), [Doc. No. 54-21], which were on-target for its FY2019 announced revenue and EPS projections.

Nevertheless, the falsity of Defendants' statements "began to emerge" following DXC's annual shareholder meeting on August 15, 2018 when, on August 17, 2018, *The Register* reported that additional staff firings had occurred at DXC and that "customer support delivery—we are told by DXCers—is strained due to the headcount reduction." *Id.* ¶ 71; *see also id.* ¶ 67. Although Defendants met with analysts to deflect concerns, *id.* ¶¶ 72, 73, an article in *The Register* published in late October 2018 reported that DXC had fired a senior executive who had been hired months earlier and quoted insiders at DXC who stated that the Company was "descending into turmoil." *Id.* ¶¶ 74, 75. The article also reported that, in early October, Lawrie had held a "town hall" meeting where he announced additional firings and blamed a senior executive, Karan Puri, for a "10 to 15 per cent shortfall in [forecast] revenues." *Id.* ¶ 75. This news caused the Company's stock price to decline by more than 16%. *Id.* ¶ 78. That same day, DXC quickly responded in a Form 8-K filed before close of business, which reiterated its previous guidance; later, it filed another Form 8-K clarifying its previous statement issued earlier that day, and again reaffirmed the guidance. *Id.* ¶ 77.

[1] While Lead Plaintiffs' Amended Complaint does not contain this information, it references the contents of the May 24, 2018 press release wherein DXC made this announcement as an example of Defendants' materially false and misleading statements, Am. Compl. ¶ 177, and so the Court may consider it and others like it to be incorporated into the Complaint by reference. *See In re Constellation Energy Grp., Inc.*, 738 F. Supp. 2d 602, 613 (D. Md. 2010). Defendants have attached it to their Motion to Dismiss. [Doc. No. 54-23].

Then, on November 6, 2018, DXC issued a press release, filed on Form 8-K, in which it reported that it had experienced significant revenue declines across all segments during its second quarter fiscal year 2019 earnings (July 1 to September 30, 2018), with overall revenue down 8.1% year-over-year. Am. Compl. ¶ 84. DXC attributed the overall decline to "a stronger dollar, completion of several large transformation projects, and slower ramp up on a few large Digital contracts," while attributing the slump in Global Business Services to a decline in the "traditional application maintenance and management business" and delayed "client migrations from traditional to cloud environments." *Id*. In a subsequent earnings call, the Company reduced its revenue guidance for the fiscal year by approximately $800 million, projecting FY 2019 revenue of $20.7 billion to $21.2 billion, rather than its previous guidance of $21.1 to 22 billion. Am. Compl. ¶¶ 57, 86. Following this news, the stock price dropped over 12% and had not recovered at the time of the filing of the Amended Complaint. Am. Compl. ¶ 96.

On November 8, 2018, at DXC's Investor Day, Defendant Lawrie "admitted that he was 'responsible' for the Company's failed 'generalist' sales approach, and stated that he concluded it was not working after seeing two quarters of 'a continued lack of discipline and execution around some of the workforce optimization issues.'" *Id.* ¶ 97. Defendant Lawrie also "conceded that [an] analyst's 'hypothesis is right in that the management team has been more preoccupied with [cost-cutting] than growth. Because that was what our plan was. Our plan was to get those costs out and then turn our attention to growth, which is what we are now in the early stages of doing.'" *Id.* ¶ 98.

The core substance of their claims is that during the Class Period, Defendants provided positive revenue and other guidance to the market through earnings calls, press releases, and SEC filings that attributed their growth projections to the success of their transformation

strategy, when in fact, they knew that their cost cutting had adversely affected the company's ability to achieve their revenue projections. More specifically, the Amended Complaint alleges 38 false and misleading statements in the following five subject areas: (1) DXC's revenue; (2) "optimization" of the workforce; (3) DXC's "investment in people"; (4) DXC's "digital growth"; and (5) DXC's goodwill as an asset. *See id.* ¶¶ 157–218.[2] Through these statements, Defendants "recklessly" engaged in "efforts to reduce costs to report seemingly strong short-term financial performance," misled investors in order to hide that "they had caused DXC to make such drastic workforce reductions that the Company was becoming unable to deliver on its client contracts," had knowledge of the "negative impacts on customer satisfaction" as a result of the workforce cuts they were making, and knew that they could not bring on the resources needed to support their promised growth. *Id.* ¶¶ 10, 126–43.

Overall, Lead Plaintiffs allege that as a result of Defendants' conduct, "Lead Plaintiffs and the Class purchased or otherwise acquired shares of DXC common stock at artificially inflated prices and were damaged thereby when the price of those shares declined when the truth was revealed and when the risks that Defendants concealed with their false statements materialized." Am. Compl. ¶ 220. In that regard, "[t]he price of DXC shares declined by statistically significant amounts, causing investors losses, when Defendants' misrepresentations and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed and/or the foreseeable risks that had been fraudulently concealed by Defendants materialized." *Id.*

[2] The relied upon statements are listed *verbatim* in Appendix A.

On December 27, 2018, Lead Plaintiffs filed this class action suit under the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104–67, 109 Stat. 737 (the "PSLRA").[3]

**II. STANDARD OF REVIEW**

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint. *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1994). A claim should be dismissed "if, after accepting all well-pleaded allegations in the plaintiff's complaint as true . . . it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999); *see also Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001). In considering a motion to dismiss, "the material allegations of the complaint are taken as admitted," *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (citations omitted), and the court may consider exhibits attached to the complaint, *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F. 2d 1462, 1465 (4th Cir. 1991).

Moreover, "the complaint is to be liberally construed in favor of plaintiff." *Id.*; *see also Bd. of Trustees v. Sullivant Ave. Props., LLC,* 508 F. Supp. 2d 473, 475 (E.D. Va. 2007). In addition, a motion to dismiss must be assessed in light of Rule 8's liberal pleading standards, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Nevertheless, while Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (the complaint "must be enough to raise a right to relief above the

[3] The Lead Plaintiffs were appointed by order dated March 26, 2019 [Doc. No. 38], following which they filed the amended complaint on April 15, 2019, [Doc. No. 50]. Defendants moved to dismiss the action on May 15, 2019 [Doc. No. 53]. The Motion was heard on July 26, 2019.

speculative level" to one that is "plausible on its face"); *see also Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). As the Supreme Court stated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008), "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw a reasonable inference that the defendant is liable for the conduct alleged."

In an action brought under the PSLRA, certain elements of a plaintiff's claim must be pleaded with greater particularity than the traditional Rule 8 standard. A plaintiff who alleges "that the defendant (A) made an untrue statement of material fact; or (B) omitted to state a material fact . . . shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1). Similarly, where a securities action has scienter as an element, "the complaint shall, with respect to each act or omission alleged to violate [the securities laws], state with particularity giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2). If a plaintiff fails to plead sufficiently the elements of material misrepresentations or omissions, and scienter, the court must dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

Based on these statutory requirements, to survive a motion to dismiss, Lead Plaintiffs must first allege facts sufficient to support material factual misrepresentations or omissions made by Defendants. *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 342–32 (4th Cir. 2003). "Courts have employed a statement-by-statement analysis in evaluating whether the complaint 'specif[ies] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, . . . state with particularity all the facts on which that belief is formed.'" *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 771 (E.D. Va. 2015) (quoting *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 579 (E.D. Va.

2006)). A court must also analyze whether "plaintiffs plead specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false." *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 579 (E.D. Va. 2006) (citing *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 886 (W.D.N.C. 2001)). In that regard, Plaintiffs must "allege facts sufficient to infer that . . . Defendants were actually aware of internal information inconsistent with their statements"—meaning, the statements must be both *actually false or misleading*, and Defendants must *know* that those statements are so. *In re Maximus, Inc. Sec. Litig.*, 2018 WL 4076359, at *15 (E.D. Va. Aug. 27, 2018). However, if it can be plausibly inferred that Defendants "genuinely believed that the initiatives they had put in place were sufficient to correct . . . problems," then the Court will not assume Defendants intended to mislead. *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 629–30 (4th Cir. 2008).

Notwithstanding the prohibition on false and misleading statements, certain statements are not actionable as a matter of law because they are immaterial statements "upon which reasonable investors would not rely." *See, e.g.*, *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) ("'Soft,' 'puffing' statements . . . generally lack materiality because the market price of a share is not inflated by vague statements predicting growth[,]" including such statements as a business unit was "poised to carry the growth and success of 1991 well into the future[.]") (citing *Howard v. Haddad*, 962 F.2d 328 (4th Cir. 1992)); *Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 544–45 (M.D.N.C. 2013) (finding non-actionable statements that company was "planning to increase [its] promotional activity" and was "increasing [] public relations initiatives"); *In re Computer Scis. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 668 (E.D. Va.

2012) (finding non-actionable statements that company had "steadily made progress in delivering on [its] commitments"); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 892 (W.D.N.C. 2001) (finding non-actionable company's statement that "we expect further improvements in efficiency"); *see also Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (noting that companies must be permitted to operate with a "hopeful outlook"); *see also In re Cable & Wireless, PLC, Sec. Litig.*, 332 F. Supp. 2d 896, 900 (E.D. Va. 2004) (defining an immaterial statement as "a certain kind of rosy affirmative commonly heard from corporate managers and familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available").

In addition to "puffery," certain forward-looking statements are not actionable under the PSLRA. Forward-looking statements are defined to include "statement[s] containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items," as well as "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u–5(i)(1); *see also Raab*, 4 F.3d at 290 ("projections of future performance not worded as guarantees are generally not actionable under the federal securities laws") (citing *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993)); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 321 (4th Cir. 2019); *In re Humphrey Hosp. Tr., Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 683 (D. Md. 2002) (finding statements such as "[t]his new lease structure should improve monthly cash flow," and "13% Anticipated Return" to be forward-looking statements). They are expressly protected under the PSLRA's Safe-Harbor provision if (1) the statements were

accompanied by meaningful cautionary language, or (2) Plaintiffs have failed to plead that the speaker had actual knowledge of the statements' falsity at the time the statements were made. *See* 15 U.S.C. § 78u–5(c)(1); *Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 549–50 (M.D.N.C. 2013).

Based on these protections, there is a "a clear distinction between a company's strict duty to accurately report . . . its past results" and its "relative freedom to prognosticate or make predictions of its future business prospects." *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994). As the Fourth Circuit observed in *Raab*:

> Predictions of future growth stand on a different footing, however, because they will almost always prove to be wrong in hindsight. If a company predicts twenty-five percent growth, that is simply the company's best guess as to how the future will play out. As a statistical matter, twenty percent and thirty percent growth are both nearly as likely as twenty-five. If growth proves less than predicted, buyers will sue; if growth proves greater, sellers will sue. Imposing liability would put companies in a whipsaw, with a lawsuit almost a certainty. Such liability would deter companies from discussing their prospects, and the securities markets would be deprived of the information those predictions offer. We believe that this is contrary to the goal of full disclosure underlying the securities laws, and we decline to endorse it.

*Raab*, 4 F.3d at 290. Where a plaintiff alleges that forward-looking statements are actionable based on a defendant's actual knowledge of falsity, the plaintiff must allege particularized facts that show that the defendant had actual knowledge that the forward-looking statements were false when made. *See In re CIENA Corp. Sec. Litig.*, 99 F. Supp. 2d 650, 661–62 (D. Md. 2000); 15 U.S.C. § 78u–5(c)(1)(B)(i); *see also In re Humphrey Hosp. Tr., Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 684 (D. Md. 2002) (conclusory allegations that defendants had actual knowledge because reports "must have indicated" that the company's financial health was in poor shape, that the defendants "must have known" that their statements were misleading as a result, and that it was "apparent from the monthly reports" that the company was falling short of its financial goals were insufficient).

## III. ANALYSIS

**A. Lead Plaintiffs' Claims under Section 10(b) of the Securities Exchange Act of 1934.**

Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of" the rules propounded by the SEC. 15 U.S.C. § 78j(b). Rule 10b-5 similarly provides in relevant part that "[i]t shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

In a private securities action under the PSLRA, plaintiffs are required to allege facts sufficient to support the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Yates v. Mun. Mortgage & Equity, LLC*, 744 F.3d 874, 884 (4th Cir. 2014) (quoting *Stoneridge Inv. Partners v. Scientific–Atlanta, Inc*., 552 U.S. 148, 157 (2008)).

In Section VII of the Amended Complaint, Lead Plaintiffs identify 38 specific statements which Plaintiffs contend were materially false and misleading when made in violation of Rule 10b-5 and what they specifically rely on to support their claim. *See* Am. Compl. ¶¶ 157–218. The Court has considered the sufficiency of those specific allegations with respect to each of the 38 statements,[4] which are listed in Appendix A.

---

[4] As best the Court can determine, the facts implicated in the specific allegations relied on to support their claims with respect to each allegedly false or misleading statements are taken from the following sources:

(1) Defendants' reclassification of certain contracts and services in order to inflate DXC's "digital" offerings. *Id.* ¶¶ 152–56;

### *1. Revenue Statements*

Statements 1 through 10 consist of forward-looking revenue statements, opinion concerning DXC's future growth prospects and factual statements.[5] The forward-looking statements include DXC's revenue projections and expectations for the next quarter or year that were made on quarterly earnings calls, *see* Statements 1–4, 6; at an annual shareholder meeting, *see* Statement 5; through proxy statements, *see* Statements 7, 8; in a press release, *see* Statement 9; and to financial analysts, *see* Statement 10. The opinions relate to DXC's efforts to successfully execute upon its business plans, *see* Statements 6–10. The factual statements relate to the results from FY2018, the earnings per share, revenue and free cash flow targets and the tax rate assumption used for earnings per share. *See* Statements 2, 3.

Lead Plaintiffs allege that revenue Statements 1 through 10 were false or misleading because Defendants "have admitted" the following:

1. "Defendants had 'been primarily focused on taking people out' and 'more preoccupied with [cost-cutting] then growth,' which they understood—but concealed from investors—undermined the Company's 'pivot to growth' in revenue because 'there is some trade-off between revenues and cost.'" Am. Compl. ¶ 162.

---

(2) Defendants Lawrie's and Saleh's sale of substantial amounts of DXC stock during the Class Period. *Id.* ¶¶ 225–34;
(3) The allegations of Stephen J. Hilton, the former Executive Vice President, Head of Global Delivery, who reported to Defendant Lawrie, in a lawsuit against DXC arising out of his termination for cause by Defendant Lawrie in May 2018. *See Hilton v. DXC*, No. 19-cv-01157 (S.D.N.Y. Feb. 6, 2019); Am. Compl. ¶¶ 104–11;
(4) A letter dated May 15, 2018 to Hilton, in which Lawrie stated that Hilton had "failed to achieve the required cost-cuts and imperiled DXC relationships, and [accused] Hilton of 'material misconduct' and a 'substantial and will[ful] failure to render services.'" Am. Compl. ¶ 14;
(5) Statements attributed to fifteen unnamed former employees. *Id.* ¶ 115;
(6) Defendant Lawrie's statement on November 6, 2018, which disclosed the "full truth." *Id.* ¶ 84.

[5] The Court assumes that the specific statements Lead Plaintiffs primarily rely on are those that appear in bold typeface in ¶¶ 157–59, 161.

2. "Defendants knew—but concealed from investors—that, on May 15, 2018, DXC had accused the Executive Vice President in charge of its largest division of 'material misconduct' and a 'substantial and willful failure' to render services, yet that Executive Vice President would remain in his role even into the second quarter of fiscal year 2019." *Id.*

3. "Defendants were engaged in reckless cost-cutting measures, including quota-driven workforce optimization designed to manage earnings, that Defendants knew—but concealed from investors—caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth." *Id.*

4. "Defendants had no reasonable basis for their revenue projections." *Id.*

5. "Defendants' 'same play that has given us some of the success around offsetting that decline' primarily consisted of reckless cost-cutting measures, including quota-driven workforce optimization designed to manage earnings as well as the manipulation of compensation targets, and Defendants knew—but concealed from investors—caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth." Am. Compl. ¶ 164.

When measured against the applicable pleading requirements, Lead Plaintiffs have not alleged facts that adequately support their claim that Statements 1 to 10 were false or misleading, or that they were known to be such when made. First, there are insufficient facts alleged to support Lead Plaintiffs' conclusory allegations that "Defendants have admitted" that (1) "Defendants had no reasonable basis for their revenue projections" or (2) that their revenue-related strategies "primarily consisted of reckless cost-cutting measures" that they "knew" or "understood" would have the serious consequences alleged. Similarly, there are insufficient facts alleged to support that any of the statements were materially false or misleading when made

or that Defendants were actually aware that their strategic choice to adopt a workforce optimization plan would not allow DXC to reach these projected revenues. While Lead Plaintiffs have adequately supported factually that Defendants were focused on cost-cutting, those facts do not allow the inference that Defendants knew or thought that they would be unable to reach DXC's fiscal year 2019 revenue projections of $21.5 to $22 billion at the time that they made those projections. *See* Am. Compl. ¶ 57. In that regard, Lead Plaintiffs do not allege facts that explain away those facts that are fundamentally inconsistent with any such inference, including that under Lawrie's cost-cutting strategy, DXC had realized in fiscal year 2018 $24.5 billion in revenue, earnings per share of $6.04, and more than $1.1 billion in cost savings, [Doc. No. 54-23], DXC was on track to realize the FY 2019 projected revenue through the first quarter of fiscal year 2019, *see* [Doc. No. 54-21]; and even after it reduced its fiscal year 2019 revenue projections by $800 million, *see* Am. Compl. ¶ 86, DXC raised its EPS projection range to $7.95 to $8.20, which Plaintiffs do not challenge. [Doc. No. 54-11].

Similarly, Defendant Lawrie's accusation against Hilton of "material misconduct" and a "substantial and willful failure" to render services does not sufficiently support the claim that DXC would be unable to meet its revenue projections. Revenue projections are the exact type of forward-looking statements protected by the PSLRA, and the conclusory statements that Defendants knew of facts that might "cause[] serious execution issues" or that "Defendants had no reasonable basis for their revenue projections," are not sufficiently particularized facts that make plausible that Defendants had actual knowledge that their revenue projections were false or misleading.

None of the relied upon forward-looking statements were presented as or reasonably understood as guarantees of any sort and, contrary to Lead Plaintiffs' contention,[6] they were also sufficiently accompanied by the required cautionary language. For example, Defendants' 2018 10-K, explicitly warned about the operational and external challenges the Company might face—including, among others:

- "Our ability to continue to develop and expand our service offerings to address . . . the demand for digital technologies and services[] may impact our future growth."
- "Our ability to provide customers with competitive services is dependent on our ability to attract and retain qualified personnel."
- "[A]n inability to adequately develop and train personnel and assimilate key new hires or promoted employees could have a material adverse effect on . . . our financial condition and results of operations."

[Doc. No. 54-3] DXC's 2018 10-K, at 8–16. These statements "not only include significant cautionary language . . . , but also lack any demonstrably false statements with respect to current or historical facts." *Okla. Firefighters Pension & Ret. Sys. v. K12, Inc.*, 66 F. Supp. 3d 711, 722 (E.D. Va. 2014).

Similar cautionary language accompanied Statements 1 through 10 when made. *See, e.g.*, [Doc. No. 54-6] May 24, 2018 Earnings Call Tr., at 3 ("[Y]ou'll see that certain comments we make on the call will be forward looking. These statements are subject to known and unknown risks and uncertainties, which could cause actual results to differ materially from those expressed on the call. A discussion of risks and uncertainties is included in our quarterly reports on Form 10-Q, our annual report on Form 10-K that we'll file in the next few days and other SEC

[6] *See* Am. Compl. ¶¶ 240, 241.

filings."); *see also* [Doc. No. 54-13] at 5; [Doc. No. 54-19] at 4; [Doc. No. 54-5] at 5; [Doc. No. 54-21] at 4.

As for the relied upon opinions that accompanied the revenue projections, Lead Plaintiffs have failed to alleged facts that take them out of the category of non-actionable puffery[7] and to the extent they also contain statements of current or historical fact, Plaintiffs have not alleged facts that make plausible that those statements were false or misleading at the time they were made or that Defendants were aware of any misleading or false statements at the time they made them. For example, there are no facts to support any claim that when it had made its statements, DXC had not "delivered year-over-year growth in revenue, margins and earnings per share" or that it had not had "significant market expansion." *See* Am. Compl. ¶ 161. Nor does Plaintiffs' disagreement with *how* DXC attained those metrics make their statements untrue or misleading when DXC reported them.

***2. Workforce Management and "Optimization" Statements***

Statements 11 to 22, reproduced in Appendix A, are statements regarding Defendants' strategy to optimize their workforce by reducing their labor base "through a combination of automation, best shoring and pyramid correction." Statement 12, Am. Compl. ¶ 173. In addition to the facts alleged in support of their claims based on the Revenue Statements, Lead Plaintiffs allege the following in support of their claims that these Workforce Management and Optimization Statements were materially false and misleading when made:

1. "Defendants' 'enhancement' to their 'workforce management process' were primarily quota-driven workforce reductions designed to manage earnings, not the Company's workforce,

---

[7] These include that the statements that DXC's progress had "enabled us to make the pivot to growth," Am. Compl. ¶ 161; "driven by continued execution of our synergy levers," *id.*; and that DXC "took actions to optimize our workforce, extract greater supply chain efficiencies and rationalize our real estate footprint," *id.* ¶ 183.

which Defendants knew—but concealed from investors—caused serious execution issues in 'deliver[ing] existing business' and prevented DXC from 'staffing the required labor for new business[,]'" *id.* ¶ 172, and "delayed DXC from bringing on the resources needed to support digital growth." *Id.* ¶ 174.

2. "Defendants instituted this sales model after they had already fired, and continued to fire throughout the Class Period, substantial numbers of DXC's 'subject matter experts' as part of their workforce reduction quotas designed to optimize earnings, which Defendants knew—but concealed from investors—caused serious execution issues and delayed DXC from bringing on the resources needed to support digital growth." *Id.* ¶ 176.

3. "[A]t the end of the Class Period, Defendant Lawrie would admit that for the past two quarters, Defendants had been using a 'generalist sales model' and not a 'specialized application sales force'—a decision that, on November 8, 2018, Lawrie also explicitly admitted that he was 'responsible' for the Company's failed 'generalist' sales approach, and in connection therewith that he had observed several quarters of 'a continued lack of discipline and execution around some of the workforce optimization issues.'" *Id.*

Most of the Workforce Management and Optimization Statements are immaterial puffery upon which no reasonable investor would rely; and the remaining statements are current or historical facts, without sufficient particularized allegations as to how they were false or misleading at the time Defendants made the statements or that Defendants knew that they were so at the time they were made. In short, Plaintiffs' contentions reduce in large degree to a disagreement over DXC's strategy and judgments in connection with its disclosed workforce reduction plan. *See Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 629–30 (4th Cir. 2008) (finding that if it can be plausibly inferred that Defendants "genuinely believed that the

initiatives they had put in place were sufficient to correct . . . problems," the court will not assume defendants intended to mislead).

### *3. Investment in People Statements*

Statements 23 to 34, reproduced in Appendix A, relate to Defendants' statements that they were "investing in their people." Lead Plaintiffs contend that the statements are false and misleading based on the following specific allegations:

1. "[T]he 'same plays that [Defendants] ran this year' had actually 'been primarily focused on taking people out' and 'more preoccupied with [cost-cutting] than growth,' which Defendants understood—but concealed from investors—undermined the Company's ability to 'expand the revenue payments' because 'there is some trade-off between revenues and cost[.]'" Am. Compl. ¶ 194; *see also* ¶¶ 205, 210, 212.

2. "As a result of Defendants' reckless cost-cutting practices, Defendants knew—but concealed from investors—"

a. that "they were unable to 'rebalance' the Company's 'skill mix' sufficiently to 'respond' 'to what clients are looking for' and 'expand the revenue payments' on the Company's digital business," *id.* ¶ 194; *see also* ¶ 212;

b. "frustrated the Company's efforts to 'rebalance' and 'retrain' the Company's 'skill mix' as needed to support the Company's digital growth," *id.* ¶ 207;

c. "that they could not attract and retain the 'right digital-generation talent to optimally meet current and future clients' needs,'" *id.* ¶ 196; *see also* ¶ 212;

d. "the Company could not 'attract and upskill' the 'highly talented people' needed to support the Company's digital growth," *id.* ¶ 198; *see also* ¶ 212;

e. "the Company could not 'rebalance' the Company's workforce sufficiently to 'increase the percent of revenue that we get from digital to offset the natural headwinds we have in the ITO business, some of the other legacy businesses,'" *id.* ¶ 203;

f. "delayed DXC from bringing on the resources needed to support digital growth," *id.* ¶ 205;

g. that their reckless cost-cutting measures "undermined the Company's investments to attract and train the talent needed to support the Company's digital growth," *id.* ¶ 210.

The statements concerning "investing in people" are either forward-looking statements or immaterial puffery. Lead Plaintiffs have not alleged any facts that would make plausible that these statements, including the associated statements concerning DXC's investment in reskilling its workers, attracting talent in the cyber business, or retraining and recruiting, were false or misleading at the time they were made. For example, the allegation that DXC was making significant cuts to its workforce does not make plausible that DXC was not also training current workers and recruiting new workers in different areas. Once again, Lead Plaintiffs' contentions are essentially based on disagreements over DXC's strategic choices, not materially false statements that would be actionable under the securities laws.

***4. Digital Growth Statement***

Statement 35, reproduced in Appendix A, is based on statements made during a February 8, 2018 earnings call about DXC's growth in Cloud revenue. This statement contains non-actionable puffery—"we have been a little more successful" and "a little better than we had modeled . . ."—as well as current facts about DXC's growth in Cloud revenue and the enterprise cloud apps business generally, including that DXC had seen 24–25% growth. Plaintiffs claim

that the statement was materially false and misleading when made because, "just months earlier, in December 2017, DXC had re-classified certain work done by the Company's Consulting group as part of the Company's Cloud offering in a deliberate effort to manipulate the impression of the Company's digital business." Am. Compl. ¶ 214. But Lead Plaintiffs do not allege facts that make plausible that as of the call DXC had not seen 24–25% growth and overlooks Defendant's explanation during the call that "digital . . . include[d] enterprise cloud apps and *consulting*, cloud infrastructure, analytics and security." [Doc. No. 54-5] February 8, 2018 Earning Call Transcript, at 7 (emphasis added).

***5. Goodwill Statements***

Finally, Statements 36 to 38 involve Defendants' statements regarding the value of DXC's "goodwill" asset. Am. Compl. ¶¶ 215–17. Plaintiffs allege that all three statements were false and misleading because DXC knew that it was engaging in "reckless cost-cutting measures, including quota-driven workforce reductions designed only the manage earnings, that had already caused and would continue to cause serious execution issues and delay DXC from bringing on the resources needed to support its promised digital growth," and thereby overstated the value of its goodwill throughout the Class Period. Am. Compl. ¶ 218. These are not particularized facts that sufficiently support Lead Plaintiffs' claim that DXC's reporting of the value of its Goodwill was false or misleading at the time the statements were made.

***6. Allegations not specifically tied to any particular Statement***

Section VII is preceded by 156 paragraphs of allegations over 51 pages, organized into three sections with subsections,[8] only some of which are specifically referenced in Part VII in

[8] These sections are the following:
IV. SUMMARY OF THE ACTION
A. Lawrie and Saleh Orchestrate a Merger with HPE to Create DXC.

support of any of the 38 Statements. Section VII is then followed by another 17 paragraphs of allegations in Sections VIII and IX pertaining to loss causation and scienter,[9] but not specifically aligned with any of the 38 Statements. Nevertheless, in their briefings and through vague references in Section VII,[10] Lead Plaintiffs appear to rely generally on these overall allegations, even though not specifically connected to any particular Statement; and it is impossible for the Court to discern which part of the allegations in Sections IV–VI or VIII–IX are relied on to support which Statements in Section VII. Nevertheless, the Court has considered the factual content of the allegations in these other sections, as opposed to the conclusory allegations, characterizations and summary arguments that constitute the content of much of those allegations; and find them to be insufficient, either in isolation or when combined with all the other allegations, to support Lead Plaintiffs' claims based on any of the specific Statements relied upon. For example:

(1) None of statements from the former, unidentified DXC employees make actionable any of the Statements. *See* Am. Compl. ¶¶ 115–56. Most of the attributed statements simply

---

B. Throughout the Class Period, Defendants Assure The Market That The Reorganization Is Proceeding Well.

V. THE TRUTH IS REVEALED IN THE FALL OF 2018

A. Reports Emerge That DXC's Business Is "In Chaos," But Defendants Reaffirm Their Guidance.

B. The Truth Fully Emerges As Defendants Reveal An Enormous Revenue Shortfall And Issue Revised Guidance Showing Decline, Not Growth.

VI. DEFENDANTS MISLED INVESTORS THROUGHOUT THE CLASS PERIOD ABOUT DXC'S TRANSFORMATION

A. DXC's Former Head of Global Delivery Exposes Defendants' Deception

B. Former Employees Corroborate that Defendants Made "Chaotic" and "Sub-Optimal" Firing Decisions.

C. Defendants Personally Learned About "Negative Impacts On Customer Satisfaction" From Their Workforce Reductions.

D. Defendants Knew That They Could Not Bring On The Resources Needed To Support Their Promised Growth.

E. Defendants Had Access To, And Knowledge Of, Information Undermining Their Projections And Revenue Guidance.

F. Defendants Classified "Digital" Offerings To Manipulate The Market.

[9] Am. Compl. ¶¶ 219–35.

[10] Lead Plaintiffs appear to refer to the allegations preceding Part VII by the catch-all phrase "as discussed further above" when listing those specifically alleged facts relied on to prove the falsity of each relied upon statement. This vague and generalized reference fails to satisfy the applicable pleading requirements.

characterize the disclosed workforce reductions and the impact they had on particular people or segments. Nor do any make plausible that Lawrie or Saleh knew their statements were false or misleading when made.[11] *See Bao v. Solarcity Corp.*, 2016 WL 4192177, at *8 (N.D. Cal. Aug. 9, 2016) (allegation that a former employee "participated on conference calls with Individual Defendants" and "discuss[ed] underperforming cash sales projects" did not support strong inference that defendants "knew that the entire sales segment was experiencing negative gross margins at the same time that the company was publicly reporting positive margins"); *see also In re Conventry Healthcare, Inc. Sec. Litig.*, No. 08:09-CV-2337-AW, 2011 WL 1230998, at *6 (D. Md. Mar. 30, 2011) (anonymous witnesses lacking "direct contact with" defendants logically cannot know "what the Defendants knew or recklessly disregarded"); *Carlucci v. Han*, 886 F. Supp. 2d 497, 519–20 (E.D. Va. 2012) (same). These generalized subjective assessments from employees who disagree with managers' courses of conduct do not demonstrate that those managers knew that their conduct would be unsuccessful or that their statements would be misleading to investors.

Similarly, the allegations in the complaint filed by Hilton in connection with his employment dispute with DXC, even assuming they are true, do not do make plausible that Defendants' statements to investors were actually or knowingly false. *See* Am. Compl. ¶¶ 101–

[11] *See, e.g.*, Am. Compl. ¶ 127 ("Defendants . . . repeatedly emphasized to investors their personal knowledge of DXC's business and clients, and hands-on approach."), ¶ 129 (describing a dissatisfied client who "demanded to speak with Defendant Lawrie" about DXC's deficiencies in October 2018, and Lawrie acknowledged this at the November 8, 2018 Investor Day), ¶ 130 (former employee "generally stated that Defendants Lawrie and Saleh were aware that their headcount reductions fired employees who supported the contracts and delivered service to the clients"), ¶ 132 (former employee "participated in meetings with Defendants Lawrie and Saleh concerning high-profile deals" and described a deal that failed in April 2018 and noted that "Defendants . . . would have learned of the situation"), ¶ 133 (former employee understood "that [a contract cancellation in June or July 2018] would have been discussed further up the chain including to the Individual Defendants"), ¶ 138 (former employee participated in a workforce planning call on which Defendant Lawrie participated in summer 2017—outside of the Class Period—and Lawrie was told that "people were declining to be interviewed for DXC positions because they believed they would be laid off quickly if they worked there"), ¶ 153 (former employee attended "meetings" involving "decisions to re-categorize certain offerings as 'digital'").

14. In that regard, Lead Plaintiffs allege that Hilton "repeatedly advised Lawrie about his reservations concerning the pace of cuts" and that "Lawrie understood that workforce reductions could not be achieved at the pace required by his internal budget without negative impacts on customer satisfaction." *Id.* ¶ 106. But as reflected in Hilton's complaint as a whole, Hilton's dispute with DXC related to his termination for cause; and on that issue, Hilton contends, contrary to Lawrie's claim that Hilton was guilty of gross mismanagement, that he did, in fact, successfully execute on the workforce optimization goals that were used for the purposes of revenue projections. In short, Hilton's "reservations" that he allegedly conveyed to Lawrie did not relate to the workforce cuts that had been achieved, and which Hilton appears, by his allegations, to have supported, but rather more extensive aspirational goals, not achieved, reflected in an internal budget. In sum, neither category of allegations includes particularized facts that allow a reasonable inference that any of Defendants' Statements were knowingly false or misleading when made.

(2) None of the "truth" disclosed by Lawrie or the financial press, as described in the Amended Complaint, supports the claims that Defendants issued false or misleading statements known to be false when made. In fact, much of the "truth" that Lawrie disclosed attributed the shortfall in revenue to issues other than those alleged to have been misleadingly presented. *See generally* Am. Compl. ¶¶ 84–96. For example, the shortfall in revenue was attributed not to a lack of demand, but rather, *inter alia*, (1) "a stronger dollar, completion of several large transformation projects, and slower ramp-up on a few large Digital contracts," Am. Compl. ¶ 84, caused by "it . . . taking us longer than expected to bring on resources to support the digital growth," *id.* ¶ 88; (2) "a decline in our application and maintenance management business," "particularly in the Americas," *id.* ¶ 85; (3) "[s]everal clients were . . . behind in scaling their

digital transformations," *id.* ¶ 88, and were beginning "to contemplate upgrades to some of their systems," but had "scal[ed] back on the maintenance of those existing systems," *id.* ¶ 90. Additionally, Defendant Lawrie stated that they "went to a generalist sales model in the United States. And after watching that for 2 quarters, I concluded that wasn't the right approach. And the reason for that is we were missing some of the add-on work that we would get by having deployed a more specialized application sales force. So we have corrected that. And we've gone back, and we've put that dedicated application sales force in place, which will allow us to pick up on some of those incremental add-on projects that we didn't get, particularly in the second quarter." *Id.* ¶ 92. Though Lead Plaintiffs emphasize that this information "surprised investors," *see id.* ¶ 93, Lawrie's statements cannot be reasonably viewed as an admission that his previous statements, and that of Saleh, were false or misleading when made or that they knew as much.

(3) The additional allegations concerning scienter do not support the required inference that Defendants had the required state of mind necessary to establish a securities violation. In that regard, the "required state of mind" under Section 10(b) is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). To qualify as "strong," an inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. "Severe recklessness" can also suffice to meet the scienter requirement. *Ottmann v. Hanger Ortho. Group., Inc.*, 353 F.3d 338, 344 (4th Cir. 2003). However, as this Court has noted, "this 'slightly lesser species of intentional misconduct,' must be 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *In re Maximus,*

2018 WL 4076359 at *24–25 (internal citations omitted). "[T]he complaint must plead specific facts that, when taken collectively, give rise to an inference of scienter that "a reasonable person would deem . . . at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (quoting *Tellabs*, 551 U.S. at 322–24).

The "additional facts" alleged to demonstrate scienter relate entirely to Lawrie's and Saleh's stock sales during the Class Period, which Plaintiffs' allege "were highly suspicious, unusual and out of character with prior sales" and reflected their motivation "to artificially inflate the price of DXC's stock, so that they could maximize the sales of substantial amounts of their personal holdings." *Id.* ¶ 225. Though these stock sales at first glance raise legitimate concerns, when considered in context, including that these sales were made pursuant to pre-arranged stock sale plans, the way they compared with sales before the Class Period and the stock purchases that were made during the same period, these "additional facts" do not "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007) (while allegations of personal gain "may weigh heavily in favor of a scienter inference," the inferential weight attributable to motive must be evaluated in context of entire complaint).

First, as stated above, the stock sales were made pursuant to non-discretionary Rule 10b5-1 plans, which undercuts the inference that Lawrie and Saleh had devised a scheme to inflate stock prices and then sell their shares at that inflated price.[12] *See* [Doc. No. 54-15]; *see also* 17 C.F.R § 240-10b5-(c); *Yates*, 744 F.3d at 891. Second, Saleh sold less stock during the Class Period than during the preceding "Control Period," *see* Am. Compl. ¶ 226 (181,206 shares

[12] Given Plaintiffs' allegations in the Amended Complaint concerning these stock sales, the Court may consider the circumstances under which they were made, including any stock plans in place, on a motion to dismiss. *See Yates*, 744 F.3d at 891(considering stock plans during the motion to dismiss stage).

during the Control Period and 105,000 shares during the Class Period), which also tends to weaken any inference of scienter. *See, e.g.*, *In re Glenayre Techs., Inc. Sec. Litig.*, No. 96-cv-8252(HB), 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998). And third, Lawrie's sales, though substantial during the Class Period, *see* Am. Compl. ¶¶ 226, 228, amounted to 17% of his holdings, *id.* ¶ 231, not including the additional shares he purchased during that period, and therefore, under all the circumstances, they do not give rise to a strong inference of scienter. *See Proter v. Medifast, Inc.*, No. CIV. A. GLR-11-720, 2013 WL 1316034, at *21 (D. Md. Mar. 28, 2013).

**B. Lead Plaintiffs' Claims under Section 20(a) of the Securities Exchange Act of 1934.**

Given Lead Plaintiffs' failure to state a claim under Section 10(b), they have failed to state a claim for controlling person liability under Section 20(a).

## IV. CONCLUSION

For the foregoing reasons, the Amended Complaint fails to state a claim under Sections 10(b) or 20(a) of the Securities Exchange Act of 1934; and it is hereby

ORDERED that Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint for Violations of the Federal Securities Laws [Doc. No. 53] be, and the same hereby is GRANTED; and it is further

ORDERED that this action be, and the same hereby is, DISMISSED.

The Clerk is directed to forward copies of this Order to all counsel of record and enter judgment in favor of Defendants pursuant to Fed. R. Civ. P. 58.

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
June 2, 2020

***<u>Appendix A</u>***

**<u>(1) Revenue Projections</u>**

**<u>Statement 1:</u>** On May 24, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the fourth quarter and fiscal year 2018, during which Defendants provided the Company's fiscal year 2019 guidance (the "Fiscal Year 2019 Guidance"). Specifically, during that call, Defendant Lawrie stated:

"For fiscal 2019, **we expect revenue to be $21.5 billion to $22 billion,** which excludes the USPS business. There are several positive things contributing to that target as well as a couple of mitigating factors. **We continue to accelerate the growth in our digital and industry IP offerings, and our BPS business is also demonstrating strong momentum.** We do expect some additional revenue dissynergies next year as well as the ongoing headwinds in traditional services that we had previously discussed. Also, the revenue from our HPE contract associated with the merger will normalize this year at a bit lower rate, and we continue to gauge the potential impact of Brexit in our U.K. business. We're targeting non-GAAP EPS of $7.75 to $8.15 and adjusted free cash flow to be 90% or more of adjusted net income." Am. Compl. ¶ 157 (bold in original).

**<u>Statement 2:</u>** During the May 24, 2018 call, Defendant Saleh stated:

"Now let me close with fiscal '19 targets, all of which will now exclude USPS. **We're targeting revenue for the fiscal year to be $21.5 billion to $22 billion. This compares with $21.7 billion in fiscal '18.** Our fiscal 2019 target for non-GAAP EPS from continuing operations is $7.75 to $8.15. Now this compares with roughly $6.70 for fiscal 2018, which was recast to exclude earnings per share associated with the USPS business and adjusted for any stranded G&A cost. Our EPS target assume a tax rate of 24% to 28% for the full year, and our adjusted

free cash flow target for fiscal 2019 is 90% or more of adjusted net income. . . . I think what we will see is a relatively consistent performance throughout the year, growing a little bit more in the second half of the year on a sequential basis." Am. Compl. ¶ 158 (bold in original).

**Statement 3:** On August 7, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the first quarter fiscal year 2019, during which they reiterated the previously provided fiscal year 2019 guidance, and assured investors that they were on track to achieve those targets. Specifically, during that call, Defendant Lawrie stated:

**"[F]or fiscal '19, we continue to target revenue of $21.5 billion to $22 billion** and on a non-GAAP EPS of $7.75 to $8.15. Although we are trending to the upper end of that EPS range. And we continue to target adjusted free cash flow of 90% or more of adjusted net income. . . . Now, before I turn this over to Paul [Saleh], just to reiterate, **for fiscal 2019, we continue to expect revenue to be $21.5 billion to $22 billion,** and we also continue to target non-GAAP EPS of $7.75 to $8.15. And as I said before, we are trending to the upper end of that range. And we expect adjusted free cash flow to be 90% or more of adjusted net income." Am. Compl. ¶ 159 (bold in original).

**Statement 4:** During the August 7, 2018 call, Defendant Saleh stated,

"[I]n closing, we had a solid start to the year, and we're on pace to deliver against our financial targets for the fiscal year." Am. Compl. ¶ 160.

**Statement 5:** On August 15, 2018, DXC held its annual shareholder meeting, during which Defendant Lawrie again reiterated that DXC would achieve its fiscal year 2019 guidance, stating:

"[T]he progress we have made has enabled us to make the pivot to growth, positioning DXC to capitalize on the vast digital opportunities ahead across all industry and offering areas.

This momentum was reflected in our fiscal year '19 first quarter earnings announced last week. In the first quarter, we've delivered year-over-year growth in revenue, margins and earnings per share. We had significant margin expansion . . . driven by continued execution of our synergy levers. These levers include workforce optimization, supply chain efficiencies and facilities rationalization. And our first quarter performance **positions us well to deliver on our financial targets for fiscal 2019.**" Am. Compl. ¶ 161 (bold in original).

**Statement 6:** During the February 8, 2018 earnings call, Defendant Lawrie stated that Defendants' digital business had actually "**been a little more successful than we had planned in terms of offsetting the decline in the legacy infrastructure business . . . a little better than what we had modeled and what we had communicated,"** and also that Defendants would **"continue with the same play that has given us some of the success around offsetting that decline in the traditional ITO business.**" Am. Compl. ¶ 163 (bold added).

**Statement 7:** On June 29, 2018, Defendant DXC filed its annual proxy statement, which was signed by Defendant Lawrie. In it, Defendants stated that Defendants had "**continued to successfully execute on our value creation levers**," attaining "**stable revenue**." Am. Compl. ¶ 165 (bold added).

**Statement 8:** On July 18, 2018, DXC filed additional proxy materials, consisting of a presentation entitled "Key Discussion Topics," in which Defendants again boasted that Defendants had "**successfully executed on our value creation levers**," attaining "**Stable revenue**." Am. Compl. ¶ 166 (bold added).

**Statement 9:** On August 7, 2018, DXC issued a press release announcing its earnings for the first quarter of fiscal year 2019, which quoted Defendant Lawrie as stating, "**We continue to**

**build momentum in digital, with double-digit growth in each of our digital areas, and we also drove growth in our industry offerings.**" Am. Compl. ¶ 168 (bold added).

**Statement 10:** On or about September 5, 2018, Defendant Saleh and other members of DXC management met with analysts at Evercore. At that meeting, as described by Evercore analysts in an October 24, 2018 report, Saleh "**confirmed to [Evercore] that in 2H/FY19, DXC should achieve constant currency, organic revenue growth for the first time aided by easier year-over-year comps, a moderation in declines in the legacy business, and 20%+ growth in Digital**." Am. Compl. ¶ 169 (bold added).

**(2) Workforce Management and "Optimization" Statements**

**Statement 11:** On February 8, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the third quarter fiscal year 2018. During that call, Defendant Lawrie stated that Defendants had "**enhanced**" their "**workforce management process**," which allowed DXC "**to more cost-effectively deliver existing business while staffing the required labor for new business.**" Am. Compl. ¶ 171 (bold added).

**Statement 12:** During the February 8, 2018 earnings call, Defendant Saleh discussed "**cost actions we're taking to optimize our workforce**," including specifically that Defendants had "**reduced our labor base by an additional 3% in the quarter through a combination of automation, best shoring and pyramid correction**." Am. Compl. ¶ 173 (bold added).

**Statement 13:** During the February 8, 2018 earnings call, Defendant Lawrie said that Defendants were "**making a big, organic investment around trying to ignite . . . digital sales**" by "**beginning to move in a direction of having one team responsible for the legacy or the run environments that we have, and then a separate team that is focused, in many cases, on disintermediating and driving digital platform growth**." Am. Compl. ¶ 175 (bold added).

**<u>Statement 14:</u>** On May 24, 2018, Defendant DXC issued a press release, filed on Form 8-K, announcing their fourth quarter and full fiscal year 2018 earnings. That press release quoted Defendant Lawrie as stating that Defendants had "**successfully executed on our strategic roadmap, including the integration of CSC and HPE Enterprise Services, achievement of our first-year financial objectives, and a strengthened leadership position in digital transformation**." Am. Compl. ¶ 177 (bold added).

**<u>Statement 15:</u>** On May 24, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the fourth quarter and full fiscal year 2018. During that call, Defendant Lawrie stated that "**[p]rofit during the first year was . . . better than expected"** thanks to **"execution of the synergy plans we outlined at our Investor Day last March, including workforce optimization, supply chain efficiencies, policy harmonization and facilities rationalization**." Am. Compl. ¶ 178 (bold added).

**<u>Statement 16:</u>** During the May 24, 2018 call, Defendant Saleh attributed DXC's "**improvement in profitability**" to "**cost actions we've taken to optimize our workforce, harmonize our policies, extract greater supply chain efficiencies and rationalize our real estate footprint**." Am. Compl. ¶ 179 (bold added).

**<u>Statement 17:</u>** During the May 24, 2018 earnings call, Lawrie stated that DXC had achieved "**significant reductions [in headcount] or, said another way, increased productivity**," and boasted, "**Our delivery teams continued to drive increased productivity while improving service levels for our clients**." Later, Lawrie stated that the Company would "**continue to drive productivity and the quality of our service delivery**" and that DXC's "**improved service levels . . . has an enormously positive impact on our business.**" Finally, Lawrie stated, "**Our customer satisfaction last year went up. So in the first year of**

**integration, all we did, customer satisfaction continued to increase. So continuing to drive our cost structure and the productivity and improve service delivery is an absolutely critical objective as we look out.**" Am. Compl. ¶ 181 (bold added).

**Statement 18:** On May 29, 2018, DXC filed its Form 10-K for fiscal year 2018, which was signed by Defendants Lawrie and Saleh. In the Form 10-K, Defendants stated as a "Fiscal 2018 Highlight" that DXC had "**further enhanced our workforce management processes to cost-effectively deliver existing business while staffing the required labor for new business.**" Defendants further stated, "**During fiscal 2018, we took actions to optimize our workforce, extract greater supply chain efficiencies and rationalize our real estate footprint. We reduced our labor base by approximately 13% through a combination of automation, best shoring and pyramid correction.**" Am. Compl. ¶ 183 (bold added).

**Statement 19:** On June 29, 2018, Defendant DXC filed its annual proxy statement, which was signed by Defendant Lawrie. In it, Defendants claimed that the Company's "**performance in fiscal 2018**" had "**exceed[ed] its external expectations on revenue, profitability, and customer satisfaction**." Elsewhere, the proxy further discussed Defendants' "**continued focus on customer satisfaction**," which was a "**key metric**" in the Company's executive compensation awards, and stated that that Defendants' "focus" had "**yielded . . . customer satisfaction results that exceeded external expectations"** and **awarded both Defendants Lawrie and Saleh a "100%" weighting for customer satisfaction**. Am. Compl. ¶ 185 (bold added).

**Statement 20:** On August 7, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the first quarter of fiscal year 2019. During the call, Defendant Lawrie stated that Defendants would "**expand margins while also improving client service levels**" through

automation, and that DXC was "**leveraging artificial intelligence, machine learning and bots . . . to eliminate labor from many processes**." Am. Compl. ¶ 187 (bold added).

**Statement 21:** During the August 7, 2018 earnings call, Defendant Saleh discussed DXC's continued efforts "**to optimize our workforce**," stating that the Company had "**reduced our total headcount by an additional 3.7% in the quarter . . . driven by automation, overhead rationalization and productivity improvements.**" Am. Compl. ¶ 188 (bold added).

**Statement 22:** On August 15, 2018, DXC held its annual shareholding meeting. At that meeting, Defendant Lawrie stated, "Today, **DXC is a stronger and more versatile leading end-to-end global technology services business that is providing unsurpassed value for our clients, partners and shareholders, along with growth opportunities for our people.**" Am. Compl. ¶ 190 (bold added).

**(3) Investing in People Statements**

**Statement 23:** On February 8, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the third quarter fiscal year 2018. During that call, Defendant Lawrie stated, "**I think the investment we're making in reskilling our people are all critical factors in helping to expand the revenue payment**" and that "**[w]e are definitely attracting now some really good talent in the cyber business**." Lawrie also said that DXC was "**reshaping [its] capabilities relative to what clients are looking for**," which was "**allowing us to respond and scale, and scale**" and further that that DXC was "**going to run a lot of the same plays that we ran this year**," including specifically "**ramping up our investment in digital skills, both the retraining of our people as well as the recruiting of our people[.]**" Am. Compl. ¶ 192 (bold added).

**Statement 24:** During the February 8, 2018 earnings call, Defendant Saleh stated that DXC had "**continue[d] to rebalance our skill mix, including the addition of 5,300 new employees and the ongoing retraining of the existing workforce.**" Am. Compl. ¶ 193 (bold added).

**Statement 25:** On February 28, 2018, DXC issued a press release that stated, among other things, that DXC was "**empowering our workforce by investing in our people, driving a cultural shift and elevating skillsets to ensure that DXC has the right digital-generation talent to optimally meet current and future clients' needs**" and that DXC could "**quickly build and deliver partner-engineered, at-scale, repeatable offerings and solutions that help drive client digital transformations**." Am. Compl. ¶ 195 (bold added).

**Statement 26:** On or about April 17, 2018, DXC made publicly available a presentation delivered to investors during March 2018, entitled "Leading our clients' digital transformations [-] DXC Technology Corporate Overview." Among other things, this presentation told investors that DXC was "**different**" in part because of its "World-Class Talent," stating, "**We are investing to attract and upskill the talent who will lead global business tomorrow**." The presentation also stated that Defendants had "**Deep experience in digital solutions**" and **purported to have tens of thousands of qualified digital employees**. Finally, the presentation also quoted Defendant Lawrie as stating, "**Our clients are facing major disruptive changes. We're meeting these challenges with highly talented people, an experienced hand and an independent view of technology solutions[.]**" Am. Compl. ¶ 197 (bold added).

**Statement 27:** On May 24, 2018, Defendant DXC issued a press release, filed on Form 8-K, announcing its fourth quarter and full fiscal year 2018 earnings. That press release quoted Defendant Lawrie as stating that Defendants had "**successfully executed on our strategic**

**roadmap**" over the past year and that DXC "**continue[s] to invest in our digital capabilities and strategic partnerships**." Am. Compl. ¶ 199 (bold added).

__**Statement 28:**__ On May 24, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the fourth quarter and full fiscal year 2018. During that call, Defendant Lawrie said that Defendants were making a "**major investment . . . in our people. We're continuing to invest very heavily in the retraining and reskilling of employees**." Lawrie further stated that Defendants would "**continue to focus on . . . our ability to more accurately predict what skills we're going to need, how many we're going to need, how we source them**." Lawrie continued, "**the reskilling of our people is a key priority [for] our whole digital initiative as we continue to want to increase the percent of revenue that we get from digital to offset the natural headwinds we have in the ITO business, some of the other legacy businesses[.]**" Am. Compl. ¶ 201 (bold added).

__**Statement 29:**__ During the May 24, 2018 call, Defendant Saleh stated that DXC had "**continued to rebalance our workforce . . . including the hiring of roughly 20,000 new employees during the year with a significant focus on digital capabilities**." Am. Compl. ¶ 202 (bold added).

__**Statement 30:**__ During the May 24, 2018 earnings call, Defendant Lawrie assured investors, "**the key point here is we are investing back in the business. So this is not just about taking cost out**." Am. Compl. ¶ 204 (bold added).

__**Statement 31:**__ On May 29, 2018, DXC filed its Form 10-K for fiscal year 2018, which was signed by Defendants Lawrie and Saleh. In the Form 10-K, DXC stated as a "Fiscal 2018 Highlight" that it had "**rebalanced our skill mix, including the addition of more than 18,000**

**new employees and the ongoing retraining of the existing workforce**." Am. Compl. ¶ 206 (bold added).

**Statement 32:** On August 7, 2018, Defendants Lawrie and Saleh participated in DXC's earnings call for the first quarter of fiscal year 2019. During the call, Defendant Lawrie stated that DXC "**continue[s] to invest in the business and in attracting and developing our digital workforce,**" describing "**digital boot camps where employees as well as our client executives are provided training**" and "**investing to scale our digital General Manager capabilities**." Lawrie further stated that DXC is: "**investing in our digital centers in the U.S., the U.K. and other countries. We're hiring into our global delivery centers and leveraging our graduate program to continuously refresh our talent base . . . . We're making a huge commitment to hiring graduates globally. We'll hire somewhere between 3,000 and 5,000 graduates this year. . . training . . . [and] deploying [them] along many of these digital solution opportunities . . . . [W]e're building career paths with -- for these graduates that come in. . . . The digital business, much more onshore, much more customer intimate, and we're making big investments in those centers. Not only the centers themselves but then in the hiring and re-skilling of people that we have to deploy against those opportunities**." Am. Compl. ¶ 208 (bold added).

**Statement 33:** During the August 7, 2018 earnings call, Defendant Saleh stated that DXC had "**hired more than 6,000 new employees to support our continued shift to digital and drive location mix and pyramid improvement**s." Saleh further stated, "**I also want to tell you that we're reinvesting in the business. It's not just about cost reduction. We are -- as we mentioned, across the way, we're putting quite a bit of investment in our digital**

**transformation ourselves and upskilling our employee base and also training them and also attracting new talent[.]**" Am. Compl. ¶ 209 (bold added).

**Statement 34:** On August 15, 2018, DXC held its annual shareholding meeting. At that meeting, Defendant Lawrie stated that Defendants were "**building on the momentum established during the first 16 months with a focus on a number of key areas**," including DXC's "**continued shift to digital**" and "**continuing to invest in our people**." Lawrie continued, "**[W]e're continuing to ramp up training and certification programs and are recruiting people with the right next-gen skills.**" Am. Compl. ¶ 211 (bold added).

**(4) Digital Growth Statement**

**Statement 35:** During the Company's February 8, 2018 earnings call, Defendant Lawrie stated that "**Cloud revenue was up 13% year-over-year, and book-to-bill in the quarter was 1x,**" and spoke generally of Cloud's importance to the Company's pivot to growth through digital, stating that Defendants "**have been a little more successful than we had planned in terms of offsetting the decline in the legacy infrastructure business. We've been more successful offsetting that with cloud and some of our other digital offerings. So that has gone, in all candor, a little better than what we had modeled and what we had communicated . . . . I mean, we're seeing 24%, 25% growth in our enterprise cloud apps business.**" Am. Compl. ¶ 213 (bold added).

**(5) Goodwill Asset Statements**

**Statement 36:** On February 9, 2018, DXC filed its Form 10-Q for third quarter fiscal year 2018, which was signed by Defendants Lawrie and Saleh. In it, Defendants reported "Goodwill" of $9.32 billion, making it the largest asset on the Company's balance sheet. Of that total, over 77% came from the $7.208 billion in goodwill recognized from the acquisition of

HPE by CSC (which created DXC), which itself was over 73% of the purchase price of $9.85 billion. The Company stated that this goodwill "**was attributable to the synergies expected to be achieved by combining the businesses of CSC and HPES, expected future contracts and the acquired workforce. The cost-saving opportunities are expected to include improved operating efficiencies and asset optimization**." Am. Compl. ¶ 215 (bold added).

**Statement 37:** On May 29, 2018, DXC filed its Form 10-K for fiscal year 2018, which was signed by Defendants Lawrie and Saleh. In it, DXC reported that "Goodwill" had increased by $332 million, to $9.652 billion, still the largest asset on the Company's balance sheet. This increase in Goodwill in part reflected the Company's $184 million increase in goodwill it recognized from the HPE acquisition, now $7.392 billion—75% of the HPE purchase price—as a result of "**a number of refinements to the . . . purchase price allocation**," including an increase in liabilities of $436 million from a "**valuation adjustment for outsourcing and other customer contracts taking into account continuing performance obligations**." The Company again ascribed the goodwill from the HPE merger as "**attributable to the synergies expected to be achieved by combining the businesses of CSC and HPES, expected future contracts and the acquired workforce. The cost-saving opportunities are expected to include improved operating efficiencies and asset optimization**." Am. Compl. ¶ 216.

**Statement 38:** On August 8, 2018, DXC filed its Form 10-Q for first quarter fiscal year 2019, which was signed by Defendants Lawrie and Saleh. In it, DXC reported that "Goodwill," now $7.451 billion, was 25% of the Company's assets and still the largest asset on the Company's balance sheet. As in the 2018 Form 10-K, the Company allocated as goodwill $7.392 billion of the purchase price of the HPE merger; thus, even after subtracting the $2.0 billion of that goodwill that DXC had allocated to the now spun-off USPS operating segment, goodwill

from the HPE merger still amounted to 72% of the Company's total goodwill. Am. Compl. ¶ 217.